Elsa **IWANOWA, on her own behalf, and on behalf of all others similarly situated; namely Persons Compelled To Perform Forced Labor for Ford Werke A.G., between 1941 and 1945, Plaintiffs,**

v.

**FORD MOTOR COMPANY and Ford Werke A.G., Defendants.**

No. Civ.A. 98–959 JAG.

United States District Court, D. New Jersey.

Oct. 28, 1999.

Allyn Z. Lite, Joseph J. DePalma, Lite, DePalma, Greenberg & Rivas, LLC, Newark, New Jersey, Melvin I. Weiss, Deborah Sturman, Milberg, Weiss, Bershad, Hynes & Lerach, LLP, New York City, Michael D. Hausfeld, Cohen, Milstein, Hausfeld & Toll, P.L.L.C., Washington, D.C., Burt Neuborne, New York City, for plaintiffs.

James S. Dobis, Dobis & Reilly, P.A., Livingston, New Jersey, Warren Christopher, Walter Dellinger, John H. Beisner, Thomas E. Donilon, John F. Niblock, O'Melveny & Myers LLP, Washington, D.C., for defendant Ford Motor Company.

Robert Biskup, Ford Motor Company, Dearborn, MI, for defendant Ford Motor Company.

Clyde A. Szuch, Elizabeth J. Scher, Pitney, Hardin, Kipp & Szuch, Morristown, New Jersey, for defendant Ford Werke, A.G.

## AMENDED OPINION

GREENAWAY, District Judge.

### INTRODUCTION

This matter comes before the Court on the motion of defendants Ford Motor Company ("Ford") and its German subsidiary, Ford Werke A.G. ("Ford Werke") (collectively "Defendants"), seeking to dismiss plaintiff Elsa Iwanowa's ("Iwanowa" or "Plaintiff") Complaint, pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6). Before this Court ruled on the above-mentioned motion, Defendants filed a second motion to dismiss on the grounds of nonjusticiability and international comity. This Court shall consider each of Defendants' motions.

This action arises out of Iwanowa's allegations that Ford Werke coerced her, and thousands of other persons, to perform forced labor under inhuman conditions during World War II without compensa-

tion.[1] The Complaint asserts causes of action against Defendants (1) for restitution/unjust enrichment and quantum meruit/quasi-contract under Michigan and Delaware law[2]; (2) for restitution/unjust enrichment under German law; and (3) for violations of the law of nations. Iwanowa seeks disgorgement of all economic benefits which have accrued to Defendants as a result of her forced labor, compensation for the reasonable value of her services and damages for the inhuman conditions Ford Werke inflicted upon her.

For the reasons set forth below, Defendants' motion to dismiss the claims under international law for lack of subject matter jurisdiction, pursuant to Rule 12(b)(1), is denied. Defendants' motion to dismiss all of the claims, pursuant to Rule 12(b)(6), is granted. Defendants' motion to dismiss on the grounds of nonjusticiability and international comity is also granted. Accordingly, the Complaint is dismissed in its entirety, with prejudice.[3]

## *BACKGROUND*[4]

### *NAZI GERMANY*

Ford established its German subsidiary, Ford Werke, in 1925. (Compl.¶ 6.) In 1931, Ford Werke moved its headquarters and manufacturing plant to Cologne, Germany. (*Id.*) Ford Werke's Cologne plant produced passenger vehicles until 1938,

when it began manufacturing tracked vehicles for the German government to be used to transport troops and military equipment during World War II. (Compl.¶ 11.) By 1941, Ford Werke had ceased production of passenger vehicles and had begun to devote its entire production capacity to the manufacture of military trucks. (*Id.*) The Complaint alleges that Ford Werke produced approximately sixty percent (60%) of the three-ton tracked vehicles the German army used during World War II. (*Id.*)

By December, 1941, the German National Socialist Party (the "Nazis")[5] had achieved domination over territories, in Europe and elsewhere, with an aggregate population of 350,000,000 people. (Compl.¶ 8.) The Nazi juggernaut required more labor than the voluntary labor the German people could provide. (*Id.*) In order to support its war effort, the Nazi regime turned to unpaid, forced labor. (*Id.*) Specifically, the Nazis used forced labor from the captive population, inmates of concentration camps and prisoners of war. (*Id.*)

On March 21, 1942, the Nazi Party appointed Fritz Sauckel ("Sauckel") as Nazi Plenipotentiary General for the Allocation of Labor, with explicit authority over all available manpower, including workers recruited from abroad and prisoners of war.

1. Pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure, Iwanowa brings the instant action on her own behalf, and on behalf of a class of all persons similarly situated; namely, persons who performed forced labor for Ford Werke in Germany between 1941–1945. Consideration of these various motions to dismiss precedes any consideration of the applicability of Rule 23.

2. Ford is incorporated in Delaware and its principal place of business is in Michigan.

3. This Court is cognizant that because plaintiffs should generally be allowed to cure their defective pleadings and refile their claims, the Third Circuit frowns on dismissals with prejudice. In the instant case, however, this Court is dismissing the Complaint not because it is defective or fails to state a claim, but because

the claims are barred by the applicable statute of limitations and, in addition, are nonjusticiable. Thus, an amended complaint would be dismissed on the same grounds. "Obviously, the effect of a dismissal without prejudice where the statute of limitations has run is the same as dismissal with prejudice: it bars a subsequent action." *Green v. Humphrey Elev. & Truck Co.,* 816 F.2d 877, 879 n. 4 (3d Cir.1987).

4. Federal Rule of Civil Procedure 12(b)(6) requires this Court to accept the allegations in the Complaint as true. *See Nami v. Fauver,* 82 F.3d 63, 65 (3d Cir.1996); *see also infra* Part II.B.1.

5. The National Socialist Party was the fascist party which controlled Germany from 1933–1945 under Adolf Hitler.

(Compl.¶9.) After Sauckel's appointment, the Nazi regime obtained forced laborers by conducting manhunts in the streets, movie houses and churches. (*Id.*) The Nazi regime forcibly deported over 7,500,000 persons from occupied territories to Germany to support its war effort. (*Id.*)

Sauckel encouraged German industries to bid for forced laborers in order to meet production quotas and to increase their profits. (*Id.* ¶10.) The Complaint alleges that Ford Werke began utilizing French prisoners of war as forced laborers in 1941 and continued utilizing thousands of forced laborers throughout World War II. (*Id.*) The Complaint further alleges that by 1942, unpaid, forced laborers comprised twenty-five percent (25%) of Ford Werke's work force. (*Id.*) By 1943, that percentage had risen to fifty percent (50%), where it remained until the end of the war. (*Id.*) The forced laborers at Ford Werke's Cologne plant included French prisoners of war; Russian, Ukrainian, Italian and Belgian civilians; and concentration camp inmates from Buchenwald. (*Id.*)

The Complaint alleges that Ford Werke profited from the use of forced laborers because, although it paid the Nazi government for its use of the prisoners, it did not compensate the laborers for their work. (Compl.¶12.) Consequently, Ford Werke's annual profits doubled between 1939 and 1943. (*Id.*) The Complaint further alleges that Ford Werke placed its wartime profits in a growing reserve account or reinvested them in the company through the building of additional production capacity. (*Id.*) In the years succeeding the war, as a result of its economic reserves and increased production capacity, Ford Werke continued producing trucks at a substantial profit, even though most of Europe, and specifically the German economy, was devastated. (*Id.* ¶14.) Iwanowa alleges that Ford Werke's inter-

nal reserves and large production capacity resulted from the work of unpaid, forced laborers. (*Id.*)

In addition to bringing suit against Ford Werke, Iwanowa has also named Ford, Ford Werke's parent company, as a defendant. Ford is a party based on its ownership of between fifty-two percent (52%) to seventy-five percent (75%) of Ford Werke's outstanding shares during World War II. (*Id.* ¶15.) Although the Nazi party nationalized or confiscated many American companies in Germany, the Nazis did not confiscate Ford Werke as enemy property; instead, the Nazis allowed Ford to continue its controlling ownership of Ford Werke. (*Id.* ¶¶16–17.) Indeed, the Nazis named Robert H. Schmidt ("Schmidt"), Ford Werke's CEO, *Wehrwirtschaftsfuehrer*, meaning Military Economic Leader. (*Id.* ¶17.) In addition to his duties as Military Economic Leader, Schmidt continued to manage Ford Werke on Ford's behalf until the end of the War. (*Id.*)[6]

### IWANOWA

Plaintiff Iwanowa was born in 1925, in Rostov, Russia. Starting in November, 1941, the Nazi army occupied Rostov. (Compl.¶24.) In June, 1942, the Nazi army began abducting adolescents as young as fourteen (14) years of age for transportation to Germany as forced laborers. (*Id.*) On October 6, 1942, Nazi troops abducted Iwanowa and transported her to Germany with approximately 2,000 other adolescents. (*Id.* ¶25.) When Iwanowa arrived in Wuppertal, Germany, a representative of Ford Werke purchased her, along with thirty-eight (38) other adolescents from Rostov. (*Id.*) Ford Werke's representative had Iwanowa, and the other adolescents, transported to Ford Werke's plant in Cologne. (*Id.*) Once in Cologne, Ford Werke placed Iwanowa with approximately sixty-five Ukrainian deportees in a

---

**6.** Although not pertinent to the issues before this Court, it is interesting to note that the favorable treatment that the Nazis accorded to Ford, as Ford Werke's parent company, may have been attributable, in part, to the personal friendship between Henry Ford and Adolf Hitler. (Compl.¶23.)

wooden hut, without heat, running water or sewage facilities. (*Id.*) They slept in three-tiered bunks without bedding and were locked in at night. (*Id.*)

From 1942–1945, Ford Werke required Iwanowa to perform heavy labor at its Cologne plant. (*Id.* ¶ 26.) Iwanowa's assignment consisted of drilling holes into the motor blocks of engines for military trucks. (*Id.*) Ford Werke security officials supervised the forced laborers, at times using rubber truncheons to beat those who failed to meet production quotas. (*Id.*)

Iwanowa continued to perform forced labor for Ford Werke until 1945, when the victorious Allied Powers[7] liberated her, and thousands of other slave laborers, in 1945. After the War, she became a citizen of Belgium, where she presently resides. Ford Werke's forced laborers, including Iwanowa, have never received compensation for their years of forced labor. (*Id.* ¶ 27.)

On March 8, 1998, Iwanowa filed the instant suit on her own behalf and on behalf of a class of thousands of persons who were compelled to perform forced labor for Ford Werke between 1941–1945. Iwanowa seeks compensation for the reasonable value of her services, restitution of unjust enrichment flowing to Defendants, as a consequence of her labor, and damages for the pain and suffering that Defendants' imposition of inhuman working conditions caused her.

Defendants moved to dismiss on the grounds that (1) this Court lacks subject matter jurisdiction over the claims under the law of nations; (2) all of the claims are barred by the applicable statute of limitations; (3) the Complaint fails to state a cognizable cause of action; (4) the claims are nonjusticiable; and (5) consideration of the instant claims would violate principles of international comity. This Court heard oral argument on Defendants' motions on March 8, 1999 and August 5, 1999.

## DISCUSSION

### I. OVERVIEW OF GERMAN JUDICIAL SYSTEM

In their submissions, the parties refer this Court to German cases and statutes; thus, a brief overview of the current German judicial system is essential. Foreign law questions are considered questions of law in the federal courts, and may be resolved by reference to any relevant information. Fed.R.Civ.P. 44.1; *see also Sidali v. Immigration and Naturalization Serv.*, 107 F.3d 191, 197 (3d Cir.1997) (stating that "[t]he determination of foreign law in the federal courts is a question of law.").

The German court system creates a dichotomy between ordinary courts and special courts. *See I Business Transactions in Germany* § 4.04[2] (Campbell et al. eds., 1998) ["*I Business Transactions*"]. Ordinary courts handle all civil and criminal cases not otherwise assigned by law to one of the six special courts: labor courts, administrative courts, social welfare courts, tax courts, constitutional courts and the Federal Patent Court.[8] *Id.*

Since its unification in 1991, Germany consists of sixteen states: eleven from the former Federal Republic of Germany ("F.R.G." or "West Germany"), and five from the former German Democratic Republic ("G.D.R." or "East Germany"). *See Germany: Law Digest of the Federal Republic of Germany, in Martindale–Hubbell International Law Digest* GER–1, GER–1 ["*Germany: Law Digest*"]. There are ordinary courts and special courts at both the federal and state level. So far as here material, German law is

---

7. Although many nations were part of the Allied forces, the "Allied Powers" refers to the United States ("U.S."), the United Kingdom of Great Britain and Northern Ireland ("U.K."), France and the Union of Soviet Socialist Republics ("U.S.S.R.").

8. All ordinary courts have separate civil and criminal sections. *I Business Transactions, supra* § 4.04[2][a].

federal law and, thus, is identical in each of the States. *See I Business Transactions, supra* § 4.04[2][a]; Benjamin Kaplan et al., *Phases of German Civil Procedure,* 71 Harv.L.Rev. 1193, 1195–96 (1958). Further, although state court judges are appointed and paid by the state where the court sits, the state courts' jurisdiction and procedure is established by federal law. *See* Kaplan, *supra,* at 1195. Consequently, although the first level of review is always before a state court, unlike the United States, there are no parallel federal and state courts in Germany.[9] *See id.; see also Germany: Law Digest, supra,* at GER–10.

As in most civil law jurisdictions, Germany does not follow the rule of *stare decisis. See Randi Seltzer, The Erroneous Interpretation of the Foreign Compulsion Defense in the ADEA: Mahoney v. RFE/RL, Inc.,* 23 Brook.J. Int'l L. 655, 682 (1997) (stating that German courts do no more than apply the law when they make a decision, thus, "the decision itself can have no force as law beyond the very case in which it is rendered.") (citing Norbert Horn et al., *German Private and Commercial Law: An Introduction* 11 (Tony Weir, trans., 1982)); Edward J. Eberle, *Human Dignity, Privacy, and Personality in German and American Constitutional Law,* 1997 Utah L.Rev. 963, 970 n. 22 (citing Donald P. Kommers, *The Constitutional Jurisprudence of the Federal Republic of Germany* 48 (1989)); *see also* (I Tr. at 17:22–25.)[10] (stating that "German courts don't abide by stare decisis. There's no principle of *stare decisis* under German law. They [German courts], respectfully, look at past cases, but each case is supposed to do on its own from the civil code.").

In practice, however, German courts strive to adhere to precedent and generally follow the holdings of the German Supreme Court, the highest court for civil and criminal matters. *See* Eberle, *supra,* at 970 n. 22; *see also* David S. Clark, *The Selection and Accountability of Judges in West Germany: Implementation of a Rechtstaat,* 61 S.Cal.L.Rev. 1795, 1847 (1988) (stating that "judge made law in Germany occupies large areas in the corpus of legal rules. In some ways German judges are just as bold and innovative as their common law colleagues."); *Interpreting Statutes: A Comparative Study* 90, 97 (D. Neil MacCormick & Robert S. Summers eds., 1991) (stating that although precedents are not a formal source of German law, they play an important role in justifying judicial decisions, and the party wishing to depart from precedent carries the burden of argument). Moreover, decisions of the Federal Constitutional Court represent binding interpretations of the German constitution, the *Grundgesetz. See* Eberle, *supra,* at 970 n. 22.

### A. ORDINARY COURTS

The lowest ordinary courts are the *Amtsgerichte,* the Municipal Courts (also known as Local Courts). *See Germany: Law Digest, supra,* at GER–10. Municipal Courts have jurisdiction over cases where the amount in controversy does not exceed 10,000 deustchmark ("DM"), approximately $5,412.00 American dollars.[11] *Id.* They also have exclusive jurisdiction over landlord-tenant disputes, family law, divorces, bankruptcy and nonlitigation proceedings such as probate and guardianship. *See I Business Transactions, supra* § 4.04[2][a][I]. There is one Municipal Court per city or county and cases are

---

**9.** There is one exception. Patent and trademark disputes are not heard by state courts; the Federal Patent Court has original jurisdiction over such disputes. *I Business Transactions, supra* § 4.04[2][c][ii].

**10.** "I Tr." refers to the transcript of the March 8, 1999 oral argument.

**11.** One U.S. dollar equals approximately DM 1.9. *See Bloomberg Currency Calculator* (visited Sept. 1, 1999) <h ttp://www.bloomberg.com/markets/currency/currc-alc.cgi/markets_curr99currcalc.html>.

heard by a single judge. *See Germany: Law Digest, supra,* at GER–10. Parties litigating in a Municipal Court may proceed *pro se. See* Astrid Stadler, *The Law of Civil Procedure, in Introduction to German Law* 357, 358 (Werner F. Ebke & Matthew W. Finkin, eds., 1996).

Parties may appeal decisions of the Municipal Courts to the *Landgerichte* ("LG"), the state District Courts (also known as Regional Courts). *See Germany: Law Digest, supra,* at GER–10. The District Courts' venue covers several Municipal Courts. *See id.* District Courts possess both appellate and original jurisdiction. *See id.; I Business Transactions, supra* § 4.04[2][a][ii]. In addition to reviewing the judgments of the Municipal Courts for findings of fact and conclusions of law, the District Courts are also courts of first resort in matters where the amount in controversy exceeds DM 10,000, and in cases not specifically assigned to the Municipal Courts or special courts. *See Germany: Law Digest, supra,* at GER–10; *I Business Transactions, supra* § 4.04[2][a][ii]. Specific District Court panels [12] hear appeals from the Municipal Courts, while other panels handle cases in which the District Courts have original jurisdiction. *See I Business Transactions, supra* § 4.04[2][a][ii]. Decisions of the District Courts rendered as appellate decisions reviewing the Municipal Courts' judgments are final; no further appeal to another court exists. *See id.; Germany: Law Digest, supra,* at GER–11; Stadler, *supra,* at 371. Although three judges sit on each District Court panel, a single judge hears each case, unless the case is unusually complex, or is of fundamental importance. *See Germany: Law Digest, supra,* at GER–10; *I Business Transactions, supra* § 4.04[2][a][ii]. Parties appearing before the District Court must be represented by counsel. *See Germany:*

*Law Digest, supra,* at GER–11; Stadler, *supra,* at 358.

Insofar as a District Court acted as a court of first resort, appeals for reasons of fact and/or law are heard by the *Oberlandesgerichte* ("OLG"), the Courts of Appeals (also known as Higher Regional Courts). *See Germany: Law Digest, supra,* at GER–11; *I Business Transactions, supra* § 4.04[2][a][iii]; Stadler, *supra,* at 371. Like the Municipal and District Courts, the Courts of Appeals are also state courts. Three judge panels called Senates hear civil appeals and five judge panels hear criminal appeals. *See I Business Transactions, supra* § 4.04[2][a][iii]. There are up to three Courts of Appeals in each state. *See id.*

The highest ordinary court is the *Bundesgerichtshof* ("BGH"), the Supreme Court (also known as the Federal Court of Justice). This is the highest court for criminal and civil cases. The Supreme Court reviews the decisions of the Courts of Appeals on points of law only. *See Germany: Law Digest, supra,* at GER–11. The Supreme Court's function, *inter alia,* is to ensure the uniform interpretation of the law. The Supreme Court hears cases only where (1) the sum involved exceeds DM 60,000 (approximately $32,471.00 U.S. dollars) [13]; (2) a Court of Appeals has granted leave to appeal because the case is of fundamental legal importance; or (3) a Court of Appeals wishes to depart from an existing ruling of the Supreme Court. *See* Stadler, *supra,* at 372. The Senates of the civil section of the Supreme Court are comprised of five judges. *See I Business Transactions, supra* § 4.04[2][a][iv]. In order to assure uniformity of judicial decisions, however, the civil section and the criminal section each have nine judge panels, known as Great Senates, which rule on cases in which one Senate intends to de-

**12.** District Court panels, known as Chambers, consist of three judges. *See Germany: Law Digest, supra,* at GER–10; *I Business Transactions, supra* § 4.04[2][a][ii].

**13.** *Bloomberg Currency Calculator,* (visited Sept. 1, 1999) <http://www.bloomberg.com/markets/currency/currc alc.cgi/markets_curr99currcalc.html>.

part from the rulings of another Senate. *See id.*

## B. SPECIAL COURTS

As stated *supra*, there are six special courts in Germany: (1) labor courts; (2) administrative courts; (3) social welfare courts; (4) tax courts; (5) constitutional courts; and (6) the Federal Patent Court. *See I Business Transactions, supra* § 4.04[2]. Labor courts have jurisdiction over disputes between employers and employees, collective bargaining agreements and the regulation of trade unions. *See Germany: Law Digest, supra,* at GER–11; *I Business Transactions, supra* § 4.04[2][c][I]. Administrative courts have jurisdiction over matters involving zoning, immigration, state licenses, health, sanitation, transportation, regulation of the professions and the civil service. *See Germany: Law Digest, supra* at GER–11; *I Business Transactions, supra* § 4.04[2][b]. Administrative courts also preside over claims against public authorities (federal, state or local) for violations of individual rights. *See I Business Transactions, supra* § 4.04[2][b]. Social welfare courts hear cases involving social security, public mandatory health insurance and aid for the unemployed or disabled. *See Germany: Law Digest, supra,* at GER–11; *I Business Transactions, supra* § 4.04[2][c][iii]. The structure of the labor, administrative and social welfare courts contains three levels of review. The respective special District Courts and Courts of Appeals represent the first two levels of review. The respective Federal Court (e.g., the Federal Labor Court, the Federal Administrative Court or the Federal Social Welfare Court) entertains the final appeal. *See I Business Transactions, supra* §§ 4.04[2][b], [c].

Tax courts have jurisdiction over tax matters, including custom duties and taxes on international and foreign trade. *See Germany: Law Digest, supra,* at GER–11. Constitutional courts preside over all constitutional matters. The tax courts and constitutional courts have only two levels of review. Only one tax court and one constitutional court exist in each state. The next and final level of review is at the federal level by the Federal Tax Court or the Federal Constitutional Court. *See Germany: Law Digest, supra,* at GER–11. The Federal Constitutional Court (the "*Bundesverfassungsgericht*" or "BVerfG") reviews the law and decisions of other courts, including other Federal Courts, when challenged on constitutional grounds. *See I Business Transactions, supra* § 4.04[3][d]; *Germany: Law Digest, supra,* at GER–11.

As stated in *supra* note 9, state courts lack jurisdiction over patent or trademark matters. Instead, parties may appeal decisions of the Federal Patent Office directly to the Federal Patent Court. Appeals from decisions of the Federal Patent Court are heard by the Supreme Court on points of law only. *See I Business Transactions, supra* § 4.04[2][c][ii].

## II. CLAIMS UNDER THE LAW OF NATIONS

Iwanowa asserts that "[b]y knowingly utilizing unpaid, forced labor under inhuman conditions, [Defendants] violated the law of nations, including the Hague Convention and the Geneva Convention." (Compl. ¶ 40.) Defendants have moved to dismiss Iwanowa's claims under the law of nations based on (1) lack of subject matter jurisdiction; (2) failure to state a claim; and (3) expiration of the applicable limitations period.

### A. MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION

#### 1. Standard for Dismissal

Pursuant to Federal Rule of Civil Procedure 12(h)(3), "[w]henever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction over the subject matter, the court shall dismiss the action." Thus, a motion to dismiss for lack of subject matter jurisdiction may be made

at any time. *See id.; Mortensen v. First Fed. Sav. & Loan Ass'n,* 549 F.2d 884, 891 (3d Cir.1977).

A defendant may attack a district court's subject matter jurisdiction in one of two ways. *See Mortensen,* 549 F.2d at 891. First, a defendant may challenge subject matter jurisdiction by asserting that the complaint, on its face, does not allege sufficient grounds to establish subject matter jurisdiction. *See id.; see also Cardio-Medical Assocs. Ltd. v. Crozer-Chester Med. Ctr.,* 721 F.2d 68, 75 (3d Cir.1983). In assessing a Rule 12(b)(1) motion based on the pleadings, the court "must assume that the allegations contained in the complaint are true." *Cardio-Medical,* 721 F.2d at 75; *Mortensen,* 549 F.2d at 891; *see also Sitkoff v. BMW of N. Am., Inc.,* 846 F.Supp. 380, 383 (E.D.Pa. 1994), *aff'd,* 92 F.3d 1172 (3d Cir.1996). Under those circumstances, the court may dismiss the complaint only if it appears to a certainty that the plaintiff will not be able to assert a colorable claim of subject matter jurisdiction. *See Mortensen,* 549 F.2d at 891; *Kronmuller v. West End Fire Co. No. 3 Fire Dep't of Borough of Phoenixville,* 123 F.R.D. 170, 172 (E.D.Pa. 1988).

A defendant may also challenge a federal court's jurisdiction by factually attacking the plaintiff's jurisdictional allegations as set forth in the complaint. *See Mortensen,* 549 F.2d at 891. In such circumstances, the "court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Id.* Thus, "no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluat-

ing for itself the merits of jurisdictional claims." *Id.* The court may consider affidavits, depositions and testimony to resolve factual issues bearing on jurisdiction. *See Gotha v. United States,* 115 F.3d 176, 179 (3d Cir.1997). The plaintiff bears the burden of proving that the court has jurisdiction to adjudicate the claims in the complaint. *See Mortensen,* 549 F.2d at 891.

Although Defendants have not stated whether they consider their Rule 12(b)(1) motion to be a facial or factual attack, they have attached the Declaration of Professor Gerhard Laule to their reply brief. Furthermore, Iwanowa submitted the Declaration of Dr. Ekkehard Schumann with her opposition brief. Therefore, this Court will evaluate the 12(b)(1) motion as a factual attack and consider the declarations that the parties have submitted.

Upon consideration of the Complaint, the relevant case and statutory law and the declarations the parties have submitted to the Court, this Court finds that Defendants' motion to dismiss the claims under the law of nations for lack of subject matter jurisdiction is without merit. As shown below, this Court has jurisdiction over the instant claims, pursuant to the Alien Tort Claims Act, 28 U.S.C. § 1350.

### 2. *Alien Tort Claims Act*

Iwanowa claims that the Alien Tort Claims Act ("ATCA"), 28 U.S.C. § 1350, grants this Court subject matter jurisdiction over her claims under customary international law.[14] Originally promulgated as part of the Judiciary Act of 1789, the ATCA provides that

[t]he district courts shall have original jurisdiction of any civil action by an alien

---

14. The terms "law of nations" and "customary international law" are interchangeable. *See Siderman de Blake v. Republic of Argentina,* 965 F.2d 699, 715 (9th Cir.1992) (stating that customary international law is the direct descendant of the law of nations); *Sanchez-Espinoza v. Reagan,* 770 F.2d 202, 206 (D.C.Cir.1985) ("As for the law of nations—so called 'customary international law' "); *Jama*

*v. Immigration and Naturalization Serv.,* 22 F.Supp.2d 353, 362 (D.N.J.1998) (noting that plaintiffs submitted treaties in support of their "claim under the 'law of nations' or international law"); *Doe v. Islamic Salvation Front* (FIS), 993 F.Supp. 3, 7 (D.D.C.1998) ("The law of nations [is] currently known as international customary law.").

for a tort only, committed in violation of the law of nations or a treaty of the United States.

28 U.S.C. § 1350.

■■■ The Complaint alleges that Defendants' use of forced labor violated both the Hague Convention and the Geneva Convention.[15] (Compl.¶ 40.) At oral argument, however, Iwanowa's attorneys clarified that Iwanowa is not asserting a claim under either of those treaties. (I Tr. at 19:8–12.) Rather, she is asserting a claim under the law of nations and is merely relying on the Hague and the Geneva Conventions as evidence of an emerging norm of customary international law. Thus, this Court need only address Iwanowa's claim under the law of nations.[16]

As stated above, Iwanowa contends that Defendants' use of forced labor during World War II violates the law of nations. (Compl.¶ 40.) The ATCA confers federal subject matter jurisdiction when: "(1) an alien sues (2) for a tort (3) committed in violation of the law of nations (i.e., international law)." *Kadic*, 70 F.3d at 238. The ATCA grants district courts subject matter jurisdiction to entertain "suits alleging torts committed anywhere in the world against aliens in violation of the law of nations." *Id.* at 236.

As a citizen and resident of Belgium, Iwanowa is an alien. She alleges that Defendants committed a tort by forcing her to perform unpaid, forced labor under inhuman conditions. Thus, she has satisfied the first and second requirements for jurisdiction under the ATCA. This Court must now determine whether Defendants' use of forced labor constitutes a violation of the law of nations.

### a. Unpaid, Forced Labor Violates Law of Nations

■■■ "Customary international law results from a general and consistent practice of states followed by them from a sense of legal obligation." *Restatement (Third) of Foreign Relations Law* § 102(2) (1987). In other words, customary international law is comprised of such widely held fundamental principles of civilized society that they constitute binding norms on the community of nations.

■■■ The law of nations "may be ascertained by consulting the works of jurists, writing professedly on public law; or by the general usage and practice of nations; or by judicial decisions recognizing and enforcing that law." *United States v. Smith*, 5 Wheat. 153, 18 U.S. 153, 160–61, 5 L.Ed. 57 (1820); *Kadic*, 70 F.3d at 238; *Jama*, 22 F.Supp.2d at 362. Further, courts may rely upon treaties (such as the

15. There are various treaties known as the Hague Convention or the Geneva Convention. At oral argument, Iwanowa's attorneys stated that the Complaint references the Hague Convention No. IV Respecting the Laws and Customs of War on Land, Oct. 18, 1907, 36 Stat. 2277, T.S. 539 and the Geneva Convention IV Relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949, 6 U.S.T. 3516. (*See* I Tr. at 18:22–19:1.)

16. Had Iwanowa attempted to assert a claim under the Hague or Geneva Conventions, it would have been dismissed for lack of jurisdiction because only self-executing treaties, i.e., those that do not require legislation to make them operative, confer rights enforceable by private parties. *See Jama*, 22 F.Supp.2d at 362; *Handel v. Artukovic*, 601 F.Supp. 1421, 1425 (C.D.Cal.1985); *Restatement (Third) of Foreign Relations Law*

§ 111(4)(a) (1987). Courts have unanimously held that neither the Hague nor Geneva Conventions are self-executing. *See Handel*, 601 F.Supp. at 1425; *Princz v. Federal Republic of Germany*, 26 F.3d 1166, 1175 (D.C.Cir.1994); *Goldstar (Panama) S.A. v. United States*, 967 F.2d 965, 968–69 (4th Cir.1992); *Tel–Oren v. Libyan Arab Republic*, 726 F.2d 774, 808 (D.C.Cir.1984) (per curiam) (Bork, J., concurring); *Huynh Thi Anh v. Levi*, 586 F.2d 625, 629 (6th Cir.1978). Since neither the Hague nor Geneva Conventions provide a private right of action, they cannot provide a basis for suit under the ATCA. As discussed *infra*, however, although Iwanowa may not rely upon these treaties as independent sources of international law, she may use them as "evidence of an emerging norm of customary international law." *See Kadic v. Karadzic*, 70 F.3d 232, 238 n. 1 (2d Cir.1995).

Hague and Geneva Conventions) as evidence of an emerging norm of customary international law. *See Kadic*, 70 F.3d at 238 & n. 1; *Jama*, 22 F.Supp.2d at 362. If this inquiry reveals that forced labor violates "well-established, universally recognized norms of international law, as opposed to idiosyncratic legal rules, then federal jurisdiction exists under the [ATCA]." *Kadic*, 70 F.3d at 239.

▮ The use of unpaid, forced labor during World War II violated clearly established norms of customary international law. The Complaint alleges that Iwanowa "was literally purchased, along with 38 other children from Rostock [sic] [17], by a representative of [Ford Werke]." (Compl.¶ 25.) Such assertions suffice to support an allegation that Defendants participated in slave trading. *See Doe v. Unocal Corp.*, 963 F.Supp. 880, 892 (C.D.Cal. 1997); *National Coalition Gov't of the Union of Burma v. Unocal, Inc.*, 176 F.R.D. 329, 349 (C.D.Cal.1997) (allegations that defendants "knowingly accepted the benefit of and approved the use of forced labor" may be sufficient to state a claim for participation in slave trading). As shown below, all of the sources of international law expressly provide that the enslavement of civilians during war time violates the law of nations.

First, the Nuremberg Tribunals held that the enslavement and deportation of civilian populations during World War II constitutes a crime against humanity in violation of customary international law. *See* R. Jackson, *The Nuremberg Case* xiv–xv (1971). The Nuremberg trials "for the first time made explicit and unambiguous what was theretofore, as the tribunal has declared, implicit in International Law, namely, that ... to exterminate, enslave or deport civilian populations, is an international crime." *Id.* (citing *The Final Report to the President by Justice Robert H. Jackson on the Nuremberg Trials* (Oct. 6, 1946)). Further, Nuremberg Principle IV(b) provides that the "deportation to slave labor ... of civilian populations of or in occupied territory" constitutes both a "war crime" and a "crime against humanity". Nuremberg Charter, annexed to the London Agreement on War Criminals, Aug. 8, 1945, art. 6, 59 Stat. 1544, 82 U.N.T.S. 279; *see also* Rome Statute of the International Criminal Court, Adopted by the United Nations Diplomatic Conference of Plenipotentiaries on the Establishment of an International Criminal Court on July 17, 1998, art. 7 ¶ 1(c), (d).

▮ Second, courts have repeatedly held that "deportation to slave labor" violates the law of nations. *See Handel*, 601 F.Supp. at 1426 n. 2; *Kadic*, 70 F.3d at 239 (holding that conduct related to slave trade violates the law of nations); *Princz*, 26 F.3d at 1180 (acknowledging that forced labor of civilians during World War II violated international law);[18] *Siderman de*

---

**17.** The Complaint reads "Rostock" but this appears to be a typographical error since Iwanowa lived in Rostov.

**18.** Although not germane to this action, Judge Wald, in a strong dissent, found that "Germany clearly violated *jus cogens* norms by forcibly extracting labor" from the captive population. *Princz*, 26 F.3d at 1180 (Wald, J., dissenting). The *Princz* Court held that plaintiff could not recover money damages from Germany for the forced labor he performed during World War II because Germany is immune from suit pursuant to the Foreign Sovereign Immunities Act. Judge Wald dissented on the grounds that Germany waived its sovereign immunity by violating the *jus cogens* norms of international law condemning enslavement. *Id.* at 1179 (Wald, J., dissenting).

A *jus cogens* norm "is a norm accepted and recognized by the international community of States as a whole from which no derogation is permitted...." Vienna Convention of the Law of Treaties, May 23, 1969, art. 53, 1155 U.N.T.S. 332; *Restatement (Third) of Foreign Relations Law* § 102, cmt. k & rptr's n. 6 (1987) (adopting Vienna Convention's definition of *jus cogens*). *Jus cogens* norms are a narrow subset of the norms recognized as customary international law. *See Committee of United States Citizens Living in Nicaragua v. Reagan*, 859 F.2d 929, 940 (D.C.Cir.1988). The same tools used to ascertain customary international law are used to determine whether a norm of customary international

*Blake,* 965 F.2d at 715 (finding that "[t]he universal and fundamental rights of human beings identified by Nuremberg—rights against genocide, enslavement, and other inhumane acts . . . are the direct ancestors of the universal and fundamental norms recognized as *jus cogens.*"); *Tel–Oren,* 726 F.2d at 781 (Edwards, J., concurring) (reiterating that genocide and slavery are "heinous actions—each of which violates definable, universal and obligatory norms"); LG [District Court] Bremen, 1 O 2889/90, at 7 (1998) (F.R.G.) ["LG Bremen (1998)"][19] ('Among these prevailing rules of international law is the law that prisoners of war and civilians in occupied territories may not be murdered or enslaved."); *Krakauer v. Federal Republic of Germany,* LG [District Court] Bonn, 1 O 134/92, at 21 (1997) (F.R.G.) ["*Krakauer I,* LG Bonn (1997)"] (same), *rev'd on other grounds,* OLG [Court of Appeals] Cologne ["*Krakauer II,* OLG Cologne (1998)"], 7 U 222/97 (1998) (F.R.G.). Thus, the case law and statements of the Nuremberg Tribunals unequivocally establish that forced labor violates customary international law.

Defendants assert that even if forced labor violates the law of nations, Iwanowa has failed to establish subject matter jurisdiction under the ATCA because (1) no private right of action exists for violations of the law of nations and (2) the ATCA only applies to state actors. The Court shall address each of these arguments separately.

#### b. Private Right of Action for Violations of the Law of Nations

■ Defendants argue that the law of nations mimics treaties in that neither is self-executing and thus, neither is enforceable by private parties absent legislation. Defendants contend that the ATCA merely provides district courts with jurisdiction to address an alien's claims under the law of nations in limited instances; namely, those in which Congress has enacted specific legislation authorizing a private right of action for such violations.

The majority of courts addressing claims under the law of nations have rejected Defendants' narrow interpretation of the ATCA. Instead, those courts have concluded that the ATCA provides both subject matter jurisdiction and a cause of action for claims alleging violations of customary international law. *See Jama,* 22 F.Supp.2d at 362–63; *Abebe–Jira v. Negewo,* 72 F.3d 844, 848 (11th Cir.1996) ("we read the [ATCA] as requiring no more than an allegation of a violation of the law of nations in order to invoke section

law has attained *jus cogens* norm status. *See Siderman de Blake,* 965 F.2d at 715. A rule of customary international law becomes a *jus cogens* norm if the international community recognizes the norm as so fundamental that it is nonderogable. *See Reagan,* 859 F.2d at 940.

Judge Wald concluded that because of the universal consensus on the existence of norms against enslavement, the customary international law condemning enslavement had attained *jus cogens* status: "What could be more elementary than a prohibition against eviscerating a person's human dignity by thrusting him into the shackles of slavery?" *Princz,* 26 F.3d at 1180 (Wald, J., dissenting).

19. German opinions generally do not include the litigants' names. However, along with the translations, counsel provided this Court with the parties' names where available. In those instances, the Court shall include the parties' names when discussing or citing those cases. All pinpoint citations in German cases refer to the English translations on file with this Court. All of the German cases were translated from German to English by either TransPerfect Translations, Inc. in Washington, D.C., or by Plaintiff's counsel, Deborah Sturman, with the assistance of Gabrielle Friedman, a German speaker.

As is common in civil law jurisdictions, a substantial number of German decisions are never published in official reporters. In such cases, this Court will cite to the journal or legal periodical in which the decision appeared. All citations include the name of the court, e.g., "BGH" (Supreme Court), "LG" (District Court), "OLG" (Court of Appeals) or "OVG" (Administrative Court of Appeals) and the year the decision was issued. In addition, citations to the lower courts include the location of the court, e.g., Bonn, Bremen, Cologne or Müenster.

1350."); *Kadic,* 70 F.3d at 236 (concluding that the ATCA "appears to provide a remedy for the appellants' allegations of violations related to genocide, war crimes and official torture"); *In re Estate of Ferdinand Marcos, Human Rights Litig.,* 25 F.3d 1467, 1475 (9th Cir.1994) ("We thus join the Second Circuit in concluding that the [ATCA], 28 U.S.C. § 1350, creates a cause of action for violations of specific, universal and obligatory international human rights standards," and "nothing more than a violation of the law of nations is required to invoke section 1350."); *Xuncax v. Gramajo,* 886 F.Supp. 162, 179 (D.Mass. 1995) (" § 1350 yields both a jurisdictional grant and a private right to sue for tortious violations of international law ... without recourse to other law as a source of the cause of action."); *Paul v. Avril,* 812 F.Supp. 207, 212 (S.D.Fla.1993) ("The plain language of the [ATCA] and the use of the words 'committed in violation' strongly implies that a well pled tort[,] if committed in violation of the law of nations, would be sufficient [to give rise to a cause of action]."); *But see Tel–Oren,* 726 F.2d at 810–20 (Bork, J., concurring).[20]

The only case in this Circuit addressing the issue, *Jama,* followed this line of cases in holding that the ATCA provides both subject matter jurisdiction and a cause of action for violations of the law of nations. *See Jama,* 22 F.Supp.2d at 363. The *Jama* Court noted that, after the Second Circuit's decision in *Filartiga v. Peña–Irala,* 630 F.2d 876 (2d Cir.1980)[21]; Congress could have amended the ATCA when it enacted the Torture Victim Protection Act of 1991 ("TVPA")[22] to reflect its dis-

**20.** In his concurring but highly criticized opinion in *Tel–Oren,* Judge Bork concluded that only those rules of international law which explicitly provide that an individual may sue to enforce them may be used to infer a cause of action in U.S. courts. *See Tel–Oren,* 726 F.2d at 812 (Bork, J., concurring). Judge Bork reasoned that because the ATCA refers to "the law of nations" and to "a treaty of the United States" without distinguishing between the two, they must stand in parity. *See id.* Judge Bork found that customary international law is similar to non-self-executing treaties which do not provide a private right of action. *See id.* He further explained that interpreting the ATCA as providing plaintiffs with a private right of action for violations of the law of nations means that the ATCA must also provide a private right of action for violations of a treaty, even those that are non-self-executing. *See id.* According to Judge Bork, inferring a private right of action under the ATCA for violations of the law of nations would mean "that all existing treaties became, and all future treaties will become in effect, self-executing, when ratified. This conclusion stands in flat opposition to almost two hundred years of our jurisprudence". *Id.* at 820. Thus, under Judge Bork's view, most of the rules of customary international law are similar to non-self-executing treaties; they have no impact upon individuals.

Commentators have criticized Judge Bork's opinion in *Tel–Oren* because it would, in effect, render the ATCA useless since nations (as opposed to individuals) rarely bring suit in U.S. courts for violations of customary international law. *See* Anthony D'Amato, *Judge Bork's Concept of the Law of Nations is Seriously Mistaken,* 79 Am.J. Int'l L. 92, 98 (Jan. 1985); *see also* Virginia A. Melvin, *Tel–Oren v. Libyan Arab Republic: Redefining the Alien Tort Claims Act,* 70 Minn.L.Rev. 211 (1985) (criticizing Judge Bork's approach). Furthermore, Judge Bork's reasoning is flawed because it is based on the erroneous assumption that customary international law is non-self-executing. *See Tel–Oren,* 726 F.2d at 812 (Bork, J., concurring). However, it is well-established that international law is " 'self-executing' and is applied by courts in the United States without any need for it to be enacted or implemented by Congress." Louis Henkin, *International Law as Law in the United States,* 82 Mich.L.Rev. 1555, 1561 (1984).

**21.** The *Filartiga* Court recognized a cause of action for official torture under the ATCA.

**22.** The TVPA provides in relevant part:

> (a) Liability—An individual who, under actual or apparent authority, or color of law, of any foreign nation—
> (1) subjects an individual to torture shall, in a civil action, be liable for damages to that individual; or
> (2) subjects an individual to extrajudicial killing shall, in a civil action, be liable for damages to the individual's legal representative, or to any person who may be a claimant in an action for wrongful death.

Pub.L. No. 102–256, 106 Stat. 73 (codified at 28 U.S.C. § 1350 note (1992)).

agreement with the courts' interpretation of the ATCA. *See Jama,* 22 F.Supp.2d at 363. Indeed, the TVPA is codified as a statutory note to the ATCA. *See supra* note 22. Congress, however, did not address whether the ATCA provides a private cause of action for violations of international law although it enacted the TVPA to codify the cause of action (torture) recognized in *Filartiga* under the ATCA. *See Kadic,* 70 F.3d at 241.

The Eleventh Circuit, persuaded by both Congress' silent endorsement of *Filartiga* and subsequent interpretations of the ATCA, also found that the ATCA provides a private right of action. *See Abebe–Jira,* 72 F.3d at 848. The *Abebe–Jira* Court noted that the legislative history indicated that Congress was aware that

> [t]he TVPA would establish an unambiguous and modern basis for a cause of action that has been successfully maintained under an existing law, section 1350 of the Judiciary Act of 1789 [the ATCA], which permits Federal district courts to hear claims by aliens for torts committed in violation of the law of nations.

*Abebe–Jira,* 72 F.3d at 848 (quoting H.R.Rep. No. 367, 102d Cong., 2d Sess. 3, *reprinted in* 1992 U.S.C.C.A.N. 84, 86). Based on this statement, the *Abebe–Jira* Court concluded that Congress recognized that courts viewed the ATCA as conferring both a forum and a private right of action to aliens alleging violations of international law. 72 F.3d at 848.

This Court concludes that if Congress had disagreed with the courts' finding of a private right of action under the ATCA, Congress could have, and likely would have, amended the ATCA to reflect its intent. Further, the " 'committed in violation' language of the [ATCA] suggests that Congress did not intend to require an alien plaintiff to invoke a separate enabling statute as a precondition to relief under the

[ATCA]." *Abebe–Jira,* 72 F.3d at 847; *see also Paul,* 812 F.Supp. at 212. Accordingly, this Court finds that the ATCA provides both subject matter jurisdiction and a private right of action for violations of the law of nations. *See Jama,* 22 F.Supp.2d at 362–63; *Abebe–Jira,* 72 F.3d at 847–48; *Kadic,* 70 F.3d at 236.

### c. Does the Law of Nations Apply to Private Actors?

 Defendants contend that the Complaint does not allege violations of international law because such norms bind only states and its agents, not private corporations such as Defendants. While the Third Circuit has never addressed this issue, the Second Circuit recently held that

> [w]e do not agree that the law of nations, as understood in the modern era, confines its reach to state action. Instead, we hold that certain forms of conduct violate the law of nations *whether undertaken by those acting under the auspices of a state or only as private individuals.*

*Kadic,* 70 F.3d at 239 (emphasis added) [23]. Similarly, in his often cited concurring opinion, Judge Edwards, although refusing to apply the ATCA to cover torture by non-state actors, stated that there are a "handful of crimes to which the law of nations attributes individual responsibility", such as piracy and slave-trading. *Tel–Oren,* 726 F.2d at 794–95 (Edwards, J., concurring); *see also Unocal Corp.,* 963 F.Supp. at 891–92 (stating same); *National Coalition Gov't,* 176 F.R.D. at 348 (noting that private company utilizing slave labor may be subject to liability under the ATCA); *Jama,* 22 F.Supp.2d at 362 (stating that "depending upon the nature of the offense, an ATCA claim may be brought against private individuals as well as state actors."); *Islamic Salvation Front,* 993 F.Supp. at 8 (following *Kadic* and holding that murder, mutilation, cruel

---

**23.** In *Kadic,* the court also noted that individuals who engage in slave trading are liable for violations of the law of nations. *Id.*

treatment and torture, kidnaping, and summary executions constitute violations of international law whether committed by state or private actors); *Beanal v. Freeport–McMoRan, Inc.,* 969 F.Supp. 362, 371 (E.D.La.1997) (following *Kadic* and holding that genocide violates the law of nations whether undertaken by state or nonstate actor).

In determining that private individuals who engage in slave trading violate the law of nations, the *Kadic* Court noted that "[i]ndividuals may be held liable for offenses against international law, such as piracy, war crimes, and genocide." *Kadic,* 70 F.3d at 240. As stated *supra,* deportation of civilian populations to slave labor is a war crime. *See supra* Part II.A.2.a; Nuremberg Charter, 82 U.N.T.S. 279. The *Kadic* Court further noted that section 702 of the Restatement (Third) of Foreign Relations Law [24] identifies violations that are actionable when committed by a state, whereas section 404 of the Restatement [25] lists a more limited category of violations of universal concern. *See Kadic,* 70 F.3d at 240. The *Kadic* Court concluded that the inclusion of "slave trade" within both sections 702 and 404 of the Restatement demonstrates that this is an offense of "universal concern" for which non-state actors may be liable. *See id.*

Several pre-*Kadic* decisions have stated that only state actors are liable for violations of international law. *See In re Estate of Ferdinand E. Marcos Human Rights Litig.,* 978 F.2d 493, 501–02 (9th Cir.1992); *Sanchez–Espinoza v. Reagan,* 770 F.2d 202, 206–07 (D.C.Cir.1985). These cases are inapposite. First, both of these cases expressly relied on Judge Edward's concurring opinion in *Tel–Oren* and stating same. *See Sanchez–Espinoza,* 770 F.2d at 206–07 (concluding that based on the reasons stated by Judge Edwards in *Tel–Oren,* the law of nations does not reach private, non-state conduct); *In re Estate of Ferdinand E. Marcos,* 978 F.2d at 502 (citing Judge Edwards' concurring opinion in *Tel–Oren* ). As indicated *supra,* however, although Judge Edwards refused to "extend the definition of the 'law of nations' absent direction from the Supreme Court", to cover torture by nonstate actors, he stated that there are a "handful of crimes to which the law of nations attributes individual responsibility", such as piracy and slave-trading. *Tel–Oren,* 726 F.2d at 792, 794–95 (Edwards, J., concurring); *see also Unocal Corp.,* 963 F.Supp. at 891 (stating that after *Tel–Oren,* individual liability remained for a handful of private acts, including piracy and slave trading); *Islamic Salvation Front,* 993 F.Supp. at 8 (stating that "[t]he opinions in *Tel–Oren* did not hold that international law requires state action").

Second, *Kadic* was decided after *Tel–Oren, Sanchez–Espinoza* and *In re Estate of Ferdinand E. Marcos. Kadic* 's recent interpretation of international law in 1995 carries greater weight than the conflicting interpretations of the three concurring opinions in *Tel–Oren,* which examined international law as it stood over fifteen years ago. *See Islamic Salvation Front,*

---

**24.** Section 702 provides that:

A state violates international law if, as a matter of state policy, it practices, encourages, or condones

(a) genocide,

(b) slavery or *slave trade,*

(c) the murder or causing the disappearance of individuals,

(d) torture or other cruel, inhuman, or degrading treatment or punishment,

(e) prolonged arbitrary detention,

(f) systematic racial discrimination, or

(g) a consistent pattern of gross violations of internationally recognized human rights.

*Restatement (Third) of Foreign Relations Law* § 702 (1987) (emphasis added).

**25.** Section 404 provides that:

A state has jurisdiction to define and prescribe punishment for certain offenses recognized by the community of nations as of universal concern, such as piracy, *slave trade,* attacks on or hijacking of aircraft, genocide, war crimes, and perhaps certain acts of terrorism, even where [no other basis of jurisdiction] is present.

*Restatement (Third) of Foreign Relations Law* § 404 (1987) (emphasis added).

993 F.Supp. at 8. Customary international law is not static; thus, courts must interpret it as "it has evolved and exists among the nations of the world today." *Id.* (quoting *Kadic,* 70 F.3d at 238); *see also Tel–Oren,* 726 F.2d at 777 (Edwards, J. concurring) ("[T]he 'law of nations' is not stagnant and should be construed as it exists today among the nations of the world.").

Third, the Ninth Circuit later distanced itself from its statement in *In re Estate of Ferdinand E. Marcos* that only state actors are liable for violations of international law. In *Hamid v. Price Waterhouse,* 51 F.3d 1411 (9th Cir.1995), the Ninth Circuit ignored its earlier comment in *In re Estate of Ferdinand E. Marcos* and merely stated that it did "not need to reach the issue of whether the law of nations applied to private as opposed to governmental conduct." *Id.* at 1417.[26]

Fourth, none of these cases—*Sanchez–Espinoza, In re Estate of Ferdinand E. Marcos* or *Tel–Oren* —involved slave labor or slave trading. *Sanchez–Espinoza* involved allegations that, in violation of the law of nations, U.S. executive officials (including President Ronald Reagan) and organizations operating paramilitary training camps in the United States assisted and financed the Contra forces in their attempt to overthrow the Nicaraguan government. 770 F.2d at 204–07. Both *In re Estate of Ferdinand E. Marcos* and *Tel–Oren* involved allegations of torture committed by non-state actors. "Because this action involves allegations of forced labor and because slave trading is included in that 'handful of crimes' to which the law of nations attributes individual responsibility, this action raises questions not addressed" in cases holding that private actors are not liable for violations of international law. *National Coalition Gov't,* 176 F.R.D. at 348.

No logical reason exists for allowing private individuals and corporations to escape liability for universally condemned violations of international law merely because they were not acting under color of law. This Court is inclined to agree with *Kadic,* and its progeny, and find that private entities using slave labor are liable under the law of nations. However, this Court need not make that determination. As shown, *infra,* Iwanowa has pled sufficient facts to allege that Defendants acted as agents of the state.

#### d. Defendants Were De Facto State Actors

██ Defendants concede that the ATCA applies to *de facto* state actors. (Def.'s Reply Br. at 22) (citing *Filartiga,* 630 F.2d at 884). Even assuming *arguendo* that the ATCA only applies to state actors, the Complaint pleads sufficient facts to support a claim that from 1942–1945, Defendants were acting as *de facto* state actors. The Complaint alleges that the Nazi army abducted · adolescents in occupied territories, including Iwanowa, and transported them to Germany to work as slave laborers. (Compl.¶¶ 24–25.) The Complaint also asserts that Sauckel, the Nazi Plenipotentiary General for the Allocation of Labor, encouraged German industries to bid for forced laborers in order to meet production quotas and to increase their profits. (*Id.* ¶¶ 9–10.) The Complaint further alleges that as a result of Sauckel's solicitation, Ford Werke purchased forced laborers, including Iwanowa, from the Nazis. (*Id.* ¶¶ 10, 25.)

Hence, the Complaint alleges that Defendants acted in close cooperation with Nazi officials in compelling civilians to perform forced labor. This constitutes an allegation that Defendants were *de facto* state actors and are therefore, liable under

---

**26.** One court has criticized the Ninth Circuit's statement in *In re Estate of Ferdinand E. Marcos* as "without significant analysis". *See National Coalition Gov't,* 176 F.R.D. at 348 (noting that in contrast to *In re Estate of Ferdinand E. Marcos, Kadic* provides a reasoned analysis of the scope of a private individual's liability for violations of the law of nations).

all possible interpretations of the ATCA.[27] (*See also* I Tr. at 24:25–25:3) (Plaintiff's counsel's assertion that Ford Werke acted under color of Nazi law when it utilized forced laborers).

The allegation that Ford Werke pursued its own economic interests, or that its own employees (as opposed to Nazi officials), mistreated Iwanowa, does not preclude a determination that Ford Werke acted as an agent of, or in concert with, the German Reich. *See* BGH [Supreme Court], NJW 1973, 1549, at 9–10 (F.R.G.) ["BGH (1973)"].[28] Indeed, German courts have held that private companies using forced labor as a result of Nazi directives, acted as agents of the German Reich. *See id.; Staucher v. I.G. Farben,* BGH [Supreme Court], RzW 1963, 525, at 4–5 (F.R.G.) ["*Staucher,* BHG (1963)"]; LG [District Court] Frankfurt, NJW 1960, 1575, at 2–3 (F.R.G.) ["LG Frankfurt (1960)"] (stating that "[b]ecause of the course taken by the war, any and all German industrial companies, whether operated as public law or private law entities, were required to put to work the foreign laborers assigned to them" by the Nazi regime); *see also Krakauer I,* LG Bonn (1997), at 15 (stating that concentration camp prisoners remained under ·the Nazi's official authority during their work deployment).

Consequently, even if this Court were to find that no liability attaches to private actors for violations of international law, by showing that (1) she is an alien (2) suing for a tort (forced labor/slave trade) (3) committed by a *de facto* state actor (4) in violation of the law of nations, Iwanowa has established subject matter jurisdiction under the ATCA. Accordingly, Defendants' motion to dismiss Iwanowa's claims under

international law for lack of subject matter jurisdiction is denied.

**B.** **MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM**

Defendants have moved, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss Iwanowa's claims under the law of nations on three separate grounds: (1) the Paris Reparations Treaty subsumed all individual claims arising out of World War II into each nation's reparations claims against Germany; (2) the claims are time-barred; and (3) the U.S.S.R. waived Iwanowa's claims. The Court shall address each argument separately.

**1. Standard for Dismissal for Failure to State a Claim**

A motion to dismiss, pursuant to Federal of Civil Procedure 12(b)(6), may be granted only if, accepting all well-pleaded allegations in the complaint as true, and viewing them in the light most favorable to plaintiff, plaintiff is not entitled to relief. *See Nami,* 82 F.3d at 65; *Holder v. City of Allentown,* 987 F.2d 188, 194 (3d Cir.1993); *Bartholomew v. Fischl,* 782 F.2d 1148, 1152 (3d Cir.1986). The Court may not dismiss the complaint unless plaintiff can prove no set of facts which would entitle him to relief. *See Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Graves v. Lowery,* 117 F.3d 723, 726 (3d Cir.1997); *Unger v. National Residents Matching Program,* 928 F.2d 1392, 1395 (3d Cir.1991); *Angelastro v. Prudential–Bache Sec., Inc.,* 764 F.2d 939, 944 (3d Cir.1985). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to

**27.** It is well established that where a private actor works closely with a state actor in effecting a deprivation of individual rights, each is liable. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 152, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Dennis v. Sparks,* 449 U.S. 24, 27–28, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980); *Collins v. Womancare,* 878 F.2d 1145, 1154 (9th Cir. 1989).

**28.** When citing to the Supreme Court, "BGH" is the name of the court, "NJW" or "RzW" refers to the legal periodical where the opinion was published, followed by the year of publication and the page where the opinion begins. For example, "BGH [Supreme Court], NJW 1999, 135" means that it is a Supreme Court decision, published in NJW in 1999, starting on page 135.

support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). In setting forth a valid claim, a party is required only to plead "a short plain statement of the claim showing that the pleader is entitled to relief." Fed. R.Civ.P. 8(a). To withstand a motion to dismiss, "a plaintiff is not required to provide evidence of or prove the truthfulness of his complaint." *Quiñones v. Szorc,* 771 F.2d 289, 291 n. 3 (7th Cir.1985). The court, however, is not required to accept conclusory allegations. *See Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986). Thus, the complaint "must set forth sufficient information to suggest that there is some recognized legal theory upon which relief may be granted." *District of Columbia v. Air Florida, Inc.,* 750 F.2d 1077, 1078 (D.C.Cir.1984).

A complete comprehension of the context of this litigation and the parties' arguments cannot be attained without an overview of post-war Germany and four relevant treaties: (1) Agreement on Reparations From Germany, on the Establishment of an Inter–Allied Reparation Agency and on the Restitution of Monetary Gold, Jan 14, 1946, 61 Stat. 3157, T.I.A.S. 1655 ("Paris Reparations Treaty"); (2) Convention Between the United Kingdom of Great Britain and Northern Ireland, France, the United States of America and the Federal Republic of Germany on the Settlement of Matters Arising Out of the War and the Occupation, May 26, 1952 ("Transition Agreement") (as amended by Schedule IV to the Protocol on the Termination of the Occupation Regime in the Federal Republic of Germany, Oct. 23, 1954), U.S.–Fr.–U.K.–F.R.G., 6 U.S.T. 4117, 331 U.N.T.S. 219; (3) Agreement on German External Debts, Feb. 27, 1953, 4 U.S.T. 443, 333 U.N.T.S. 3 ("London Debt Agreement"); and (4) Treaty on the Final Settlement with Respect to Germany, Sept. 12, 1990, F.R.G.–G.D.R.–U.S.–U.S.S.R.–Fr.–U.K., 29 I.L.M. 1186 ("Two–Plus–Four Treaty").

## 2. *Post–War Germany*

On May 8, 1945, the Nazi army surrendered unconditionally. *See Germany: Law Digest, supra,* at GER–1. The Allied Powers' immediate objective was to completely demilitarize, disarm and dismember Germany to the extent deemed necessary for future peace and security in Europe. *See* Protocol of Proceeding of the Crimea (Yalta) Conference, Sec. III, Feb. 11, 1945, 3 Bevans 1013 ("Yalta Conference"). To implement this plan, the Allied Powers divided Germany into four occupation zones, American, British, French and Soviet, and assumed government control in their respective occupation zones. *See* Werner Maser, *Nuremberg: A Nation on Trial* 33 (1979); *Germany: Law Digest, supra,* at GER–1. The most senior military commanders for each of the Allied Powers, Eisenhower (U.S.), Zhukov (U.S.S.R.), Montgomery (U.K.) and De-Latttre de Tassigny (France), formed the Inter–Allied Control Council with legislative authority over Germany. *See* Maser, *supra,* at 33. Although Berlin was situated in the Soviet zone, all four Allied Powers occupied and governed Berlin by inter-allied authority. *See Germany: Law Digest, supra,* at GER–1.

The occupying powers could not agree on Germany's political and economic future. The U.S., France and the U.K. ("Western Powers") intended to create a democratic German state. In furtherance of this end, they (1) gave the Germans substantial administrative responsibility beginning in 1946, (2) set up state (*Länder*) governments with state parliaments in their zones of occupation (the "Western Zones") and (3) helped the Germans draft a constitution, the Basic Law, in 1948. *See Germany: Law Digest, supra,* at GER–1. The Soviets objected to the Western Powers' goals regarding the future political status of Germany, specifically, their efforts to create a fully sovereign Germany.

*See* Marian Nash Leich, *Contemporary Practice of the United States Relating to International Law*, 85 Am.J. Int'l L. 155, 164 (1991). As shown *infra*, the U.S.S.R. and the Western Powers also disagreed on the issue of reparations. Consequently, in March, 1948, the U.S.S.R. left the Inter–Allied Control Council, thus initiating the division of Germany. *See Germany: Law Digest, supra*, at GER–1.

On May 23, 1949, the Western Powers established the F.R.G. in the Western Zones. In response to the creation of the F.R.G., the Soviets formed the G.D.R. in the Soviet Zone that same year. *See Germany: Law Digest, supra*, at GER–1. In 1954, the Western Powers· ended the occupation regime in the F.R.G. *See* Protocol on Termination of the Occupation Regime in the Federal Republic of Germany, Oct. 23, 1954, 6 U.S.T. 4117, 331 U.N.T.S. 219. However, the Western Powers explicitly reserved their rights with respect to Berlin and Germany as a whole, and to participate in the conclusion of a final peace treaty. *See id.*

### a. Yalta and Potsdam

In February, 1945, prior to Germany's surrender, Roosevelt, Churchill and Stalin, the heads of the U.S., the U.K. and the U.S.S.R., respectively, met in Yalta to decide post-war policies. *See* Seymour J. Rubin, *The Washington Accord Fifty Years Later: Neutrality, Morality, and International Law*, 14 Am.U. Int'l L.Rev. 61, 62 (1998). They agreed that "Germany must pay in kind for the losses caused by her to the Allied nations in the course of the war." Yalta Conference, Sec. V.1. The U.S. the U.K. and the U.S.S.R. agreed that the Allied nations which bore the main burden of the war, suffered the greatest losses and organized the victory over Germany, would receive reparations from Germany. *Id.*

Shortly after the war, the U.S., the U.K. and the U.S.S.R. met again, this time in

Potsdam, and reiterated their Yalta understanding—to make Germany pay reparations. *See* Protocol of Proceedings Approved at Berlin (Potsdam), Sec. III, Aug. 2, 1945, 3 Bevans 1207 ("Potsdam Conference"). They decided to extract reparations from Germany in the form of machines, other industrial equipment and German external assets, rather than in monetary payments. *See* Henry A. Turner, Jr., *The Two Germanies Since 1945*, at 12 (1987). They further agreed that the U.S.S.R. would take reparations in the form of (1) industrial equipment from the Soviet Zone and (2) German external assets in Finland, Bulgaria, Hungary, Romania and Eastern Austria. *See* Inter–Allied Reparation Agency, *First Report of the Secretary General for 1946 ("IARA 1946 Report")*, at 8. In addition, since most of Germany's production industry was located in the Western Zones, the U.S. and the U.K. agreed to give the U.S.S.R. twenty-five percent of the industrial equipment extracted from the Western Zones. *See id.* Since the Soviet Zone was mostly agricultural, the U.S.S.R. agreed to ship food and raw materials to the Western Zones as payment for fifteen percent of the industrial equipment it would receive. *See id.* Further, the U.S.S.R. agreed to satisfy Poland's claims from its share of reparations. *See id.* In turn, the U.S. and the U.K. would satisfy the reparations claims of the rest of the Allies from the removal of industrial equipment in the Western Zones and from German external assets in countries other than those set aside for the U.S.S.R. *See id.*

### b. Paris Reparations Treaty

█ In January, 1946, the U.K. and the U.S., along with the governments of sixteen other nations [29], met in Paris to decide upon the method of distributing reparations between those nations as to whom no decision had been reached at the

---

**29.** Albania, Australia, Belgium, Canada, Denmark, Egypt, France, Greece, India, Luxembourg, Norway, New Zealand, the Netherlands, Czechoslovakia, South Africa and Yugoslavia. *See* Paris Reparations Treaty, at 5.

Potsdam Conference.[30] The Paris conference culminated in the enactment of the Paris Reparations Treaty, which provided that each signatory nation would receive a percentage of the total reparations the Western Powers collected based on their war related damages and contribution to the Allied war effort. *See IARA 1946 Report,* at 8; *see also* Paris Reparations Treaty, Part I, Art. 1. The signatory nations agreed that Germany would pay reparations in the form of industrial and capital equipment, merchants ships, German external assets and monetary gold.[31] *See* Paris Reparations Treaty, Part I, Art. 1.A, Part III. Further, the Western Powers agreed to dismantle and transfer Germany's industrial plants located in their respective zones, along with any other German assets, to the Inter–Allied Reparation Agency[32] by the end of 1947, for redistribution as war reparations. *See IARA 1946 Report,* at 8.

Pursuant to the Paris Reparations Treaty, each signatory nation's share of reparations was supposed to satisfy any and all claims held by a nation, or its nationals, against the German government or German companies. Specifically, the Paris Reparations Treaty provided that:

> The Signatory Governments agree among themselves that their respective shares of reparation, as determined by the present Agreement, *shall be regarded by each of them as covering all its claims and those of its nationals*

against the former German Government and its Agencies, of a governmental or private nature arising out of the war. . . .

Paris Reparations Treaty, Part I, Art. 2.A ("Article 2.A" or "Art. 2.A") (emphasis added). In sum, the Paris Reparations Treaty authorized the Western Powers to seize Germany's assets for distribution to the signatory nations in accordance with the Treaty, thereby satisfying any claims the signatory nations, or their nationals, might have against the German government or its "Agencies".

The German Supreme Court has held that the term "Agencies" encompasses private corporations using forced laborers, such as Defendants. *See* BGH (1973), at 9; *Staucher,* BGH (1963), at 5. Thus, the parties agree that Article 2.A of the Paris Reparations Treaty subsumed the claims of the signatory nations, and their nationals, thereby precluding nationals of the signatory nations from bringing forced labor claims against the German government or German companies. (*See* II Tr. at 5:13–18.)[33] As stated by Professor Neuborne at oral argument,[34] it would have been illogical to allow "private litigation against corporations all of whose assets were being seized, dismantled and taken and literally distributed to the people on whose behalf the litigation would have been brought." (II Tr. at 10:3–8.)

However, the Paris Reparations Treaty did not subsume all individual claims.

---

**30.** The U.S.S.R. did not attend the Paris conference because it had negotiated its reparations arrangements at the Potsdam Conference. *See* Rubin, *supra,* at 62.

**31.** The Paris Reparations Treaty does not define the term "monetary gold". However, the U.S. representative to the Paris conference stated that "monetary gold" consists of "gold bullion and gold coins found in Germany [or] gold which is in such form as to be a medium of exchange." Elizabeth B. White, *The Disposition of § —Looted Victim Gold During and After World War II,* 14 Am.U. Int'l L.Rev. 213, 221 (1998). "Non-monetary gold" includes gold and non-gold personal property that the Nazis seized from their victims. *Id.*

**32.** The Paris Reparations Treaty provided for the creation of an Inter–Allied Reparation Agency that would collect the assets the Western Powers extracted and distribute them to the signatory nations. *See IARA 1946 Report,* at 8.

**33.** "II Tr." refers to the transcript of the August 5, 1999 oral argument.

**34.** Burt Neuborne, a professor at New York University School of Law, submitted various declarations to the Court in support of Iwanowa's claims and argued on Iwanowa's behalf at oral argument.

The War had produced a class of persons categorized as "nonrepatriable victims of German action" who had no national government to protect their interests. Consequently, the reparations scheme set forth in the Paris Reparations Treaty could not satisfy their claims. In order to assist nonrepatriable victims, the signatories inserted a provision in the Paris Reparations Treaty establishing a fund to assist nonrepatriable persons. Article 8 titled *Allocation of a Reparation Share to Nonrepatriable Victims of German Action* provides in relevant part:

> In recognition of the fact that large numbers of persons have suffered heavily at the hands of the Nazis and now stand in dire need of aid to promote their rehabilitation but will be unable to claim the assistance of any Government receiving reparation from Germany, the Governments of the United States, France, the United Kingdom, Czechoslovakia and Yugoslavia, in consultation with the Inter–Governmental Committee on Refugees, shall as soon as possible work out in common agreement a plan on the following general lines:
>
> A. A share of reparation consisting of all the non-monetary gold found by the Allied Armed Forces in Germany and in addition a sum not exceeding 25 million dollars shall be allocated for the rehabilitation and resettlement of nonrepatriable victims of German action.
>
> \* \* \* \* \* \*
>
> D. The persons eligible for aid under the plan in question shall be restricted to true victims of Nazi persecution and to their immediate families and dependents, in the following classes:
>
> \* \* \* \* \* \*
>
> (iii) Nationals of countries formerly occupied by the Germans who cannot be repatriated or are not in a position to be repatriated within a reasonable time. . . .

Part I, Art. 8 ("Article 8" or "Art. 8"). This fund, however, would not be used to satisfy nonrepatriable victims' individual claims. Section H provides that "[t]he fund shall be used, not for the compensation of individual victims, but to further the rehabilitation or resettlement of persons in the eligible classes." Paris Reparations Treaty, Part I, Art. 8, § H. Furthermore, Article 8 preserved the right of nonrepatriable victims to press claims against a future German government. Specifically, section I provides that "[n]othing in this Article shall be considered to prejudice the claims which individual refugees may have against a future German Government, except to the amount of the benefits that such refugees may have received from the sources referred to ... above." Paris Reparations Treaty, Part I, Art. 8, § I.

Although Article 8 applies only to stateless refugees asserting war related claims against the government, Iwanowa asserts that Article 8, § I is evidence that the Paris Reparations Treaty contemplated that individuals like herself could, and would, assert such claims at a later date. This Court disagrees with Plaintiff's assertion.

As shown in Part II.B.3.a, *infra*, when the terms of a treaty are unambiguous, courts must interpret the treaty's terms according to their ordinary plain meaning. *See Santovincenzo v. Egan*, 284 U.S. 30, 40, 52 S.Ct. 81, 76 L.Ed. 151 (1931) (holding that court must construe terms of a treaty "in their ordinary meaning"); *United States v. M.H. Pulaski Co.*, 243 U.S. 97, 106, 37 S.Ct. 346, 61 L.Ed. 617 (1917) (stating that there "is a strong presumption that the literal meaning [of a treaty] is the true one"); *Brink's Ltd. v. South African Airways*, 93 F.3d 1022, 1027 (2d Cir. 1996) (stating that interpretation of a treaty must begin "with the literal language" and where the language is " 'reasonably susceptible of only one interpretation, [the court's] task of interpretation ends there."); *Victoria Sales Corp. v. Emery Air Freight, Inc.*, 917 F.2d 705, 707 (2d Cir.1990) (stating that when the text is unambiguous, "a court shall not, through

interpretation, alter or amend the treaty.").

Article 8's plain language indicates that the Paris Reparations Treaty contemplated that nonrepatriable victims of German action could bring individual claims against the German government in the future. There is no evidence, however, that the signatories to the Paris Reparations Treaty envisioned that persons other than nonrepatriable victims could press individual claims against the German government or its agencies. Since Iwanowa has never alleged that she is a nonrepatriable victim of German action, within the meaning of Article 8, this Court finds that only Article 2.A, precluding individual claims, is relevant to this action.

### c. Halt of Reparations

Tensions between the Western Powers and the U.S.S.R. developed over the issue of reparations. The Soviets felt that they were entitled to seize as much of Germany's industrial equipment as possible as compensation for the Nazis' destruction and ravaging of the U.S.S.R. Accordingly, they dismantled and shipped entire factories, motor vehicles and railroad rails from the Soviet Zone to the U.S.S.R. See Turner, supra, at 13. In addition, they seized a portion of the current production of German factories in the Soviet Zone and shipped it to the U.S.S.R. See id.

These actions were unacceptable to the Western Powers. First, because the Soviets never shipped food and raw materials to the Western Zones, as agreed in Potsdam, those Zones (which did not produce enough food to feed their population) had to export industrial products to pay for the cost of importing food. Id. at 14. Second, the reduction in Germany's industrial productivity as a result of reparations to the Soviets shifted the cost of feeding the Germans to the Western Powers. Id. at 13–14. The Western Powers feared that the extraction of reparations would destroy Germany's economy, and that they, specifically the U.S., would have had to bear responsibility for providing relief to the Germans. See John L. Gaddis, The United States and the Origins of the Cold War 1941–1947, at 221–22 (1972).

Pursuant to the Potsdam Conference and the Paris Reparations Treaty, the Western Powers were supposed to complete the removal of industrial equipment from their respective Zones by the end of 1947 so that the Inter–Allied Reparation Agency could complete distribution of reparations by June, 1948. See Resolution by the Inter–Allied Reparation Agency, in II Foreign Relations, 734, 734 (1948). However, taxpayers in the U.S., the U.K. and France began pressuring their governments to reduce costly shipments of food to the Germans in the Western Zones. Id. Consequently, in May, 1946, the U.S. halted the dismantling of German industries in its Zone and halted reparation shipments to the Soviet Zone. See Turner, supra, at 14. Shortly thereafter, the U.K. and France did the same. See id. Further, by mid–1947, the Western Powers had suspended the allocation to the Inter–Allied Reparation Agency of all but 250 of the more than 1,600 plants they had estimated would be available for distribution to the Allies. See Inter–Allied Reparation Agency, Report of the Secretary General for the Year 1948 ("IARA 1948 Report"), at 5. Although the Western Powers later provided the Inter–Allied Reparation Agency with a list of 858 plants that would be available as reparations, by July, 1948, the Western Powers had allocated only 147 of those plants. Id. at 5–7; see generally Recommendation Concerning the Retention in Germany or Removal as Reparations of the German Industrial Plants Listed by the Humphrey Committee, Mar, 31, 1949, U.S.–Fr.–U.K., 63 Stat. 2901, T.I.A.S. 2142 (agreeing to dismantle less than ten (10) of the 167 plants reviewed on the ground that the rest of the plants would contribute more to Europe's economic recovery if they remained in the Western Zones). Furthermore, the plants that the Western Zones allocated to the Inter–Allied Reparation Agency "con-

tained a disproportionate amount of machines and equipment of markedly inferior quality or condition." *IARA 1948 Report.* at 7. Consequently, the Allies never received their respective share of reparations, as negotiated in the Paris Reparations Treaty.

### d. Transition Agreement

The German Reich's military and political collapse in 1945 resulted in state bankruptcy such that the amount of debt precluded complete satisfaction of all liabilities. *See* BVerfG [Federal Constitutional Court], NJW 1996, 2717, at 3 (F.R.G.) ["BVerfG (1996)"]. By 1952, the F.R.G. had not paid its war debts, including the reparations set forth in the Paris Reparations Treaty. Furthermore, as stated above, the Western Powers feared that the payment of reparations would continue to hinder the F.R.G.'s ability to rebuild its economy. *See* Gaddis, *supra,* at 221–22. Consequently, on May 26, 1952, the Western Powers and the F.R.G. entered into the Transition Agreement, whereby the Western Powers agreed to defer payment of their share of reparations until a later date. Specifically, the Transition Agreement provides that:

> The problem of reparation shall be settled by the peace treaty between Germany and its former enemies or by earlier agreements concerning this matter. The Three Powers undertake that they will at no time assert any claim for reparation against the current production of the Federal Republic [of Germany].

Ch. 6, Art. 1. Further, in addition to deferring payment of reparations, by agreeing to never seek reparations from the F.R.G.'s current production, the Western Powers gave the F.R.G. the encouragement and freedom it needed to rebuild its industries and stabilize its economy.

### e. London Debt Agreement

Many of the signatories to the Paris Reparations Treaty agreed with the Western Powers' philosophy, as evidenced by the Transition Agreement—that allowing West Germany to rebuild its economy was more important than collecting their respective shares of reparations. *See* LG Bremen, at 8 (stating that the signatories to the London Debt Agreement viewed "the rebuilding and economic consolidation of the [F.R.G. as] urgent—in comparison to compensation and reparations payments."). Thus, on February 27, 1953, Belgium, Canada, Ceylon, Denmark, France, Greece, Iran, Ireland, Italy, Liechtenstein, Luxembourg, Norway, Pakistan, Spain, Sweden, Switzerland, South Africa, the U.K., the U.S. and Yugoslavia, on the one hand, and the F.R.G., on the other, entered into the London Debt Agreement.

The Preamble to the London Debt Agreement clearly states its intent. It provides in relevant part:

> Desiring to remove obstacles to normal economic relations between the [F.R.G.] and other countries and thereby to make a contribution to the development of a prosperous community of nations;

> Considering that, for about twenty years, payments on German external debts have not, in general, conformed to the contractual terms; that from 1939 to 1945 the existence of a state of war prevented any payments from being made with respect to many of such debts; that since 1945 such payments have been generally suspended; and that the [F.R.G.] desires to put an end to this situation;

> Considering that [France, the U.K. and the U.S.] have, since 8th May, 1945, furnished to Germany economic assistance which has substantially contributed to the rebuilding of the German economy, with the effect of facilitating a resumption of payments on the German external debts;

> \* \* \* \* \* \*

> Considering that the Governments of [France, the U.K. and the U.S.] set up

... the Tripartite Commission on German Debts for the purpose of preparing and for working out, with the Government of the [F.R.G.], with other interested Governments and with representatives of creditor and debtor interests, a plan for the orderly overall settlement of German external debts;

Considering that [the Tripartite] Commission informed the representatives of the Government of the [F.R.G.] that the Governments of [France, the U.K. and the U.S.] were prepared to make important economic concessions with respect to the priority of their claims for post-war economic assistance over all other foreign claims against Germany and German nationals and with respect to the total amount of these claims, on condition that a satisfactory and equitable settlement of Germany's pre-war externals debts was achieved;

Considering that such a settlement of German external debts could be achieved only by a single overall plan which would take into account the relative positions of the various creditor interests, the nature of various categories of claims and the general situation of the [F.R.G.].

London Debt Agreement, Preamble. As stated by the Preamble, the London Debt Agreement's main purpose was to enable the F.R.G. to establish normal economic relations with other nations and to settle its external debts. *See id.; see also* OVG [Administrative Court of Appeals] Müenster, NJW 1998, 2302, at 8 (F.R.G.) ["OVG Muenster (1998)"]. In order to allow the F.R.G. to settle its external debts, the London Debt Agreement established a list of the debts that the Agreement would settle, along with a schedule of payments.[35]

The London Debt Agreement's objective, "to achieve the reestablishment of orderly and normal economic relations with foreign [nations], could only be accomplished" if the F.R.G. could avoid excessive claims for wartime and pre-war debt. *See* BGH[36] (1973), at 16; *see also Staucher,* BGH (1963), at 3. To relieve the F.R.G. from excessive claims, the signatories to the London Debt Agreement agreed to defer the collection of reparations, as defined and scheduled by the Paris Reparations Treaty, until the F.R.G. rebuilt its economy. In effect, the London Debt Agreement established the equivalent of a bankruptcy workout plan designed to defer consideration of certain private liabilities until the bankrupt entity (the F.R.G.) regained its financial health. *See Krakauer I,* LG Bonn (1997), at 23, 28.

Article 5 of the London Debt Agreement sets forth the claims that would be deferred. Article 5(2) titled *Claims Excluded from the Agreement* is particularly relevant to Iwanowa's claims. Article 5(2) provides:

> Consideration of claims arising out of the Second World War by countries which were at war with or were occupied by Germany during that war, and by nationals of such countries, against the Reich [or] agencies of the Reich ... shall be deferred until the final settlement of the problem of reparations.

Thus, Article 5(2) defers consideration of the war related claims of the Allies, or their nationals, against the German government or its agencies.[37]

---

**35.** Article 4 titled *Debts to be Settled,* provides that the London Debt Agreement would settle the following debts:

(a) non-contractual pecuniary obligations, the amount of which was fixed and due before 8th May, 1945;
(b) pecuniary obligations arising out of loan or credit contracts entered into before 8th May, 1945;
(c) pecuniary obligations arising out of contracts other than loan or credit contracts and due before 8th May, 1945.
London Debt Agreement, Art. 4.

**36.** As shown *supra,* the BGH, the Supreme Court, is Germany's highest court for civil and criminal matters.

**37.** Article 5(1) deferred claims arising out of World War I. Article 5(3) deferred the claims

Although Article 5(2) of the London Debt Agreement only addressed claims "against the Reich or agencies of the Reich", the Supreme Court has interpreted the London Debt Agreement as covering claims against private corporations such as Defendants. *See* BGH (1973), at 9; *Staucher*, BGH (1963), at 11. Specifically, German courts have held that, pursuant to Article 5(2) of the London Debt Agreement, private corporations that utilized unpaid labor during World War II were entitled to the same deferral defense as the German government. *See* BGH (1973), at 9–11; *Staucher*, BGH (1963), at 11 (holding that Article 5(2) of the London Debt Agreement precluded Polish plaintiff's forced labor claims against a German company).[38]

### f. *Two–Plus–Four Treaty*

The London Debt Agreement precluded adjudication of any war related claims by the Allies, and their nationals, against German defendants "until the final settlement of the problem of reparations." Art. 5(2). Although the London Debt Agreement was silent as to when this "final settlement" would occur, as stated *supra*, the Transition Agreement specifically dictated that "[t]he problem of reparation shall be settled by the peace treaty between Germany and its former enemies or by earlier agreements concerning this matter." Ch. 6, Art. 1.

On September 12, 1990, the F.R.G. and the G.D.R. on one side and the U.S., the U.K., France and the U.S.S.R. on the other, entered into the Two–Plus–Four Treaty, effective March 15, 1991. The Two–Plus–Four Treaty reunified West and East Germany and terminated the occupying Allied Powers' rights and responsibilities over Germany. *See* Two–Plus–Four Treaty, Art. 7.[39] In accordance with the Transition Agreement, the Two–Plus–Four Treaty, a peace treaty between a unified Germany and its former adversaries, settled the problem of reparations. *See* Transition Agreement, Ch. 6, Art. 1; *see also* OVG Müenster (1998), at 12 (stating that the final settlement of the reparations issue within the context of Article 5(2) of the London Debt Agreement was necessarily linked to Germany's reunification "because only a government which represent[ed] all of Germany [could] assert or waive German counterclaims.").

In Article 7 of the Two–Plus–Four Treaty, the Allied Powers relinquished the rights and responsibilities concerning Berlin and all of Germany that they expressly had reserved in Potsdam. *See supra* note 38. Although the Two–Plus–Four Treaty does not expressly state that the phase of German reparations has ended, it is clear from Article 7 that the Allied nations can demand no further reparations payments from Germany. *See Krakauer I*, LG Bonn

---

of countries which were not at war with, or occupied by, Germany during World War II. Article 5(4) addressed the claims of countries that were incorporated in, or allied with, Germany during World War II. Article 5(2) is the only provision pertinent to Iwanowa's claims since she was national of the U.S.S.R. during World War II, a nation which was at war with, and had been occupied by, Germany when her cause of action arose.

**38.** The Supreme Court found that the legislative history surrounding the London Debt Agreement revealed that its drafters discussed forced labor claims by foreign concentration camp prisoners in the context of Article 5(2). *See Staucher*, BGH (1963), at 3. The Supreme Court further noted that it was apparent from the negotiations preceding execution of the London Debt Agreement, and from the text of

the Agreement, that its drafters intended Article 5(2) to protect not only the German government, but also the F.R.G.'s industry and currency from forced labor claims. *See id.*

**39.** Article 7 of the Two–Plus–Four Treaty provides:

(1) The French Republic, [the U.S.S.R., the U.K. and the U.S.] hereby terminate their rights and responsibilities relating to Berlin and to Germany as a whole. As a result, the corresponding, related quadripartite agreements, decisions and practices are terminated and all related Four Power institutions are dissolved.
(2) The United Germany shall have accordingly full sovereignty over its internal and external affairs.

(1997), at 24–27; LG Bremen (1998), at 11. Further, the Two–Plus–Four Treaty's silence on the issue of reparations can be explained, in part, by the fact that between 1953 and 1990, the F.R.G. resolved the issue of reparations by way of international agreements with the individual Allied nations.[40] (*See* Letter from German Ministerial Director Horst Teltschik to Chancellor Helmut Kohl of 3/15/90, at 2.) Indeed, the F.R.G.'s Federal Government has stated that "45 years after the war, the reparations issue is de facto finished with, owing to the lack of concrete, contractually agreed upon obligations, owing to the renunciations of our former enemies, and owing to already completed efforts of Germany." (*Id.*); *see also* OVG Müenster (1998), at 12 (stating that the Two–Plus–Four Treaty must be viewed before the backdrop of (1) the reparations payments which Germany had made during the first post-war years and (2) the ongoing extensive payments toward the restitution of Nazi wrongs which Germany made to individual persons on the basis of international treaties or contracts with private organizations).

Thus, German courts have held that the signing of the Two–Plus–Four Treaty constitutes the "final settlement of the problem of [World War II] reparations" for purposes of the London Debt Agreement. *See* OVG Müenster (1998), at 9; LG Bremen (1998), at 12; *Krakauer I*, LG Bonn (1997), at 23. Since the Two–Plus–Four Treaty is the final settlement of the reparations issue, the London Debt Agreement no longer bars review of the war related claims of the Allies or their nationals against the German government or German companies. *See* OVG Müenster (1998), at 8–10. As stated by the Administrative Court of Appeals:

> [T]he Two Plus Four Treaty causes the lapse of the postponement agreed upon in [the London Debt Agreement] because the issue of reparations in connection with World War II will no longer arise after the conclusion of this Treaty. It is apparent from the preamble that the [T]reaty was concluded with the goal of agreeing upon the definite settlement with regard to Germany. This makes it clear that there will be no additional (peace) treaty settlements concerning legal questions in connection with World War II and the occupation of Germany.

*Id.* at 11. The Administrative Court of Appeals concluded that "it was the intent of the signatory parties that there be no future treaty settlement of the reparation issue with regard to Germany; thus, the reparations issue was 'settled.'" *Id.* at 12. In short, the Two–Plus–Four Treaty lifted the London Debt Agreement's moratorium on consideration of the Allies', or their nationals', claims against the German government or German companies. *See* LG Bremen (1998), at 13; *Krakauer I*, LG Bonn (1997), at 24.

### 3. *London Debt Agreement Contemplates Individual Claims*

Defendants argue that the Paris Reparations Treaty permanently subsumed all private claims arising out of World War II, thereby precluding the instant claims. Iwanowa agrees that the intent of the Paris Reparations Treaty was to subsume gov-

---

**40.** Since the end of World War II, the F.R.G. has established several major compensation programs and entered into at least two dozen treaties or agreements with, *inter alia,* the U.S., the U.K., the former U.S.S.R., Poland, Belgium, France and Israel, providing for post-war reparations programs to compensate persons who suffered injuries attributable to the Nazi war effort. *See, e.g.,* Exchange of Notes, Mar. 30, 1993, F.R.G.–Uk.–Bela.–Rus.; Transition Agreement; 1952 Federal Act on Compensation for Victims of National Social- ist Persecution; 1981 Compensation for Non–Jewish Victims Fund. To date, the German government has paid more than $100 billion in compensation to Nazi victims. *See* Stuart E. Eizenstat, *Statement by Under Secretary of State for Economic, Business and Agricultural Affairs to Executive Monitoring Committee* (Apr. 15, 1999), *reprinted at FinanceNet, Property Restitution in Central and Eastern Europe,* at 8 (visited Sept. 13, 1999) <http://www.financenet.gov/financenet/nyc-net/Eizenstt.htm>.

ernment and individual claims arising out of the war into the Treaty and preclude private litigation. (*See* II Tr. at 41:23–42:5.) She asserts, however, that "the entire structure of the Paris [Reparations] Agreement was axed ... because it was self-defeating, and we moved instead to the London Debt Agreement." (II Tr. at 42:8–12.) Iwanowa argues:

> If, in fact, the [Paris Reparations Treaty] subsumed [private] claims once and for all, and there were no individual claims left, why was it necessary to say [in the London Debt Agreement] that the individual claims would be postponed?
>
> It was because the people who were drafting the London Debt Agreement knew that this was a new regime, that the old regime, in which these claims would have been subsumed, because there was no room for them, was simply over, and that there was a new regime in which these claims had to be thought about, but they wanted to postpone them to give the German corporations a chance to regain their economic health.

(II Tr. at 48:15–25.) In effect, Iwanowa argues that the London Debt Agreement superseded the Paris Reparations Treaty.

Defendants assert that the London Debt Agreement could not have deferred consideration of individual claims because such claims were subsumed into the governmental claims of the signatories to the Paris Reparations Treaty. Defendants assert that the London Debt Agreement only deferred consideration of the claims of governments. (II Tr. at 51:13–20.) German courts have rejected this argument and held that the London Debt Agreement deferred consideration of private claims against the German government and its agencies, including German companies. *See* BGH (1973); BGH [Supreme Court], VI ZR 186/71, at 3 (1964) (F.R.G.) ["BGH (1964)"]; *Staucher*, BGH (1963), at 3; *Krakauer I*, LG Bonn (1997), at 23. Specifically, German courts have held that forced labor claims "are to be viewed as claims

arising from World War II within the meaning of [the London Debt Agreement], the review of which must be postponed until the final settlement of the reparations issue." *Krakauer I*, LG Bonn (1997), at 23–24. Until recently, German courts have denied forced labor claims as "unfounded at the time" or "invalid at the present time"; in each instance, the courts have cited Article 5(2) of the London Debt Agreement. *See* BGH (1973), at 16–17; BGH (1964), at 3; *Staucher*, BGH (1963), at 1; *Krakauer I*, LG Bonn (1997), at 24 ("all complaints by former forced laborers, even to the extent that they were directed against the business operations themselves, were dismissed as currently without merit.").

As shown above, the German Supreme Court has repeatedly held that the London Debt Agreement deferred individual forced labor claims until the final settlement of the reparations issue. *See* BGH (1973), at 16–17; BGH (1964), at 3; *Staucher*, BGH (1963), at 1. However, the German Supreme Court has never held that these deferred claims were cognizable. The German Supreme Court refused to address the merits of forced labor claims and merely held that courts could not consider forced labor claims for the time being. *Id.* As such, the issue before this Court is not whether the London Debt Agreement deferred consideration of private claims—the German Supreme Court has already answered that question in the affirmative—but whether such claims are cognizable versus being permanently barred by the Paris Reparations Treaty. For the reasons discussed below, this Court finds that individual claims are cognizable under the London Debt Agreement; however, only the government of the country of which the forced laborer was a national at the time the forced labor claims arose can pursue such claims. In short, Iwanowa must press her individual claims through the governments of the successor states to the U.S.S.R.

#### a. Standards for Interpreting Treaties

 A treaty is a contract between or among sovereign nations. *See Trans World Airlines, Inc. v. Franklin Mint Corp.*, 466 U.S. 243, 253, 104 S.Ct. 1776, 80 L.Ed.2d 273 (1984); *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 675, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979). General rules of construction apply to treaties. *See Trans World Airlines*, 466 U.S. at 262, 104 S.Ct. 1776 (Stevens, J., dissenting) (citing *Ware v. Hylton*, 3 U.S. 199, 3 Dall. 199, 240–41, 1 L.Ed. 568 (1796)). Treaties, like "other contracts . . . are to be read in the light of the conditions and circumstances existing at the time they were entered into, with a view to effecting the objects and purposes of the [nations] thereby contracting." *Trans World Airlines*, 466 U.S. at 262, 104 S.Ct. 1776 (Stevens, J., dissenting) (quoting *Rocca v. Thompson*, 223 U.S. 317, 331–32, 32 S.Ct. 207, 56 L.Ed. 453 (1912)). The parties' intentions dictate the interpretation of a treaty. *See United States v. Choctaw Nation*, 179 U.S. 494, 531–33, 21 S.Ct. 149, 45 L.Ed. 291 (1900).

 As with other contracts, there "is a strong presumption that the literal meaning [of a treaty] is the true one". *United States v. M.H. Pulaski Co.*, 243 U.S. 97, 106, 37 S.Ct. 346, 61 L.Ed. 617 (1917). Thus, interpretation of a treaty must begin "with the text of the treaty and the context in which the written words are used." *Air France v. Saks*, 470 U.S. 392, 397, 105 S.Ct. 1338, 84 L.Ed.2d 289 (1985) (citing *Maximov v. United States*, 373 U.S. 49, 53–54, 83 S.Ct. 1054, 10 L.Ed.2d 184 (1963)); *see also Brink's Ltd. v. South African Airways*, 93 F.3d 1022, 1027 (2d Cir.1996) (stating that interpretation of a treaty must begin "with the literal language."). A court interpreting a treaty must construe its terms "in their ordinary meaning as understood" by the international community. *See Santovincenzo v. Egan*, 284 U.S. 30, 40, 52 S.Ct. 81, 76 L.Ed. 151 (1931); *The Pizarro*, 15 U.S. 227, 2 Wheat. 227, 246, 4 L.Ed. 226 (1817);

*see also Trans World Airlines*, 466 U.S. at 262–63, 104 S.Ct. 1776 (Stevens, J., dissenting). Where the language of a treaty is " 'reasonably susceptible of only one interpretation, [the court's] task of interpretation ends there." *Brink's Ltd.*, 93 F.3d at 1027 (quoting *Buonocore v. Trans World Airlines*, 900 F.2d 8, 9–10 (2d Cir. 1990)); *see also Choctaw Nation*, 179 U.S. at 531, 21 S.Ct. 149. In such cases, courts must "be governed by the text—solemnly adopted by the governments of many separate nations—whatever conclusions might be drawn from the intricate drafting history". *Chan v. Korean Air Lines, Ltd.*, 490 U.S. 122, 134, 109 S.Ct. 1676, 104 L.Ed.2d 113 (1989). Courts must give effect to the treaty's terms "in the manner and to the extent which the parties have declared, and not otherwise." *The Amiable Isabella*, 19 U.S. 1, 72, 6 Wheat. 1, 5 L.Ed. 191 (1821). When the text is unambiguous, "a court shall not, through interpretation, alter or amend the treaty." *Victoria Sales Corp. v. Emery Air Freight, Inc.*, 917 F.2d 705, 707 (2d Cir.1990) (citing *Chan*, 490 U.S. at 134, 109 S.Ct. 1676); *see also The Amiable Isabella*, 19 U.S. at 71, 6 Wheat. 1 (holding that "to alter, amend, or add to any treaty, by inserting any clause, whether small or great, important or trivial, would be . . . an usurpation of power, and not an exercise of judicial functions."). When construing a treaty, the court must give the terms their ordinary meaning in context of the treaty, and, unless the terms are unclear, "it should rarely be necessary to rely on extrinsic evidence in order to construe a treaty." *Xerox Corp. v. United States*, 41 F.3d 647, 652 (Fed.Cir.1994).

 However, when the text of a treaty is unclear, courts may resort to extrinsic evidence to aid in its interpretation. *See Chan*, 490 U.S. at 134, 109 S.Ct. 1676 (citing *Air France v. Saks*, 470 U.S. 392, 105 S.Ct. 1338, 84 L.Ed.2d 289 (1985)); *see also Choctaw Nation*, 179 U.S. at 531, 21 S.Ct. 149; *Brink's Ltd.*, 93 F.3d at 1027. The courts "may look behind the written words to the history of the treaty, the

negotiations, and the practical construction adopted by the parties." *Air France,* 470 U.S. at 396, 105 S.Ct. 1338 (citation omitted). Treaties that are susceptible of multiple interpretations "shall be liberally construed, so as to carry out the apparent intention of the parties to secure equality and reciprocity between them." *De Geofroy v. Riggs,* 133 U.S. 258, 271, 10 S.Ct. 295, 33 L.Ed. 642 (1890); *see also Air France,* 470 U.S. at 396, 105 S.Ct. 1338.

### b. Interpretation of Article 2.A of the Paris Reparations Treaty

■ Article 2.A of the Paris Reparations Treaty provides that each signatory country's respective share of reparations, as calculated and set forth by the Treaty, covers "all its claims and those of its nationals against the former German Government and its Agencies, of a governmental or private nature arising out of the war". Paris Reparations Treaty, Part I, Art. 2.A. Article 2.A's plain language is susceptible of only one interpretation—that governmental and individual claims against Germany or its agencies arising out of the war were subsumed in each nation's share of reparations. Indeed, Plaintiff and Defendants agree that this is the proper interpretation of Article 2.A.[41] "When the parties to a treaty both agree as to the meaning of a treaty provision, and that interpretation follows from the clear treaty language, [the court] must, absent extraordinarily strong contrary evidence, defer to that interpretation." *Sumitomo Shoji America, Inc. v. Avagliano,* 457 U.S. 176, 185, 102 S.Ct. 2374, 72 L.Ed.2d 765 (1982). Thus, this Court need not go further in interpreting Article 2.A.

### c. Interpretation of Article 5(2) of the London Debt Agreement

■ The London Debt Agreement states that "[c]onsideration of claims arising out of the Second World War by coun-tries which were at war with or were occupied by Germany during that war, *and by nationals of such countries,* against the Reich or agencies of the Reich . . . shall be deferred until the final settlement of the problem of reparations." London Debt Agreement, Art. 5(2) (emphasis added). It is evident from the text of the London Debt Agreement that nationals of countries which were at war with Germany may have individual claims against Germany and its agencies, separate and apart from those claims asserted by their countries. Defendants argue that Article 5(2) merely defers the claims of governments but does not revive individual claims because the Paris Reparations Treaty subsumed an individual's claims with her government's claims.

Defendants' interpretation of the London Debt Agreement is not plausible. First, Article 5(2)'s deferral of claims brought by Allied nationals would be meaningless unless its drafters believed that such nationals possessed individual claims arising out of World War II. Second, Defendants' construction of Article 5(2) would render the term "and by nationals of such countries" superfluous. It is a cardinal principle of construction that courts shall interpret contracts, including treaties, so as to give meaning to each provision rather than rendering some provisions, or portions thereof, superfluous. *See Sullivan v. Kidd,* 254 U.S. 433, 439, 41 S.Ct. 158, 65 L.Ed. 344 (1921) ("all parts of a treaty are to receive a reasonable construction, with a view to giving a fair operation to the whole."); *De Geofroy,* 133 U.S. at 270, 10 S.Ct. 295 ("It is a rule, in construing treaties as well as laws, to give a sensible meaning to all their provisions, if that be practicable."); *United States v. State of Washington,* 873 F.Supp. 1422, 1429 (W.D.Wash.1994) (holding that "a treaty should not be interpreted so as to render one part inoperative"), *rev'd in part*

---

41. The parties disagree, however, on whether the Paris Reparations Treaty subsumed indi-vidual claims temporarily or permanently.

*on other grounds,* 135 F.3d 618 (9th Cir. 1998); *see also Restatement (Second) of Contracts* § 203(a) (1981) (stating that "an interpretation which gives a reasonable, lawful and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect.").

Third, the London Debt Agreement does not refer to the claims of nationals only once; it also refers to individual claims in Article 5(3) which provides in relevant part:

> Consideration of claims, arising during the Second World War, by countries which were not at-war with or occupied by Germany during that war, *and by nationals of such countries,* against the Reich and agencies of the Reich ... shall be deferred until the settlement of these claims can be considered in conjunction with the settlement of the claims specified in [Article 5(2) ]....

London Debt Agreement, Art. 5(3) (emphasis added). Thus, the only reasonable interpretation of Article 5 of the London Debt Agreement is that its drafters and signatories contemplated that nationals of the neutral countries (Article 5(3)) and of the Allied nations (Article 5(2)) retained [their] individual claims, separate from the claims held by their governments.

#### d. London Debt Agreement Supersedes Paris Reparations Treaty

The language of the London Debt Agreement is inconsistent with the language of the Paris Reparations Treaty. Article 2.A of the Paris Reparations Treaty subsumed the individual claims of the nationals of the Allied nations into their respective country's share of reparations. However, Article 5(2) of the London Debt Agreement contemplates that nationals of the Allied nations may have individual claims arising out of World War II, separate from the claims held by their respective nations. Iwanowa reconciles the inconsistency between Article 2.A of the Paris Reparations Treaty and Article 5(2)

of the London Debt Agreement by arguing that the drafters of the London Debt Agreement recognized that the old regime providing for reparations to the Allied nations pursuant to the Paris Reparations Treaty and subsuming individual claims, "was simply over, and that there was a new regime in which [individual] claims had to be thought about". (II Tr. at 48:20–23.) This Court finds that to the extent the Paris Reparations Treaty and the London Debt Agreement conflict, the London Debt Agreement is controlling.

A later statute or treaty must be harmonized with existing treaties to the extent possible. *See Menominee Tribe v. United States,* 391 U.S. 404, 413, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968); *Cook v. United States,* 288 U.S. 102, 119, 53 S.Ct. 305, 77 L.Ed. 641 (1933); *Whitney v. Robertson,* 124 U.S. 190, 193, 8 S.Ct. 456, 31 L.Ed. 386 (1888); *Committee of United States Citizens Living in Nicaragua v. Reagan,* 859 F.2d 929, 936 (D.C.Cir.1988). However, it has long been the rule that when a subsequent inconsistent law cannot be reconciled with a prior treaty, the subsequent law is deemed to abrogate the treaty to the extent of the inconsistency, without specific words of abrogation. *See Breard v. Greene,* 523 U.S. 371, 376, 118 S.Ct. 1352, 140 L.Ed.2d 529 (1998) ("when a statute which is subsequent in time is inconsistent with a treaty, the statute to the extent of conflict, renders the treaty null."); *Reid v. Covert,* 354 U.S. 1, 18, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957); *Whitney,* 124 U.S. at 194, 8 S.Ct. 456; *Bell v. Office of Personnel Mgmt.,* 169 F.3d 1383, 1386 (Fed.Cir.1999). By the same token, if there is an irreconcilable conflict between a subsequent treaty and a prior treaty between the same nations, relating to the same subject matter, the new treaty is controlling and must be deemed to abrogate the prior inconsistent treaty or provision therein. *See id.; see also Fotochrome, Inc. v. Copal Co., Ltd.,* 517 F.2d 512, 518 n. 4 (2d Cir.1975) (finding that where two countries that were parties to a

treaty later become signatories to a multinational convention covering the same subject matter, the convention is controlling).

 It is assumed that when signatories to a treaty enact a subsequent treaty relating to the same subject matter covered by the prior treaty, the signatories have the earlier treaty in mind. *See Farley v. Metro–North Commuter R.R.*, 865 F.2d 33, 36 (2d Cir.1989) (stating that when "the legislature enacts a provision ... it has in mind previous statutes relating to the same subject matter.") (quoting 2A N. Singer, *Sutherland's Statutes and Statutory Construction* § 51.02 (Sands 4th ed.1984)); *Int'l Union of Elec., Radio and Mach. Workers, AFL—CIO—CLC v. Westinghouse Elec. Corp.*, 631 F.2d 1094, 1110 (3d Cir.1980) (Van Dusen, J., dissenting) (stating that "in terms of legislative intent, it is assumed that whenever the legislature enacts a provision it has in mind previous statutes relating to the same subject matter"); *Damato v. Jack Phelan Chevrolet Geo, Inc.*, 927 F.Supp. 283, 292 (N.D.Ill. 1996) (stating same). The Western Powers were actively involved in negotiating and drafting the Paris Reparations Treaty and the London Debt Agreement. Article 2.A of the Paris Reparations Treaty addressed the claims of nationals. Article 5(2) of the London Debt Agreement also addressed the claims of nationals. Hence, both treaties relate to the same subject matter. As stated above, treaties on the same subject must be construed together so that effect is given to every provision unless there is an irreconcilable conflict between the treaties, in which case the latter supersedes the former.

 Article 2.A of the Paris Reparations Treaty bars individual claims against Germany or its agencies. Article 5(2) of the London Debt Agreement defers individuals' claims against Germany or its agencies. Thus, there exists an irreconcilable conflict between Article 2.A. of the Paris Reparations Treaty and Article 5(2) of the London Debt Agreement. As such, the canons of statutory interpretation dictate that Article 5(2) of the London Debt Agreement, as a provision in the later treaty, supersedes Article 2.A of the Paris Reparations Treaty.[42]

### e. Iwanowa Cannot Press Individual Claims in a Judicial Forum

As further discussed in *infra* Part V, the fact that the London Debt Agreement contemplates individual claims is not tantamount to a finding that such claims may be asserted in a judicial forum. Indeed, the London Debt Agreement indicates that all claims arising out of World War II, including individual claims, may only be pursued through government-to-government negotiations.[43]

**42.** The history surrounding post-war Germany supports this conclusion. The reparations agreed to in the Paris Reparations Treaty were supposed to satisfy individual and governmental claims arising out of World War II. Due to the failure of the reparations program, however, *see supra* Parts II.B.2.c & d, and the Allies' determination that rebuilding the F.R.G.'s economy was more important than extracting reparations, by 1952, such claims had not been satisfied. Had the signatories to the Paris Reparations Treaty received their share of reparations, there would not have been any claims to defer in the London Debt Agreement because such claims would have already have been satisfied by the reparations. However, since the claims which should have been settled by the Paris Reparations Treaty, including individual claims, were never satis-

fied, it was logical for the Allies to, in effect, revive such claims, by way of the London Debt Agreement, so that they could be addressed at a later date when the F.R.G. was economically stable.

**43.** In 1993, unified Germany agreed to contribute DM 1 billion in funds to former Soviet states, including the Russian Federation, Ukraine and Belarus, to compensate victims of Nazi persecution. *See* Exchange of Notes, Mar. 30, 1993, F.R.G.–Uk.–Bela.–Rus. Rostov is part of the Russian Federation. *See The Stateman's Year–Book 1997–98*, at 1078 (Brian Hunter, ed., 134th ed. Macmillan Press 1997). Thus, Iwanowa may be entitled to compensation from the Russian Federation's compensation fund.

### (1) *Interpretation of Article 5(3) of the London Debt Agreement*

 As stated above, pursuant to Article 5(3), "[c]onsideration of claims, arising during the Second World War, by countries which were not at war with or occupied by Germany during that war, and by nationals of such countries, against the Reich and agencies of the Reich . . . shall be deferred until the settlement of these claims can be considered in conjunction with the settlement of the claims specified in· [Article 5(2) ]", the claims of the Allies and their nationals. London Debt Agreement, Art. 5(3). However, one exception exists: instead of waiting until their claims could be addressed in conjunction with the Allies', or their nationals' claims, any neutral country and its nationals could settle their claims "on the basis of, or in connection with agreements which have been signed by the Governments of [France, the U.K. and the U.S.] and the Government of any such [neutral] country." *Id.* Art. 5(3).

As stated above, there "is a strong presumption that the literal meaning [of a treaty] is the true one". *M.H. Pulaski Co.*, 243 U.S. at 106, 37 S.Ct. 346. Further, where the language of a treaty is " 'reasonably susceptible' of only one interpretation", *Buonocore*, 900 F.2d at 9–10, courts must "be governed by the text—solemnly adopted by the governments of many separate nations". *Chan*, 490 U.S. at 134, 109 S.Ct. 1676.

Article 5(3)'s text is susceptible of only one interpretation. Pursuant to Article 5(3), the claims of the neutral nations, and their nationals, could only be settled in one of two ways: (1) in conjunction with the settlement of the claims of the Allies and their nationals or (2) in connection with agreements between a neutral nation and the U.S., the U.K. or France. The first method requires an agreement between the German government and the governments of the Allied nations. The second method requires an agreement between the governments of the neutral nations and the governments of the U.S., the U.K. or

France. Thus, government-to-government negotiations and agreements are a prerequisite to the settlement of the neutral countries', and their nationals', claims.

If nationals of the Allied nations could file individual actions in different courts in different nations, the claims of the neutral countries, and their nationals, could never "be considered in conjunction with the settlement of the claims" of the Allies, and their nationals, as contemplated by Article 5(3). How could the claims of the neutral countries ever "be considered in conjunction with the settlement of the claims" of the Allies if worldwide individual litigation were to take place? The London Debt Agreement contemplates a peace treaty between Germany and its World War II enemies. Once Germany and the Allies entered into such a treaty, if any further claims by the neutral nations and their nationals remained, such claims would be settled in conjunction with the resolution, through the peace treaty, of the claims of the Allied nations. Article 5(3) is simply incompatible with private litigation.

### 4. *Statute of Limitations*

Defendants assert, in the alternative, that even if the Paris Reparations Treaty does not permanently bar Iwanowa's claims, the applicable statute of limitations for claims alleging violations of customary international law has run.

 Pursuant to Federal Rule of Civil Procedure 8(c), an assertion that the applicable statute of limitations bars a claim constitutes an affirmative defense to an action. The Third Circuit, however, has held that a Rule 12(b)(6) dismissal on statute of limitations grounds is warranted when "the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations." *Cito v. Bridgewater Township Police Dep't*, 892 F.2d 23, 25 (3d Cir.1989) (quoting *Bethel v. Jendoco Constr. Corp.*, 570 F.2d 1168, 1174 (3d Cir.1978)); *see also Rycoline Prods., Inc.*

*v. C & W Unlimited,* 109 F.3d 883, 886 (3d Cir.1997).

■ The Alien Tort Claims Act ("ATCA") does not contain a statute of limitations. When Congress fails to provide a statute of limitations for claims arising under federal statutes, courts should apply the limitations period of the "most closely analogous statute of limitations under state law." *DelCostello v. International Bhd. of Teamsters,* 462 U.S. 151, 152, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983); *Reed v. United Transp. Union,* 488 U.S. 319, 323–24, 109 S.Ct. 621, 102 L.Ed.2d 665 (1989); *Wilson v. Garcia,* 471 U.S. 261, 268, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985); *United Steelworkers of Am., AFL—CIO—CLC v. Crown Cork & Seal Co., Inc.,* 32 F.3d 53, 56 (3d Cir.1994), *aff'd sub nom. North Star Steel Co. v. Thomas,* 515 U.S. 29, 115 S.Ct. 1927, 132 L.Ed.2d 27 (1995). However, there exists a narrow exception to this rule when another federal statute or rule "clearly provides a closer analogy than available state statutes, and when the federal policies at stake and the practicalities of litigation make the [federal statute] a significantly more appropriate vehicle for interstitial lawmaking." *Reed,* 488 U.S. at 324, 109 S.Ct. 621 (quoting *DelCostello,* 462 U.S. at 172, 103 S.Ct. 2281); *see also North Star,* 515 U.S. at 34, 115 S.Ct. 1927; *Agency Holding Corp. v. Malley–Duff & Assocs., Inc.,* 483 U.S. 143, 150, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987); *Forti v. Suarez–Mason,* 672 F.Supp. 1531, 1547 (N.D.Cal.1987).

The Third Circuit has stated, and the Supreme Court has affirmed, that courts must "take seriously [the Supreme Court's admonition] that analogous state statutes of limitations are to be used unless they frustrate or significantly interfere with

federal policies." *United Steelworkers,* 32 F.3d at 57 (emphasis in original) (quoting *Reed,* 488 U.S. at 327, 109 S.Ct. 621).

■ To determine whether to apply a federal or state limitations period to a claim under the ATCA, "the Court must first identify the closest analogies under both federal and state law." *Forti,* 672 F.Supp. at 1547. "[A]ctionable claims under the [ATCA] involve harm to the person that is universally recognized" by the international community as violating the law of nations. *See id., see also supra* Part II.A.2.a. As shown *supra,* forced labor violates international law and is thus, an actionable tort under the ATCA. Iwanowa also seeks damages for the inhuman conditions Ford Werke inflicted upon her.[44] The most closely analogous state law (under Michigan, Delaware or New Jersey law) is for the recovery of damages for personal injuries.

The closest analogy under federal law is the Torture Victim Protection Act of 1991 ("TVPA"). *See Xuncax,* 886 F.Supp. at 191 (holding that the TVPA is the most analogous statute to the ATCA). Since the enactment of the TVPA, courts addressing claims under the ATCA have applied the TVPA limitations period. *See Cabiri v. Assasie–Gyimah,* 921 F.Supp. 1189, 1195–96 (S.D.N.Y.1996); *Xuncax,* 886 F.Supp. at 192–93. This Court finds that the TVPA, which was enacted as a statutory note to the ATCA, "clearly provides a closer analogy than the available state statutes." *United Steelworkers,* 32 F.3d at 57. Thus, this Court shall apply the TVPA limitations period to Iwanowa's claims under international law.[45]

The TVPA explicitly provides a ten year limitations period. *See* 28 U.S.C. § 1350, note § 2(c). World War II ended in 1945.

---

44. Iwanowa also seeks disgorgement of all economic benefits which have accrued to Defendants as a result of her forced labor and compensation for the reasonable value of her services. These claims sound in quantum meruit (not tort) and seek recovery for breach of implied contract and restitution. Claims sounding in contract, however, are not actionable under the ATCA and are thus, not relevant to Iwanowa's claims under international law.

45. The parties agree that the TVPA is the most analogous statute to the ATCA.

Iwanowa filed the instant action on March, 8, 1998, almost fifty-three (53) years after the end of the war. Iwanowa claims that the Paris Reparations Treaty, certain edicts, the doctrine of equitable tolling and the London Debt Agreement tolled the TVPA's ten year statute of limitations until November, 1997. Defendants concede that the edicts tolled the statute of limitations until 1949. However, they assert that the statute of limitations has been running since 1949 because neither the Paris Reparations Treaty nor the London Debt Agreement toll the limitations period on private claims.[46] This Court shall address these arguments separately.

### a. Tolling of the Statute of Limitations (1945–1953) ·

The Paris Reparations Treaty, along with the edicts that the Nazis and the Western Powers enacted, tolled the statute of limitations on claims against German defendants from the end of the war until the operative date of the London Debt Agreement, February 27, 1953.

On September 27, 1944, the Nazi government issued an emergency measure tolling the statutes of limitations on all civil claims until December 31, 1945. *See Edict Regarding the Effect of Total War on the Civil Law* § 32 (Sept. 27, 1944) (*"Second Edict"*). The Second Edict remained in effect after Germany's surrender in May, 1945. After the expiration of the Second Edict on December 31, 1945, the Allied Powers regulated the extension or tolling of limitations periods independently in their respective zones of occupation. The British Zone, where Ford Werke's Cologne's plant was located, issued two edicts tolling all statutes of limitations through December 31, 1948. *See Regulation of the*

*Tolling of the Statutes of Limitations and Similar Time Limits in the Civil Law and the Administration of Civil Justice* § 1 (Dec. 16, 1946); *Regulation Concerning the Extension of the Tolling of the Statutes of Limitations and Similar Time Limits in the Civil Law and the Administration of Civil Justice,* Art. I (Dec. 17, 1947).

In addition to these edicts, German courts have held, and Defendants concede, that the statute of limitations for forced labor claims was tolled from the end of the war until the establishment of the F.R.G. in 1949. *See* LG Bremen (1998), at 12; (I Tr. at 14:14–17.) Defendants assert, however, that any tolling mechanisms ended in 1949.

Iwanowa claims that the Paris Reparations Treaty tolled the statute of limitations from 1946, the date of the Paris Reparations Treaty, until 1953, the effective date of the London Debt Agreement. As stated *supra,* Article 2.A of the Paris Reparations Treaty barred any individual claims against the German government and its Agencies,[47] including Defendants, because such claims were subsumed into the governmental claims of the signatories to the Treaty. As long as Article 2.A of the Paris Reparations Treaty was in effect, former forced laborers could not press individual claims arising out of World War II against the German government or German companies. As shown *supra,* Article 2.A. of the Paris Reparations Treaty was in effect until Article 5(2) of the London Debt Agreement superseded it in 1953. Iwanowa argues that the statute of limitations was tolled during the period when the Paris Reparations Treaty barred individual claims against Ford Werke. This Court agrees.

---

**46.** As discussed *supra,* Defendants' main argument is that the Paris Reparations Treaty permanently subsumed private claims into governmental claims. In the alternative, Defendants argue that if this Court finds that the Paris Reparations Treaty does not preclude Iwanowa's claims, the Court must nevertheless dismiss the claims because they are time-barred.

**47.** As noted *supra,* German courts have repeatedly held that private corporations employing forced laborers were acting as agents of the German government. *See* BGH (1973), at 9–10; *Staucher,* BGH (1963), at 4–5.

Pursuant to German Civil Code (*"Burgerliches Gesetzbuch"* or "BGB") section 202(1), statutes of limitations are tolled during the period of time in which the law precludes a plaintiff from asserting a claim. Specifically, section 202(1) provides that:

> Prescription is suspended for so long as the performance is deferred or the person bound is temporarily entitled on any other ground to refuse to make performance.

BGB § 202(1) (Simon L. Goren, transl., 1994).

Until the London Debt Agreement superseded Article 2.A of the Paris Reparations Treaty, the law precluded Iwanowa from asserting claims arising out of World War II against German companies. Consequently, under BGB section 202(1), the statute of limitations on claims against German defendants was tolled until German law permitted the assertion of war related claims against German companies. As soon as the London Debt Agreement went into effect, the Paris Reparations Treaty's bar on forced labor claims ended, thereby lifting its tolling mechanism. However, as shown *infra*, the London Debt Agreement's deferral of such claims tolled the statute of limitations from 1953 to 1991.

### b. Tolling of the Statute of Limitations (1953–1991)

As shown in Part II.B.2.e, Article 5(2) of the London Debt Agreement postponed consideration of claims arising out of World War II against Germany and German companies until the final settlement of the problem of reparations. Indeed, the London Debt Agreement deferred consideration of forced labor claims asserted by any foreign nationals, even one whose country was not a signatory to the London Debt Agreement. *See Staucher*, BGH (1963), at 3; *see also Krakauer I*, LG Bonn (1997), at 23. Hence, pursuant to BGB section 202(1), it appears that the London Debt Agreement tolled the statute of limitations on claims arising out of World War II until the final settlement on the issue of reparations.

Defendants argue that the London Debt Agreement does not apply to individual claims and thus cannot toll the limitations period of the instant claims. As shown *supra*, this argument cannot stand in light of Article 5(2)'s plain language and German Supreme Court decisions holding that the London Debt Agreement defers consideration of individual forced labor claims. *See* London Debt Agreement, Art. 5(2); BGH (1973), at 9; *Staucher*, BGH 1963, at 11; *see also supra* Part II.B.2.e.

In the alternative, Defendants argue that the London Debt Agreement's moratorium only applied to claims by foreign nationals against the German government or German companies brought under German law, but did not toll claims under international law. This Court disagrees. The purpose of the London Debt Agreement's deferral provision was to give the F.R.G., and its industries, breathing space to rebuild and to restore its financial health. Allowing any claims against Ford Werke, regardless of whether they asserted violations of German law or customary international law, would have defeated the objectives of the London Debt Agreement. It would have been absurd for the London Debt Agreement to shield German industry from claims under German law while simultaneously allowing it to be sued for the same acts under customary international law. Hence, this Court finds that the London Debt Agreement deferred all claims by non-German nationals, arising out of World War II, against German corporations acting under color of Nazi law, regardless of whether the claims asserted violations of international law or German law. *See* London Debt Agreement, Art. 5(2).

As shown *supra* in Part II.B.2.f, the Two–Plus–Four Treaty is the final settlement contemplated by the London Debt Agreement. Thus, this Court finds that the London Debt Agreement tolled the

statute of limitations on the Allies', and their nationals', war-related claims against German companies until the Two–Plus–Four Treaty's operative date of March 15, 1991.

Ford Werke is a German corporation. As stated *supra,* German courts have held that corporations utilizing forced laborers during World War II were agents of the German government. *See* BGH (1973), at 9–10; *Staucher,* BGH (1963), at 4–5; *Krakauer I,* LG Bonn (1997), at 15. Hence, the London Debt Agreement tolled the statute of limitations on the claims against Ford Werke until March 15, 1991, the effective date of the Two–Plus–Four Treaty. *See Krakauer I,* LG Bonn (1997), at 24 (finding that the London Debt Agreement deferred claims arising out of World War II until March 15, 1991); LG Bremen (1998), at 11 (same).

### c. Tolling of the Statute of Limitations (1991–1997)

As stated in Part II.B.2.f, the Two–Plus–Four Treaty does not explicitly mention reparations. Iwanowa initially argued that the London Debt Agreement tolled the limitations period, not until the Two–Plus–Four Treaty's operative date, but rather until a German court announced that the Two–Plus–Four Treaty constituted the final resolution of the reparations issue. At oral argument, Iwanowa's counsel conceded that statutes of limitations generally begin to run on the effective date of a treaty. (*See* I Tr. at 37:17–21.) However, Iwanowa's counsel asserted that "based on confusion", the limitations period should be tolled between March 15, 1991 (the operative date of the Two–Plus–Four Treaty) and November 5, 1997, when the *Krakauer I* Court explicitly held that the Two–Plus–Four Treaty lifted the London Debt Agreement's moratorium on forced labor claims. (*Id.* at 37:20–21.) Iwanowa's counsel argues that Iwanowa could not have reasonably known that the

London Debt Agreement no longer barred review of the instant claims until publication of the *Krakauer I* opinion on November 5, 1997. This argument is not persuasive.

A statute of limitations begins to run on the effective date of the relevant treaty, not on the subsequent date of judicial interpretations of the treaty. *See Alliance of Descendants of Texas Land Grants v. United States,* 37 F.3d 1478, 1482–83 (Fed. Cir.1994). Indeed, German courts have expressly held that the London Debt Agreement postponed forced labor claims until March 15, 1991, the operative date of the Two–Plus–Four Treaty. *See* LG Bremen (1998), at 13; *Krakauer I,* LG Bonn (1998), at 46; *see also* OVG Müenster (1998), at 11.

Furthermore, Iwanowa's argument that she did not realize that the Two–Plus–Four Treaty lifted the London Debt Agreement's moratorium on claims arising out of the War until the publication of the *Krakauer I* opinion lacks merit.[48] The German Federal Register published notice of the ratification of the Two–Plus–Four Treaty on March 15, 1991. The *Krakauer I* Court noted that the media and the press discussed the Two–Plus–Four Treaty extensively. *See Krakauer I,* LG Bonn (1997), at 30. Indeed, the plaintiffs in *Krakauer I* and in LG Bremen (1998) filed their claims within twelve months and four months, respectively, of the Two–Plus–Four Treaty's operative date. Hence, it appears that those plaintiffs realized that the Two–Plus–Four Treaty lifted the London Debt Agreement's moratorium on forced labor claims before a court interpreted it as such. Consequently, Iwanowa's argument that she did not receive adequate notice that the London Debt Agreement no longer barred consideration of forced labor claims until publication of the *Krakauer I* opinion sounds hollow.

**48.** Of course, this argument is academic since in determining when the limitations period started to run, courts look at the effective date of a treaty, not the date that a litigant received notice. *See Alliance of Descendants,* 37 F.3d at 1482–83.

Iwanowa has not cited any case law showing that the statute of limitations should be tolled until the *Krakauer I* Court expressly interpreted the Two–Plus–Four Treaty as lifting the London Debt Agreement's moratorium. Thus, this Court concludes that the statute of limitations on Iwanowa's claims began to run on the effective date of the Two–Plus–Four Treaty, not when the *Krakauer I* Court first interpreted such Treaty.

### d. Claims Against Ford Werke

 Iwanowa filed the instant action on March 5, 1998. The Paris Reparations Treaty tolled the statute of limitations on war related claims against German companies, such as Ford Werke, from 1946 until 1953, when it was replaced by the London Debt Agreement. The London Debt Agreement's moratorium tolled the limitations period on such claims until March 15, 1991, the operative date of the Two–Plus–Four Treaty. As noted in *supra* Part II.B.4, the limitations period for claims under the ATCA is ten years. As such, the statute of limitations on Iwanowa's claims under international law would expire on March 15, 2001. Iwanowa filed the instant claims on March 5, 1998; thus, her claims under the ATCA against Ford Werke are timely.[49]

### e. Statute of Limitations is Not Tolled on Claims Against Ford

 Iwanowa has asserted claims under international law against both Ford Werke and Ford. The Complaint alleges that "[p]rior to November 5, 1997, plaintiffs' efforts to seek compensation for forced labor during the Second World War

from private corporations were barred under German law." (Compl.¶ 37.) The London Debt Agreement deferred consideration of claims arising out of World War II against the German government and German companies. *See* London Debt Agreement, Art. 5(2); BHG (1973), at 9–10; *Staucher*, BGH (1963), at 11. Ford is not a German company, therefore, it is not covered by the London Debt Agreement. However, Iwanowa argues that the London Debt Agreement tolled her claims against Ford because Ford's liability is partially derivative of Ford Werke's liability, thus, any suit against Ford during the period when claims against Ford Werke were precluded, would have been vulnerable to dismissal for (1) failure to join a necessary party, pursuant to Federal Rule of Civil Procedure 19; or (2) interference with the London Debt Agreement's deferral scheme. Specifically, Iwanowa argues that the London Debt Agreement tolls claims against Ford because Ford would have passed the cost incurred in defending against forced labor claims and any award recovered by forced laborers, onto Ford Werke, thereby defeating the purpose of the London Debt Agreement's deferral scheme. This reasoning is not persuasive.

Iwanowa has not attempted to explain how claims against Ford would have been vulnerable to dismissal, pursuant to Federal Rule of Civil Procedure 19. Regardless, all lawsuits are subject to potential defenses and are thus, vulnerable to dismissal for countless reasons. A plaintiff cannot delay filing her claims in derogation of the applicable statute of limitations merely because she believes a defendant has valid defenses

---

**49.** In addition, on December 19, 1956, the parliament of the [F.R.G.] enacted the *Law Concerning the Statutes of Limitations of German Foreign Debt and Similar Debt* which provided that:

The statute of limitations will not have run on those claims which were not time-barred at the effective date of the [London Debt Agreement] and which can be first asserted after the effective date of the international treaty ... foreseen by the [London Debt Agreement] until eighteen months after the

effective date of the foreseen international treaty [the Two–Plus–Four Treaty]....

*Id.* § 1 ¶ 2. The Two–Plus–Four Treaty is the international treaty foreseen by the London Debt Agreement. *See supra* Part II.B.2.f. Consequently, Iwanowa had to file her claims within eighteen months of the effective date of the Two–Plus–Four Treaty or before the expiration of the limitations period for claims under international law, whichever period is longer.

or her suit is subject to dismissal. *See Chakonas v. City of Chicago,* 42 F.3d 1132, 1135–36 (7th Cir.1994) (refusing to extend statute of limitations simply because plaintiff was not certain his claims would have succeeded if he had brought them earlier). Furthermore, the Complaint *does not* allege that the Paris Reparations Treaty or the London Debt Agreement precluded Iwanowa from asserting claims under international law against Ford, a U.S. corporation, in a U.S. court. The Paris Reparations Treaty covers war related claims "against the former German Government and its Agencies". Paris Reparations Treaty, Part I, Art. 2.A. The London Debt Agreement defers consideration of claims "against the Reich and agencies of the Reich". London Debt Agreement, Art. 5(2). Although German courts have held that German corporations utilizing forced labor acted as agents of the Reich, no court has ever held, and the Complaint does not allege, that U.S. corporations (such as Ford) were agents of the German government. Thus, this Court concludes that neither the Paris Reparations Treaty nor the London Debt Agreement prevented Iwanowa from bringing forced labor claims against Ford, a U.S. corporation, under the ATCA, a U.S. statute.

Furthermore, Iwanowa's argument that Ford would have passed the cost incurred in defending against forced labor claims onto Ford Werke must also fail. Iwanowa's assertion that as the parent company, Ford would pass its losses onto Ford Werke, thereby defeating the purpose of the London Debt Agreement's deferral scheme, is speculative at best. There is nothing before this Court enunciating what Ford's accounting practices are or how and to what extent litigation costs or losses incurred would be passed onto Ford Werke. Consequently, neither the Paris Reparations Treaty nor the London Debt Agreement tolled the limitations periods of the claims against Ford under international law.[50]

### (1) *Equitable Tolling*

Iwanowa argues that even if the London Debt Agreement does not toll the limitations period of her claims against Ford, the statute of limitations was equitably tolled by Ford's affirmative misstatements denying that it gained any economic advantages from Ford Werke's use of unpaid, forced labor.

██ Equitable tolling stops the statute of limitations from running where the claim's accrual date has already passed. *See Oshiver v. Levin, Fishbein, Sedran & Berman,* 38 F.3d 1380, 1387 (3d Cir.1994). Equitable tolling may be appropriate, *inter alia,* where the defendant has actively misled the plaintiff. *See id.; see also United States v. Midgley,* 142 F.3d 174, 179 (3d Cir.1998); *School Dist. of City of Allentown v. Marshall,* 657 F.2d 16, 19–20 (3d Cir.1981). To avoid dismissal, a complaint asserting equitable tolling must contain particularized allegations that the defendant "actively misled" plaintiff. *See 287 Corporate Ctr. Assocs. v. Township of Bridgewater,* 101 F.3d 320, 325 (3d Cir. 1996); *Oshiver,* 38 F.3d at 1387. In the instant case, the Complaint is devoid of any allegations of misrepresentation and concealment.

██ Iwanowa makes vague claims of misrepresentation by Ford for the first time in her brief in opposition to Defendants' motions to dismiss. (Pl.'s Opp'n Br. at 41.) She alleges that in 1998, a Ford spokesperson issued a statement denying

**50.** This is distinguishable from cases where the case law or statutes clearly indicate that a plaintiff's claims would be dismissed, such as forced labor claims against German corporations where the German Supreme Court had repeatedly denied such claims as "unfounded at the time" or "invalid at the present time." *See* BGH (1973), at 16–17; BGH (1964), at 3; *Staucher,* BGH (1963), at 1. A plaintiff reading those cases knew that it would be a wasted effort to bring such claims because they would definitely be dismissed. However, no court has ever held, and the London Debt Agreement does not suggest, that claims against non-German companies would be dismissed pursuant to Article 5(2) of the London Debt Agreement.

that Ford received significant economic benefits from Ford Werke's use of forced labor. (*Id.*) Iwanowa attempted to expand upon these allegations at oral argument and in her April 5, 1999 supplementary submissions. (I Tr. 51:1–5; Neuborne Supp.Decl. ¶ 23.) Iwanowa now alleges that in 1974, a Ford spokesperson publicly stated that "Ford Motor Co. had no participation in the operation or financial results of Ford [Werke] while the United States was engaged in World War II." (Neuborne Supp.Decl. ¶ 23.)

In considering a 12(b)(6) motion, the Court is limited to the facts alleged in the Complaint; a court cannot consider facts raised for the first time in counsel's legal memorandum. *See Town of Secaucus v. United States Dep't of Transp.*, 889 F.Supp. 779, 791 (D.N.J.1995), *aff'd*, 79 F.3d 1139 (3d Cir.1996); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1424–25 (3d Cir.1997). Accordingly, this Court must disregard the allegations in Iwanowa's brief and Professor Neuborne's Supplemental Declaration. Furthermore, statements made in 1974 and 1998 provide no basis for tolling limitations periods that expired decades ago. In order to provide an effective equitable tolling argument, the statements alluded to would have had to have been made within a relatively short period after the end of the War. Based on the absence of any allegations of misrepresentation and concealment in the Complaint, Iwanowa's equitable tolling theory must fail.

### 5. *The U.S.S.R. Waiver*

In 1953, the U.S.S.R. and the G.D.R. entered into a bilateral treaty, whereby the U.S.S.R. waived any further reparations payments from the G.D.R. *See* Protocol Between the Union of Soviet Socialist Republics and the German Democratic Republic Concerning the Discontinuance of German Reparations Payments and Other Measures to Alleviate the Financial and Economic Obligations of the German Democratic Republic Arising in Consequence of the War, Aug. 22, 1953, G.D.R.–U.S.S.R., 221 U.N.T.S. 136 ("U.S.S.R.Waiver").[51] Defendants argue that by signing the U.S.S.R. Waiver, the U.S.S.R. not only waived its right to seek further reparation payments from Germany, but also waived the right of its citizens to file claims arising from forced labor against Germany or German companies.[52] This assertion does not pass muster.

It is well-established that countries can waive the war-related claims of their citizens. *See Dames & Moore v. Regan*, 453 U.S. 654, 679–80, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981) ("the United States has repeatedly exercised its sovereign authority to settle the claims of its nationals against foreign countries ... by executive agreement[s] ... [u]nder [which] the President has agreed to renounce or extinguish claims of United States nationals against foreign governments in return for lump-sum payments"); *Belk v. United States*, 858 F.2d 706, 709 (Fed.Cir.1988) (same). The crucial issue is whether the U.S.S.R. intended to waive its nationals' rights to file Nazi-era forced labor claims against German companies. The German Federal Constitutional Court has held that some treaties contain waiver provisions that

---

**51.** The U.S.S.R. Waiver provides that the Soviet government "shall, as from 1 January 1954, cease completely to require the payment of reparations by the German Democratic Republic, whether in the form of goods or in any other form." 221 U.N.T.S. 136, 138. Despite the U.S.S.R. Waiver, unified Germany has established a fund in the Russian Federation, where Rostov is located, to compensate victims of Nazi persecution. *See supra* note 42; *see also* Exchange of Notes, Mar. 30, 1993, F.R.G.–Uk.–Bela.–Rus.

**52.** Although Iwanowa is now a Belgian citizen, she was a Soviet citizen when her forced labor claims arose. In analyzing claims, "plaintiff's citizenship is of importance not at the present time but at the moment of origin of the claim." BGH (1973), at 4. Consequently, if the U.S.S.R. Waiver extinguishes the individual claims of Soviet citizens, it would bar Iwanowa's forced claims because she was a Soviet citizen when her claims arose.

"only relate to the claims of states arising from harm to their citizens, but not claims of the citizens themselves." BVerfG (1996), at 23. However, treaties "expressly regulat[ing] the claims of citizens in addition to the claims of the states" can extinguish individual claims. *Id.* at 24–25.

At least one German court has held that the U.S.S.R. Waiver did not extinguish Soviet citizens' individual claims for compensation for forced labor. *See Krakauer I,* LG Bonn (1997), at 30–32.[53] The specific language of the U.S.S.R. Waiver does not mention individual claims. As stated in Part II.B.3.a, *supra,* general rules of construction apply to treaties. *See Trans World Airlines,* 466 U.S. at 262, 104 S.Ct. 1776 (Stevens, J., dissenting) (citing *Ware v. Hylton,* 3 U.S. 199, 3 Dall. 199, 240–41, 1 L.Ed. 568 (1796)). Thus, when construing a treaty, the Court must give the treaty's terms their ordinary meaning. *See, e.g., Air France,* 470 U.S. at 397, 105 S.Ct. 1338 (1985); *Santovincenzo,* 284 U.S. at 40, 52 S.Ct. 81; *M.H. Pulaski Co.,* 243 U.S. at 106, 37 S.Ct. 346; *The Pizarro,* 2 Wheat. at 246; *Trans World Airlines,* 466 U.S. at 262–63, 104 S.Ct. 1776 (Stevens, J., dissenting); *Xerox Corp.,* 41 F.3d at 652. The U.S.S.R. Waiver's plain language does not address individual citizens' claims. Thus, in accordance with the canons of interpretation, it is only logical to find that the U.S.S.R. Waiver only precludes claims by the U.S.S.R. against the G.D.R. and does not extinguish Soviet citizens' private claims.

The German Federal Government has taken the position that the U.S.S.R.'s Waiver of further reparations applies to the successor states of the U.S.S.R. and all citizens of those states. *See* German Federal Government, *Comprehensive Report on Previous Restitution Payments by German Companies,* at 2 (June 3, 1996). The German Federal Government's report does not cite any authority demonstrating that German civil law supports its position. Even if this Court were to agree with the German Federal Government's position, the U.S.S.R. Waiver is not applicable in the instant case. Specifically, the U.S.S.R. Waiver only waived further reparations payments from the G.D.R., not from its agencies.[54] Hence, the U.S.S.R. Waiver clearly does not apply to claims against German companies. Accordingly, this Court finds that the U.S.S.R. Waiver did not extinguish individual claims against Defendants under the law of nations.

Defendants have failed to show that the Paris Reparations Treaty or the U.S.S.R. Waiver permanently barred individual forced labor claims. However, Iwanowa's claims against Ford, for violations of international law, are time-barred. *See supra* Part II.B.4.e. Furthermore, although Iwanowa's claims against Ford Werke, for violations of the law of nations, are timely, they must be dismissed on the ground that the London Debt Agreement contemplated that individual claims would be pursued by way of government-to-government negotiations, not private litigation. *See supra* Part II.B.3.e. Consequently, Defendants' motion to dismiss Iwanowa's claims for violations of the law of nations is granted.

### III. CLAIMS UNDER U.S. LAW

Iwanowa asserts that "[b]y taking and receiving economic benefits from unpaid, forced labor without making any effort to compensate the laborers, [Defendants] have been unjustly enriched and are obliged under the laws of... Michigan[55]

---

**53.** The Administrative Court of Appeals was also presented with this issue but refused to address it. *See* OVG Müenster (1998), at 14–15.

**54.** It is also noteworthy that the U.S.S.R. Waiver is an agreement between the G.D.R. and the U.S.S.R. Consequently, even if the U.S.S.R. Waiver waived individual claims (as opposed to government claims) for reparations against the G.D.R., it has no effect on claims against a unified Germany.

**55.** The state of Ford's corporate headquarters.

and Delaware [56] to disgorge to plaintiff, and the Class, all profits and other economic benefits earned or derived from the forced labor of plaintiff and the Class." (Compl. ¶ 38.) She further attests that "[b]y knowingly utilizing unpaid, forced labor to generate enormous profits, [Defendants] are obliged under the laws of ... Michigan and Delaware to pay to plaintiff, and the Class, the reasonable value of their services." (*Id.* ¶ 39.) In sum, Iwanowa asserts claims for restitution/unjust enrichment and quantum meruit.

Defendants have moved to dismiss Iwanowa's claims under U.S. law, pursuant to Federal Rule of Civil Procedure 12(b)(6), on the ground that they are time-barred.

### A. SUBJECT MATTER JURISDICTION

This Court has diversity jurisdiction over Iwanowa's common law claims, pursuant to 28 U.S.C. § 1332, which provides in relevant part:

> The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs, and is between—... (2) citizens of a State and citizens or subjects of a foreign state;

28 U.S.C. § 1332(a)(2). Iwanowa is a Belgian citizen, Ford is a citizen of Delaware, and Ford Werke is a citizen of Germany. Iwanowa asserts that the matter in controversy exceeds $75,000, exclusive of interests and costs. Thus, this Court has diversity jurisdiction over Iwanowa's claims under Michigan or Delaware law. Venue is proper pursuant to 28 U.S.C. § 1391(d).[57]

**56.** The state of Ford's incorporation.

**57.** Pursuant to 28 U.S.C. § 1391(d), "[a]n alien may be sued in any district."

**58.** Iwanowa claims that Michigan or Delaware law governs this action. None of the parties assert that New Jersey substantive law should apply in this action.

**59.** If an actual conflict between the law of the interested states does exist, the court then (1)

### B. SUBSTANTIVE LAW

In deciding state law claims, a federal district court sitting in diversity must apply the choice of law principles of the forum state to determine which state's law governs. *See Van Dusen v. Barrack,* 376 U.S. 612, 645–46, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964); *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 494, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Shuder v. McDonald's Corp.,* 859 F.2d 266, 269 (3d Cir. 1988); *Rohm and Haas Co. v. Adco Chem. Co.,* 689 F.2d 424, 429 (3d Cir.1982). Since New Jersey is the forum state, New Jersey's choice of law principles apply.

New Jersey has adopted a governmental interest analysis when determining which jurisdiction's substantive law governs. *See Veazey v. Doremus,* 103 N.J. 244, 247, 510 A.2d 1187 (1986); *Mellk v. Sarahson,* 49 N.J. 226, 229–30, 229 A.2d 625 (1967). Under the governmental interest analysis, New Jersey courts must apply the substantive law of the state with the greatest interest in resolving the issue raised in the underlying litigation. *See Gantes v. Kason Corp.,* 145 N.J. 478, 484, 679 A.2d 106 (1996); *Veazey,* 103 N.J. at 248, 510 A.2d 1187. The first step in the analysis requires determining whether an actual conflict exists between the laws of the interested states, in this case, Michigan and Delaware.[58] *See Gantes,* 145 N.J. at 484, 679 A.2d 106. If no conflict exists, the Court need not make a choice of law determination.[59]

### 1. Restitution/Unjust Enrichment

To assert a claim for restitution under Delaware law, a plaintiff must

identifies the governmental policies underlying each state's law and how those policies would be affected by each state's contacts to the lawsuit and the parties and (2) weighs the factual, qualitative contacts between the parties and each related jurisdiction. *See Henry v. Richardson–Merrell, Inc.,* 508 F.2d 28, 32 (3d Cir.1975); *Veazey,* 103 N.J. at 248, 510 A.2d 1187.

show that (1) the defendant was unjustly enriched at plaintiff's expense and (2) the defendant secured a benefit which would be unconscionable for the defendant to retain. *See Fleer Corp. v. Topps Chewing Gum, Inc.,* 539 A.2d 1060, 1063 (Del.1988). Similarly, Michigan courts have held that "[a] person who has been unjustly enriched at the expense of another is required to make restitution to the other." *Kammer Asphalt Paving Co., Inc. v. East China Township Schools,* 443 Mich. 176, 504 N.W.2d 635, 640 (1993); *see also B & M Die Co. v. Ford Motor Co.,* 167 Mich.App. 176, 421 N.W.2d 620, 622 (1988) (same); *Hofmann v. Auto Club Ins. Ass'n,* 162 Mich.App. 424, 413 N.W.2d 455, 457 (1987) (finding that "[a] quasi-contractual obligation arises when a defendant receives a benefit from a plaintiff which is inequitable for the defendant to retain.").

■■■ Unjust enrichment is a necessary element of the doctrine of restitution. Hence, before a court may order restitution, it must find that the defendant was unjustly enriched at the plaintiff's expense. *See Fleer Corp.,* 539 A.2d at 1062. Unjust enrichment is defined as "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience." *Id.* (quoting 66 Am.Jur.2d, Restitution & Implied Contracts § 3, p. 945 (1973)). To assert a claim for unjust enrichment under Delaware law, a plaintiff must show: (1) an enrichment of defendants, (2) a loss to plaintiff, (3) a lack of justification for the enrichment, (4) the absence of any other available remedy and (5) the absence of law barring the remedy. *See Phoenix Canada Oil Co. Ltd. v. Texaco, Inc.,* 658 F.Supp. 1061, 1063 (D.Del.1987) *aff'd* 842 F.2d 1466 (3d Cir.1988); *Cantor Fitzgerald v. Cantor,* 724 A.2d 571, 585 (Del.Ch.1998).

■■■ Similarly, to assert a claim for unjust enrichment under Michigan law, a plaintiff must show that (1) the defendant received a benefit from the plaintiff and (2) it would be inequitable for the defendant to retain such benefit. *See Dumas v. Auto Club Ins. Ass'n,* 437 Mich. 521, 473 N.W.2d 652, 663 (1991); *B & M Die,* 421 N.W.2d at 622.

### 2. *Quantum Meruit*

The equitable doctrine of quantum meruit requires a defendant to pay a plaintiff the reasonable value of services rendered even though there was no contract to do so. *See United States v. Snider,* 779 F.2d 1151, 1159 (6th Cir.1985); *Kamalnath v. Mercy Mem. Hosp. Corp.,* 194 Mich.App. 543, 487 N.W.2d 499, 504 (1992). "Quantum meruit literally means 'as much as he deserves'; it is the reasonable worth or value of services rendered for the benefit of another." *Marta v. Nepa,* 385 A.2d 727, 730 (Del.1978) (citation omitted). A quantum meruit recovery is available under principles of restitution where recovery under contract is not possible. *See Nepa v. Marta,* 415 A.2d 470, 472 (Del.1980). In effect, the court implies an intent by defendant to pay for plaintiff's services, in order to prevent unjust enrichment. *See Roznowski v. Bozyk,* 73 Mich.App. 405, 251 N.W.2d 606, 608 (1977); *Bellanca Corp. v. Bellanca,* 169 A.2d 620, 623 (Del.1961); *see also Moscone v. Mitoff,* 33 Mich.App. 259, 189 N.W.2d 763, 764 (1971) (noting that recovery on quantum meruit is based upon defendant's acceptance of a benefit performed by the plaintiff). The theory underlying quantum meruit is that the law implies a contract when one person benefits from another's act. *See Snider,* 779 F.2d at 1159.

■■ A plaintiff seeking to recover the reasonable value of her services on a quantum meruit theory under Delaware law must establish that (1) she performed such services with an expectation that the recipient of the benefit would pay for them and (2) absent defendant's promise to pay, the plaintiff performed the services under circumstances which should have put the recipient of the benefit on notice that she (plaintiff) expected to be paid for her ser-

vices. *See Bellanca Corp.*, 169 A.2d at 623.

▮ Similarly, Michigan courts have held that a plaintiff may recover under a quantum meruit theory where the defendant accepts beneficial services from the plaintiff for which compensation is customarily made and naturally anticipated. *See Tustin Elevator & Lumber Co. v. Ryno*, 373 Mich. 322, 129 N.W.2d 409, 414 (1964); *Comber Tool and Mold Eng., Inc. v. General Motors Corp.*, 853 F.Supp. 238, 242 (E.D.Mich.1993).[60] A defendant who knowingly permits a person to perform services for defendant's benefit impliedly agrees to compensate plaintiff for performance unless there is a specific agreement that plaintiff will perform such services gratuitously. *See Bellanca Corp.*, 169 A.2d at 623; *see also Tustin Elevator*, 129 N.W.2d at 414 ("the law implies an understanding or intent to pay the value of services rendered.").

Since both interested jurisdictions, Michigan and Delaware, follow traditional common law approaches to restitution/unjust enrichment and quantum meruit, this Court need not engage in a choice of law analysis relating to these claims.

### C. STATUTE OF LIMITATIONS

▮ As stated above, a federal district court sitting in diversity must apply the choice of law precepts of the forum state.

*See Van Dusen*, 376 U.S. at 645–46, 84 S.Ct. 805; *Klaxon*, 313 U.S. at 494, 61 S.Ct. 1020. Until 1973, the general rule in New Jersey was that the forum state's limitations period applied regardless of which state's substantive law governed the case. *See Schum v. Bailey*, 578 F.2d 493, 495 (3d Cir.1978); *see also Dent v. Cunningham*, 786 F.2d 173, 176 (3d Cir.1986) ("New Jersey's general rule [is] that the forum state's limitations period applies.") (citing *O'Keeffe v. Snyder*, 83 N.J. 478, 490, 416 A.2d 862 (1980)). In 1973, however, the Supreme Court of New Jersey decided that in certain narrowly defined circumstances, its courts would borrow the limitations period of the jurisdiction creating the substantive cause of action. *See Heavner v. Uniroyal, Inc.*, 63 N.J. 130, 141, 305 A.2d 412 (1973). The *Heavner* Court held that New Jersey courts would apply the foreign state's statute of limitations when (1) the cause of action arose in another state; (2) all of the parties were present and amenable to the jurisdiction of that state; (3) New Jersey had no substantial interest in the matter; (4) the substantive law of the foreign state governed the cause of action; and (5) the foreign state's limitations period had expired by the time the suit was filed in New Jersey. *See Heavner*, 63 N.J. at 141, 305 A.2d 412 (1973)[61]; *see also Dent*, 786 F.2d at 176 (summarizing *Heavner* factors).

---

**60.** Although the parties have not asserted that New Jersey law applies, the elements of a quantum meruit claim are the same under New Jersey law as under Michigan and Delaware law. New Jersey courts have held that "[i]n order to state a claim in quantum meruit, the plaintiff must assert: the performance of services in good faith; the acceptance for those services by the entity to which they were rendered; an expectation of compensation therefor; and the reasonable value of the services." *Kopin v. Orange Prods., Inc.*, 297 N.J.Super. 353, 367–68, 688 A.2d 130 (App. Div.1997) (quoting *Lehrer McGovern Bovis, Inc. v. New York Yankees*, 207 A.D.2d 256, 615 N.Y.S.2d 31, 34 (N.Y.A.D.1994)); *see also Conklin v. Kruger*, 79 N.J.L. 326, 328, 75 A. 436 (1910) ("It is well-settled that where one performs services for another at his request, but without any agreement or understanding as to wages or remuneration, the law implies a promise on the part of the party requesting the services to pay a just and reasonable compensation").

**61.** In *Heavner*, a truck driver from North Carolina, sued Uniroyal, a New Jersey corporation, for injuries sustained when a tire that Uniroyal manufactured blew out while Heavner was driving on a North Carolina highway. 63 N.J. at 134, 305 A.2d 412. Defendant Uniroyal's only contact with New Jersey was that it was incorporated in New Jersey. *Id.* at 134 n. 3, 305 A.2d 412. The Supreme Court of New Jersey concluded that New Jersey had no substantial interest in the matter and applied North Carolina's statute of limitations. *Id.*

Courts interpreting *Heavner* have found that it extended the governmental interest analysis previously reserved for choice of substantive law to conflicts of law concerning statutes of limitations. *See Henry*, 508 F.2d at 32; *Schum*, 578 F.2d at 495; *Gantes*, 145 N.J. at 484, 679 A.2d 106; *Pine v. Eli Lilly & Co.*, 201 N.J.Super. 186, 191, 492 A.2d 1079 (App.Div.1985) ("We glean from *Heavner* that the underlying analysis of whether New Jersey should apply its limitations statute or that of the foreign state is essentially akin to the 'governmental interest' test in resolving choice of substantive law issues."). As stated in *supra* n. 59, the governmental interest approach requires the court to first determine "the governmental policies evidenced by the laws of each related jurisdiction and second the factual contacts between the parties and each related jurisdiction." *Henry*, 508 F.2d at 32; *see also Gantes*, 145 N.J. at 485, 493, 679 A.2d 106; *Pine*, 201 N.J.Super. at 192, 492 A.2d 1079. This second step—an analysis of the factual contacts between the parties and the related states—requires the balancing of all five of the *Heavner* factors against one another. *See Allen v. Volkswagen of Am., Inc.*, 555 F.2d 361, 362–63 (3d Cir.1977)

(per curiam); *Republic of the Philippines v. Westinghouse Elec. Corp.*, 774 F.Supp. 1438, 1448, 1450 (D.N.J.1991).

The initial prong of the governmental interest analysis requires the court to determine whether an actual conflict exists between the laws of the interested jurisdictions. *See Gantes*, 145 N.J. at 484, 679 A.2d 106. As shown infra, Iwanowa's claims under Michigan or Delaware law are barred under all possible statutes of limitations—Michigan's, Delaware's or New Jersey's. Thus, this Court need not make a determination as to which jurisdiction's statute of limitations applies.

### 1. *New Jersey Statute of Limitations*

The statute of limitations in New Jersey for claims sounding in restitution/unjust enrichment or quantum meruit is six years. *See* N.J.Stat.Ann. § 2A:14–1 [62]; *Miller v. Board of Chosen Freeholders of Hudson County*, 10 N.J. 398, 409, 91 A.2d 729 (1952) (finding that limitations period for actions to recover the reasonable value of services rendered is six years); *Kopin*, 297 N.J.Super. at 373–74, 688 A.2d 130 (App.Div.1997) (applying six year statute of limitations to claims based on quantum meruit and unjust enrichment).[63]

---

**62.** Section 2A:14–1 provides that "[e]very action at law ... for recovery upon a contractual claim or liability, express or implied... shall be commenced within 6 years next after the cause of any such action shall have accrued." N.J.Stat.Ann. § 2A:14–1 (West 1999).

**63.** Iwanowa claims that the relevant limitations period is governed by the equitable laches doctrine. The doctrine of laches bars an action where (1) plaintiff's delay in bringing the action is unreasonable and (2) the defendant was prejudiced by such delay. *See Claussen v. Mene Grande Oil Co. C.A.*, 275 F.2d 108, 111 (3d Cir.1960); *Sim Kar Lighting Fixture Co. v. Genlyte, Inc.*, 906 F.Supp. 967, 975 (D.N.J.1995). According to Iwanowa, her delay in bringing the instant action is not unreasonable and Defendants have not been prejudiced by the delay. The doctrine of laches, however, does not apply to Iwanowa's claims for quantum meruit and restitution, as these are legal actions, and the doctrine of

laches only governs equitable actions. *See Kopin*, 297 N.J.Super. at 373, 688 A.2d 130; *Badon v. General Motors Corp.*, 188 Mich.App. 430, 470 N.W.2d 436, 439 (1991); *Eberhard v. Harper–Grace Hospitals*, 179 Mich.App. 24, 445 N.W.2d 469, 474 (1989) (noting that laches is the equitable counterpart to the statute of limitations defense available at law, and that courts generally will not address laches where a statute of limitations will bar a claim). Further, although quantum meruit is based on equitable principles, quantum meruit is a legal remedy. *See Kopin*, 297 N.J.Super. at 373, 688 A.2d 130; *Callano v. Oakwood Park Homes Corp.*, 91 N.J.Super. 105, 108, 219 A.2d 332 (App.Div.1966); *see also D'Angelo v. Petroleos Mexicanos*, 398 F.Supp. 72, 78 (D.Del.1975) (finding that where plaintiff sought an accounting against defendant, the relief sought was legal in nature and the court must apply the statute of limitations rather than the equitable doctrine of laches). Therefore, in determining whether this action is time-barred, this Court must look to the

## 2. *Michigan Statute of Limitations*

The statute of limitations under Michigan law for claims sounding in restitution/unjust enrichment [64] or quantum meruit is either three or six years. *See* Mich. Comp.Laws Ann. §§ 600.5805 [65], 600.5807 [66]. Michigan courts have held that "[a]lthough sections 600.5805 and 600.5807 are generally thought of as 'tort' and 'contract' provisions respectively ... a party [could not] invoke the longer statute [section 600.5807] by the mere expedient of calling a tort an implied contract." *Fries v. Holland Hitch Co.,* 12 Mich.App. 178, 162 N.W.2d 672, 675 (1968); *see also Britton v. Fessler & Bowman, Inc.,* 66 B.R. 572, 575 (Bankr.E.D.Mich.1986) (stating that it is not necessary for the court to determine whether this is an action " 'in tort' or 'in contract' ... [t]he question is whether it is an action to recover damages for injuries to persons or property.").

The Supreme Court of Michigan has held that a six year breach of contract limitations period applies to actions for damages to persons or property, as long as the suit is based on an express promise, and not a duty implied by law. *See Huhtala v. Travelers Ins. Co.,* 401 Mich.

118, 257 N.W.2d 640, 644 (1977). Thus, even if a contractual relationship unites the parties, where the breach of an express promise does not serve as the claim's foundation, the three year limitations period governs the action. *See id.; compare Weeks v. Slavik Builders, Inc.,* 384 Mich. 257, 181 N.W.2d 271 (1970) (applying six year statute of limitations where defendant builder expressly warranted product that proved defective and caused property damage) *with State Mut. Cyclone Ins. Co. v. O & A Elec. Co-op.,* 381 Mich. 318, 161 N.W.2d 573 (1968) (applying three year limitations period where contractual relationship existed but alleged services breach by defendant implicated general pre-existing duties to provide service safely, not an express promise or contract to do so); *see also Insurance Co. of N. Am. v. Manufacturers Bank of Southfield,* 127 Mich.App. 278, 338 N.W.2d 214, 216 (1983) ("Where ... there is no express contract or express promise and defendant's liability, if any, is implied by law, an action for injury to persons or property is controlled by the three-year statute."). Additionally, a six year statute of limitations applies where a defendant's

applicable limitations period, not the doctrine of laches. *See Kopin,* 297 N.J.Super. at 373, 688 A.2d 130.

Even if this court were to apply the doctrine of laches, Iwanowa's claims would nevertheless be barred because in determining laches, courts look to the analogous statute of limitations. *See Badon,* 470 N.W.2d at 439.

**64.** Iwanowa asserts that there is no limitations period for claims for restitution/unjust enrichment. The Supreme Court of Michigan has held, however, that "the law in regard to unjust enrichment ... never has relieved people from the consequences of a statute of limitations of any kind where there has been no active fraud that lulled the claimant into inaction." *Milton v. Craig,* 312 Mich. 512, 20 N.W.2d 290, 293 (1945); *see also* Mich. Compl.Laws Ann. § 600.5815 (the "prescribed period of limitations shall apply to all actions whether equitable or legal relief is sought").

**65.** Section 600.5805 provides that

No person may bring or maintain any action to recover damages for injuries to persons or property ... unless, after the claim first accrued ... he commences the action within the periods of time prescribed by this section.

\* \* \* \* \* \*

(7) The period of limitations is 3 years for all other actions to recover damages for injuries to persons and property.
Mich.Comp.Laws Ann. § 600.5805 (West 1999).

**66.** Section 600.5807 provides that:

No person may bring or maintain any action to recover damages or sums due for breach of contract ... unless, after the claim first accrued ... he commences the action within the periods of time prescribed by this section.

\* \* \* \* \* \*

(8) The period of limitations is 6 years for all other actions to recover damages or sums due for breach of contract.

breach causes a plaintiff injury "in his financial expectations and economic benefits rather than his person or specified property." *Fries,* 162 N.W.2d at 675 (citing *Abbott v. Michigan State Indus.,* 303 Mich. 575, 6 N.W.2d 900 (1942)); *see also Schenburn v. Lehner Assocs., Inc.,* 22 Mich.App. 534, 177 N.W.2d 699, 702 (1970) (holding that six year statute applies to injuries to "financial expectations and economic benefit" which are not injuries to a "person or specific property.").

It appears that Iwanowa's claims for quantum meruit should be governed by a three year limitations period because her claims are not based on an express promise. It should be noted, however, that at least one Michigan court has held that an action for restitution is governed by section 600.5807(8)'s six year limitations period. *See Britton,* 66 B.R. at 577 (holding that since restitution is commonly associated with contract remedies, the six year statute of limitations for contract actions is more justified than the three year statute of limitations for torts). As shown *infra,* even if this Court were to apply the six year statute of limitations to claims for quantum meruit and restitution/unjust enrichment, Iwanowa's claims would still be time-barred. Consequently, this Court need not determine whether section 600.5805's three year or section 600.5807's six year limitations period applies.

### 3. *Delaware Statute of Limitations*

The Delaware statute of limitations for contract actions is three years. Del.Code Ann. tit. 10, § 8106.[67] Section 8106 covers all contractual claims except those specifically addressed in a separate section of title 10. *See id.; see also Freedman v. Beneficial Corp.,* 406 F.Supp. 917, 923 (D.Del.1975) (holding that section 8106 applied to quantum meruit and unjust enrichment claim).[68]

### 4. *Tolling of the Statute of Limitations*

Iwanowa filed the instant action in March, 1998, fifty-three years after the end of the war. Thus, unless the statute of limitations has been tolled, Iwanowa's claims under Michigan or Delaware common law are barred under all potentially applicable limitations periods.

Iwanowa contends that the London Debt Agreement tolled the limitations period of her claims under Michigan or Delaware law. However, the Complaint only alleges that Iwanowa's claims were barred "under German law". (Compl.¶ 37.) The Complaint *does not* allege that the London Debt Agreement precluded Iwanowa from asserting claims invoking U.S. law (Michigan or Delaware law) against Ford, a U.S. corporation, in a U.S. court. Furthermore, as stated in Part II.B.4.e, *supra,* the London Debt Agreement did not toll the statute of limitations on claims against Ford.

Even if this Court were to find that the London Debt Agreement's moratorium on forced labor claims precluded claims under U.S. law, Iwanowa's claims would nevertheless be time-barred. As noted *supra* in Part II.B.2.f, the Two–Plus Four Treaty lifted the London Debt Agreement's moratorium on forced labor claims. The Two–Plus–Four Treaty became effective on March 15, 1991, The longest applicable limitations period for quantum meruit or

---

Mich.Comp.Laws Ann. § 600.5807 (West 1999).

**67.** Section 8106 provides in relevant part:

[N]o action to recover a debt not evidenced by a record or by an instrument under seal ... no action based on a promise ... and no action to recover damages caused by injury unaccompanied with force or resulting indirectly from the act of the defendant

shall be brought after the expiration of 3 years from the accruing of the cause of such action....

Del.Code Ann. tit. 10, § 8106 (West 1999).

**68.** In *Freedman,* the plaintiff claimed that he was entitled to remuneration because defendants voluntarily accepted and used the idea that he sent to them with a reasonable expectation of compensation. *Freedman,* 406 F.Supp. at 923.

restitution/unjust enrichment claims under New Jersey, Michigan or Delaware law is six years. Because Iwanowa did not file the instant action until March, 1998, seven years after the effective date of the Two–Plus Four Treaty, her claims under U.S. law are time-barred. Defendants' motion to dismiss the claims under U.S. law is granted.

## IV. *CLAIMS UNDER GERMAN LAW*

Iwanowa asserts that "[b]y taking and receiving economic benefits from unpaid, forced labor without making any effort to compensate the laborers, [Defendants] have been unjustly enriched and are obliged under the laws of Germany . . . to disgorge to plaintiff and the Class all profits and other economic benefits earned or derived from the forced labor of plaintiff and the Class." (Compl.¶ 38.) She further alleges that "[b]y knowingly utilizing unpaid, forced labor to generate enormous profits, [Defendants] are obliged under the laws of Germany . . . to pay to plaintiff and the Class the reasonable value of their services." (*Id.* ¶ 39.)

### A. SUBJECT MATTER JURISDICTION

For the reasons stated in Part III.A, *supra*, this Court has diversity jurisdiction over Iwanowa's claims under German law. 28 U.S.C. § 1332(a)(2).

### B. STATUTE OF LIMITATIONS

■ As stated in Part III.C, *supra*, as a federal court sitting in diversity, this Court must apply New Jersey choice of law principles when determining the applicable limitations period. *See Van Dusen,* 376 U.S. at 645–46, 84 S.Ct. 805; *Klaxon,* 313 U.S. at 494, 61 S.Ct. 1020. New Jersey courts apply the statute of limitations of a foreign jurisdiction where (1) the cause of action arose in another jurisdiction; (2) the parties are all present and

amenable to the jurisdiction of that foreign state; (3) New Jersey has no substantial interest in the matter; (4) the foreign state's substantive law governs the cause of action; and (5) the foreign state's limitations period had expired at the time the plaintiff filed suit in New Jersey. *See Heavner,* 63 N.J. at 141, 305 A.2d 412; *Dent,* 786 F.2d at 176.

In interpreting *Heavner,* the Third Circuit has instructed federal courts sitting in diversity in New Jersey to borrow the statute of limitations of the state whose substantive law applies. *See Henry,* 508 F.2d at 37 ("Absent a finding that New Jersey substantive law applies, *Heavner* requires borrowing of the foreign limitations period."); *Schum,* 578 F.2d at 495 ("We glean from *Heavner* that the critical determination underlying the 'borrowing' of a foreign statute of limitations is a determination as to whether a foreign substantive law is to be applied."); *see also Thompson v. Yue,* 426 F.Supp. 853, 855 (D.N.J.1977) ("If a court concludes that New Jersey substantive law will not govern the action . . . *Heavner* requires borrowing of the foreign limitations period.").

An analysis of the *Heavner* factors mandates application of Germany's statute of limitations. First, Iwanowa's forced labor claims arose in Germany. Second, both Ford Werke, a German corporation, and Ford, as Ford Werke's parent, are amenable to suit in Germany. Third, none of the parties is a New Jersey resident, "[t]hus, New Jersey has no interest in this suit, let alone a substantial one." *See Westinghouse,* 774 F.Supp. at 1450 (finding that even defendant's residency, without more, does "not implicate New Jersey's interest in deterrence."). Fourth, German substantive law, as opposed to New Jersey substantive law, governs the instant claims.[69] Fifth, as shown *infra,* the Ger-

---

**69.** The parties concede that Germany's, not New Jersey's, substantive law controls. Furthermore, the governmental interest standard requires application of the substantive law of

the jurisdiction with the greatest interest in resolving the particular issue raised in the litigation. *See Gantes* 145 N.J. at 484, 679 A.2d 106; *Veazey,* 103 N.J. at 248, 510 A.2d

man statute of limitations had expired by the time Iwanowa filed the instant action.[70]

The parties concede that Germany's, not New Jersey's, statute of limitations applies to Iwanowa's claims under German law. However, the parties disagree as to the applicable German statute of limitations for forced labor claims.

### C. GERMAN STATUTE OF LIMITATIONS FOR FORCED LABOR CLAIMS

Defendants contend that German Civil Code ("*Burgerliches Gesetzbuch*" or "BGB") section 196(1)(9)'s two year statute of limitations applies to forced labor claims.[71] Iwanowa concedes that BGB section 196(1)(9) governs claims for wages, but argues that BGB section 195's thirty-year limitations period[72] governs unjust enrichment claims. Alternatively, Iwanowa argues that pursuant to BGB section 819(1)[73], no limitations period exists for

unjust enrichment claims arising out of particularly egregious behavior.

The parties agree that BGB section 852(1)'s three-year limitations period governs tort claims for cruel treatment and inhuman conditions.[74] However, Iwanowa argues that BGB section 852(3)[75], which provides that property acquired wrongfully must be returned even after the limitations period has run, applies in this case. Specifically, Iwanowa argues that because Defendants wrongfully obtained her property (her labor), and because she is requesting the return of that property, German law imposes no limitations period.

### 1. *Bartl v. Heinkel*

In 1967, the German Supreme Court denied a German national's forced labor claims as time-barred. *See Bartl v. Heinkel*, BGHZ [Supreme Court] 48, 125 (1967) (F.R.G.) ["*Bartl*, BGH (1967)"]. Because *Bartl* is factually similar to the case,

---

1187. Since Iwanowa's forced labor claims did not arise in New Jersey and the parties are not New Jersey residents, New Jersey does not possess an interest in having its law apply in this litigation.

70. Although expiration of the foreign statute of limitations is a requirement under *Heavner*, some courts have rejected a mechanical rule where the foreign statute of limitations will only be applied if it has expired by the time the action is brought in a New Jersey court. *See Westinghouse*, 774 F.Supp. at 1448–49. Hence, courts have borrowed the foreign statute of limitations in cases where the foreign limitations period was longer than the New Jersey statute so long as the balancing of the other *Heavner* factors favors borrowing the foreign statute. *See id.* (holding that the longer Philippine statute of limitations, rather than New Jersey's statute of limitations, applied where the action arose in the Philippines, the plaintiff was the Republic of the Philippines and Philippine substantive law governed).

71. BGB section 196(1)(9) provides:
§ 196. [Two-year period of prescription] (1) The following claims prescribe in two years:
\* \* \* \* \* \*
9. Claims of workmen—journeymen, assistants, apprentices, factory workers—day

laborers and manual laborers, for the wages and other allowances agreed upon in lieu of or as part of the wages, including disbursements....

72. BGB section 195 provides that "[t]he regular period of prescription is thirty years."

73. BGB section 819(1) provides:
If the recipient knows of the absence of a legal ground at the time of the receipt, or if he subsequently learns of it, he is bound to return from the time of receipt or of acquisition of the knowledge as if an action on the claim for return were pending at the time.

74. Section 852(1) of the BGB provides:
The claim for compensation for any damage arising from a delict is barred by prescription in three years from the time at which the injured party obtained knowledge of the injury and of the identity of the person liable to make compensation....

75. Section 852(3) of the BGB provides:
If the person liable has acquired anything by delict at the expense of the injured party, he is, even after the running of the period of prescription, bound to return it under the provisions relating to the return of unjust enrichment.

*sub judice,* a detailed discussion of its facts, procedural history and holding is appropriate.

During World War II, the Nazis shipped Dr. Edmund Bartl ("Dr.Bartl"), a German lawyer, to a concentration camp outside of Berlin.[76] *See id.* at 125. A nearby aircraft factory leased the camp inmates, including Dr. Bartl, to work as forced laborers. *See id.* The aircraft factory paid the Nazi regime a monthly fee for the forced laborers, but did not pay the laborers for their work. *See id.* In 1959, fourteen (14) years after the end of the war, Dr. Bartl became aware that the aircraft factory where he worked as a forced laborer was a subsidiary of defendant Ernst Heinkel, A.G. ("Heinkel"). *See id.* Consequently, Dr. Bartl brought suit against Heinkel alleging that he had been forced to work under inhuman conditions with inadequate food, medical care or shelter, and that the aircraft factory's inmate employees subjected him to constant physical abuse. *See id.* He also alleged that Heinkel's directors could have altered the inhuman conditions, but instead, they encouraged the abuse of camp inmates. *See id.* Dr. Bartl sued for loss of wages and for the pain and suffering that he endured. *See id.* Heinkel argued that Dr. Bartl's claims were time-barred. *See id.*

Although BGB section 852(1)'s three year statute of limitations governs tort claims, the District Court found that Dr. Bartl's claims were timely pursuant to section 852(3) because "the defendant through its participation in the deprivation of liberty and the exploitation of the labor of the plaintiff had committed a prohibited act and was enriched by it." *Id.* at 133. Section 852(3) provides that pursuant to the provisions relating to unjust enrichment[77], a person who unlawfully obtained something belonging to another, must return it even after the statute of limitations has run on the underlying claim. *See supra* n. 75.

The Court of Appeals affirmed on other grounds. Specifically, the Court of Appeals found that although BGB section 196(1)(9)'s two year statute of limitations governed claims for wages, forced labor claims were not in the same category as claims for wages, and thus, section 195's thirty year limitations period governed Dr. Bartl's claim. *Id.* at 128. The Court of Appeals reasoned that section 196(1)(9)'s short limitations period was intended to apply to "transactions of daily life". *Id.* The Court of Appeals concluded, however, that forced labor claims were distinguishable from such transactions because there was no risk that "actual facts [would] become clouded by the passage of time and that the debtor [would] be sued on account of amounts which [had] already been paid." *Id.*

The German Supreme Court reversed and dismissed Dr. Bartl's claims as time-barred under BGB section 196(1)(9).[78] *See id.* at 127. The German Supreme Court

---

**76.** It appears that Dr. Bartl opposed the Nazi regime.

**77.** BGB sections 812 *et seq.* address claims for unjust enrichment.

**78.** The German Supreme Court had previously addressed whether concentration camp laborers could assert valid claims against their employers. *See Staucher,* BGH (1963) (dismissing claims of Polish national); BGH (1964) (dismissing claim of U.S. national). However, those cases involved non-German nationals. As stated in *supra* Part II.B.2.e, the German Supreme Court has repeatedly held that forced labor claims are reparations claims, and that companies using forced la-

borers during World War II were acting as agents of the Reich. *See Staucher,* BGH (1963), at 5; BGH (1964), at 3. Thus, in each of those cases, the Court dismissed the forced labor claims as "premature" and "unjustified at this time" based on the London Debt Agreement's deferral provisions. *See Staucher,* BGH (1963), at 12–13; BGH (1964), at 4. However, the London Debt Agreement's deferral provisions (Article 5) only apply to claims brought by foreign nationals against the German government or its agencies. Article 5 does not apply to claims brought by German nationals. Since Dr. Bartl was a German national, the London Debt Agreement did not defer consideration of, or toll, his forced labor claims.

rejected the Court of Appeals' attempt to distinguish forced labor claims from ordinary claims for wages, and held that, in determining the applicable limitations period, forced labor claims should not be treated differently than ordinary claims for wages. *See id.* The German Supreme Court ruled that regardless of whether the legislature intended section 196(1)(9) to apply to transactions of day life, courts do not have the discretion to require that each case involve "a transaction of daily life of insignificant scope." *Id.* at 128. The German Supreme Court found that section 196(1)(9)'s drafters had "made a fundamental regulation through establishing objective fact situations which must be complied with even if the motives which led to the creation of [section 196(1)(9) ] are not relevant." *Id.* The Court further held that "even rights of significant scope" are time-barred if they fall within a fact situation covered by section 196(1)(9). *Id.* "Any other interpretation [of section 196(1)(9) ], which depends on the special circumstances, would result in far reaching uncertainty of the law, which would hardly be tolerable in economic life." *Id.*

The German Supreme Court further found that the Court of Appeals' attempt to distinguish forced labor claims from ordinary wage claims lacked factual accuracy. *See id.* The Court of Appeals had reasoned that forced labor claims and ordinary wage claims were dissimilar because with forced labor claims, there was no risk that the passage of time would color witnesses' memories. *See id.* The German Supreme Court rejected this argument and held that "evidential difficulties, which of necessity increase with the length of time which has passed, can be recognized particularly clearly here." *Id.* at 129. The Court found that

> [w]hat is critical is not just whether or not the plaintiff received his compensation. On the contrary, it would also have to be determined how long he worked and what work he did. That could only be presented by witnesses; if they could be obtained at all, it would have to be feared that their memories would be greatly impaired after such a long time.

*Id.* Based on this analysis, the German Supreme Court held that a two year statute of limitations governed forced labor claims brought by former concentration camp inmates.

Iwanowa asserts that although modern German courts would apply BGB section 196(1)(9)'s two year limitations period to claims for wages, the courts would apply section 195's thirty year limitations period to claims for disgorgement of unjust profits deriving from forced labor. Iwanowa attempts to distinguish *Bartl* from the instant case by noting that *Bartl* involved a claim for wages. Iwanowa argues that Dr. Bartl committed a critical pleading error by characterizing his claim as one for mathematically computed wages, thereby triggering section 196(1)(9)'s two year statute of limitations. Iwanowa contends that BGB section 195, not section 196(1)(9), applies to her claims because she seeks not merely wages, but also equitable disgorgement of all unjust profits flowing to Defendants from forced labor. Iwanowa's attempt to distinguish her claim, and those of the potential class, from those in *Bartl* must fail.

As stated above, the Court of Appeals applied BGB section 195's thirty year statute of limitations to Dr. Bartl's claims. *See id.* at 128. The German Supreme Court rejected the Court of Appeals' application of section 195. *Id.* at 127. In fact, it explicitly stated that section 196(1)(9)'s two year limitations period applied to all claims arising out of a working relationship, including claims for unjust enrichment. *Id.* A claim seeking disgorgement of unjustly obtained profits is a claim for restitution sounding in unjust enrichment. Although the German Supreme Court noted that Dr. Bartl's employment was involuntary, and that Dr. Bartl was not asserting a breach of contract claim, it held that

[t]he short statute of limitations of [BGB section 196(1)(9) ] ... is not conditioned upon any contractual basis. Instead it comprehends all claims for compensation which are derived from the actual rendering of work. To this extent, determinative alone are the actual relationships and nature of the interests involved, which do not change on the basis of the claim being derived from a de facto employment relationship, on voluntary agency [or] unjustified enrichment.... This is based on the unchanged line of case law of the Supreme Court of the German Reich, the [Supreme Court of the F.R.G.] and of the Federal Labor Court. There is no cause to deviate from this.

*Id.* (citations omitted).

The German Supreme Court further held that the District Court's application of section 852(3) to Dr. Bartl's tort claims was erroneous. Although section 852(1)'s three year limitations for tort claims had expired, the District Court held that section 852(3) [79] governed Dr. Bartl's claim because Heinkel had been unjustly enriched by its unlawful exploitation of Dr. Bartl's labor. *See id.* at 133. The German Supreme Court disagreed and held that "[t]he degree to which the damage relevant to the fact situation of a prohibited act can be proved is of no consequence, for a claim derived from [BGB section 852(3) ] would also be barred due to the running of the statute of limitations." *Id.* The German Supreme Court held that section 852(3) did not apply to forced labor claims,

and instead section 196(1)(9)'s limitations period was "also controlling to [that] extent for unjust enrichment." *Id.* In short, by applying section 196(1)(9)'s and section 852(1)'s short limitations period to Dr. Bartl's forced labor claims, the German Supreme Court explicitly rejected the arguments Iwanowa seeks to make—that either a thirty year or an unlimited limitations period applies to forced labor claims.[80]

Iwanowa claims that more recent German Supreme Court decisions have treated the limitations period for slave labor claims as an open question. *See* BGH (1973). However, the Supreme Court merely stated that since Article 5(2) of the London Debt Agreement precluded the assertion of forced labor claims by non-German nationals until the final settlement of the problem of reparations, it was "not necessary to determine ... whether the statute of limitations [had] run." *Id.* at 12–13. The German Supreme Court refused to address whether forced labor claims were time-barred because it was able to dispose of the claims by reference to Article 5(2) of the London Debt Agreement. Thus, the German Supreme Court's 1973 decision does not provide any guidance as to the applicable statute of limitations.

Conversely, the German Supreme Court in *Bartl* explicitly held that section 196(1)(9)'s two year statute of limitations applied to forced labor claims for unjust enrichment, and section 852(1)'s three year

---

79. BGB section 852(3) provides that one who wrongfully obtains another's property, must return such property to its owner even after the statute of limitations on the underlying claim has expired. *See supra* n. 74 (quoting BGB § 852(3)).

80. Iwanowa cites to two cases, *see* BGH [Supreme Court], III ZR 239/84 (1986) (F.R.G.); BGH [Supreme Court], X ZR 19/76 (1978) (F.R.G.), in support of her argument that this Court should reject the *Bartl* Court's application of BGB section 852(1)'s three year limitations period for tort claims, and instead, apply section 852(3). Those cases are factually

dissimilar from the instant case. The first case involved a claim for restitution of income tax payments, and the second involved a claim for recovery of profits unlawfully obtained in a patent infringement dispute. *See id.* In contrast, *Bartl*, BGH (1967) and LG Bremen (1998), applied section 852(1)'s three year limitations period to forced labor claims, the same claims at issue in the case, *sub judice.* Furthermore, the *Bartl* Court explicitly considered and rejected the application of section 852(3). Since *Bartl* is good law, and is factually similar to the instant case, this Court shall follow *Bartl* and its reasoning.

limitations period applied to tort claims for mistreatment. In addition, the decisions upon which Iwanowa relies in support of her claim, *Krakauer I* and LG Bremen (1998), noted that the plaintiffs filed their claims within section 852(1)'s three year limitations period.[81] *See Krakauer I*, LG Bonn (1997), at 46; LG Bremen (1998), at 12–13. Consequently, this Court finds that BGB sections 196(1)(9) and 852(1) apply to Iwanowa's claims for restitution/unjust enrichment and inhuman treatment, respectively.[82]

### 2. *Section 819(1)*

In the alternative, Iwanowa argues that pursuant to BGB section 819(1), there is no statute of limitations for unjust enrichment claims arising out of particularly egregious behavior.

BGB section 812(1) provides that "[a] person who, through an act performed by another, or in any other manner, acquires something at the expense of the latter without any legal ground, is bound to return it to him". Section 819(1) provides

81. Both District Courts held that the statute of limitations was tolled until March 15, 1991, the operative date of the Two–Plus–Four Treaty. The plaintiff in LG Bremen (1998) filed his complaint on July 18, 1991. The plaintiff in *Krakauer I*, LG Bonn (1997) filed his complaint on April 3, 1992.

82. Iwanowa argues that *Bartl* has been heavily criticized and that modern German courts would not follow *Bartl*. In support of this argument, Iwanowa cites to a German treatise rejecting *Bartl*'s application of a two year limitations period to forced labor claims. *See* I J. von Staudinger, *Commentary to the German Civil Code with Introductory Law and Other Laws* §§ 164–240, §§ 196(1)(8), (9) (Norbert Haberman, ed., Sellier—de Gruyter, Berlin 13th ed.1995). Treatises are oftentimes persuasive when there is no case law authoritatively speaking on a particular issue. However, as recently as 1988, the German Supreme Court cited *Bartl* for the proposition that BGB section 196's two year limitations period applied "not only to claims for performance but also, under certain conditions, to other contractual and non-contractual claims, such as claims based on ... unjust enrichment." BGH [Supreme Court], IX ZR 203/87

that "[i]f the recipient knows of the absence of a legal ground at the time of receipt, or if he subsequently learns of it, he is bound to return from the time of receipt or of acquisition of the knowledge as if an action on the claim for return were pending at the time." Iwanowa asserts that Defendants knew since 1946, when the Nuremberg Tribunals prosecuted and convicted several industrialists for their abuse of slave laborers, that it was unlawful to keep the profits derived from the use of forced labor. Thus, Iwanowa argues that under sections 812(1) and 819(1), Defendants are bound to disgorge the profits derived from her forced labor as if an action on the claim for disgorgement had been pending since 1946. (*See* II Tr. at 61:2–64:8.)

Although Dr. Bartl did not explicitly raise BGB section 819, he did argue that there should not be any limitations period for defendant's actions. The German Supreme Court rejected his assertion that there is no limitations period for forced labor claims and held that "the circum-

(1988) (F.R.G.). Similarly in 1975, the German Supreme Court held that claims for unjust enrichment were subject to a two year limitations period based on the *Bartl* Court's decision that BGB section 196(1)(9) "covers all compensation claims derived from the actual performance of work." BGH [Supreme Court], VII ZR 69/74 (1975) (F.R.G.). Furthermore, Defendants have referred this Court to two commentaries on the BGB stating that section 196(1)(9)'s two year limitations period governs forced labor claims regardless of whether the claim is based on contract or unjust enrichment. *See* 7 Beck, *Short Commentary, Civil Code* §§ 196(1)(8), (9) (Dr. Peter Bassenge et al., eds., Verlag C.H. Beck München 1999) (citing *Bartl* for the proposition that section 196(1)(9)'s "short statute of limitations also applies to the remuneration claim relating to forced labor which was performed in a concentration camp."); 1 *Munich Commentary to the Civil Code* §§ 1–240, §§ 196(1)(8), (9) (Dr. Franz Jürgen Säcker, ed., C.H. Beck'sche Verlagsbuchhandlung München 1999) (citing *Bartl* and stating that section 196(1)(9)'s two year statute of limitations "also applies to wage claims of a concentration camp prisoner against the business operation in which he was forced to work.").

stances under which the prohibited act was committed do not ordinarily counter the defense of the statute of limitations having run: Even the most horrible criminal is ... not prevented under applicable law from countering the victim with the three-year statute of limitations." *Bartl*, BGH (1967), at 133–34 (citation omitted). The German Supreme Court further held

> [t]hat this valid right is irreconcilable with overriding principles of law cannot be recognized. The provisions concerning the statute of limitations comprise a formal regulation established in the interest of certainty of law and comprehend all cases under consideration. Changes in this direction could not be made by judge but, rather, only by the legislative body....

*Id.* at 134. This Court agrees that Germany's legislative body, not this Court, should determine whether to extend the statute of limitations for forced labor claims.

### 3. *Tolling of the Statute of Limitations*

█ As discussed in *supra* Part II.B.2.f, the Two–Plus–Four Treaty lifted the London Debt Agreement's moratorium on foreign nationals' forced labor claims against German companies. The Two–Plus–Four Treaty became effective on March 15, 1991. The statute of limitations on the claims under German law expired, at the latest, three years later. *See supra* Parts IV.C.1 & 2; *Bartl*, BGH (1967); BGB §§ 196(1)(9), 852(1). Because Iwanowa filed her Complaint on March 5, 1998, seven years after the enactment of the Two–Plus–Four Treaty, Defendants' motion to dismiss Iwanowa's claims under German law as time-barred is granted.[83]

---

**83.** Even if Iwanowa's claims under German law were timely, they would nevertheless be dismissed for failure to state a claim. Although two District Courts *Krakauer I*, LG Bonn (1997) and LG Bremen (1998) allowed forced labor claims against the F.R.G., those decisions are not persuasive because (1) *Krakauer I* has been reversed and (2) as discussed *infra*, two recent decisions from the Courts of Appeals have rejected forced labor claims. *See* OVG Müenster (1998); *Krakaeur II*, OLG Cologne (1998).

Before deciding *Krakauer I*, the District Court of Bonn certified to the Federal Constitutional Court the question of whether international law precluded an individual from bringing forced labor claims against Germany under German law. The Federal Constitutional Court refused to address the question as procedurally impermissible because the *Krakauer I* Court's submission order did not expressly indicate that the outcome of the case before it depended on the Federal Constitutional Court's ruling on the question presented. *See* BVerfG (1996), at 12. However, in *obiter dictum*, the Federal Constitutional Court stated that remedies under international law are not exclusive, and as such, international law does not bar an individual plaintiff from asserting forced labor claims under German law. *Id.* at 22. The Federal Constitutional Court further stated that a nation that has violated international law may choose to compensate the injured parties pursuant to its own domestic law. *Id.*

In 1997, the Administrative Court of Appeals in Müenster concluded that German law does not provide a cause of action for Nazi era forced labor. *See* OVG Müenster (1998), at 8. Specifically, in dismissing forced labor claims against the German government and various private companies, the Administrative Court of Appeals, held that "[p]laintiffs have no right to compensation for the forced labor which their legal predecessor performed during prisoner of war captivity in the German Reich during the years 1940–1945." *Id.* at 8.

The Administrative Court of Appeals rejected plaintiffs' claims for unjust enrichment under German law on the grounds that plaintiffs' damages were the result of war and were thus compensable, if at all, under international law. *Id.* at 23. *There is no claim on the part of the injured party against [Germany] under domestic [German] law.* "In the event of war, individual protection by the—respective—state legal system is replaced by international law". *Id.* (emphasis added). The Court further stated:

> The result is no different with respect to the work which the Plaintiffs' legal predecessor performed for private companies. In such cases, a contractual relationship generally was established between the German Reich and the respective company, which paid compensation to the German Reich for the labor of "loaned" prisoners of war. However, the relationship between the German Reich and the prisoner of war remained exclusively characterized by international law relating to war.

## V. NONJUSTICIABILITY

Defendants have moved to dismiss the Complaint on the ground that Plaintiff's claims are nonjusticiable. This Court has dismissed Iwanowa's claims under U.S. law and German law as time-barred. This Court has also dismissed Iwanowa's claims under international law on the ground that the London Debt Agreement intended that Nazi era forced laborers pursue their claims by way of go vernment-to-government negotiations, not through individual litigation in multiple fora. This Court is also compelled to dismiss Iwanowa's claims on the ground that forced labor claims arising out of World War II raise nonjusticiable political questions.

### A. POLITICAL QUESTION

The political question doctrine holds that a federal court having jurisdiction over a dispute should decline to adjudicate it on the ground that the case raises questions which should be addressed by the political branches of government. *See Baker v. Carr,* 369 U.S. 186, 210, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); *Atlee v. Laird,* 347 F.Supp. 689, 701 (E.D.Pa.1972) (noting that "even though a dispute may constitutionally be subject to the judicial power, if a political question is present, a federal court should decline to address the merits."), *aff'd sub. nom. Atlee v. Richardson,* 411 U.S. 911, 93 S.Ct. 1545, 36 L.Ed.2d 304 (1973); *see also Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 164–66, 2 L.Ed. 60 (1803) ("Questions, in their nature political . . . can never be made in this court."). The political question doctrine does not find its roots in the Constitution, but rather is based on "pragmatic considerations, based on the separation of powers concept and our system of checks and balances." *Atlee,* 347 F.Supp. at 701; *see also Baker,* 369 U.S. at 210, 82 S.Ct. 691 (holding that "[t]he nonjusticiability of a political question is primarily a function of the separation of powers."); *Powell v. McCormack,* 395 U.S. 486, 516–17, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969) (stating that a "political question" is one "which is not justiciable in federal court because of the separation of powers provided by the Constitution."). Indeed, the text of the judiciary clause, Article III of the Constitution, does not explicitly authorize federal courts to decline to resolve cases involving political questions. U.S. Const. art. III, § 2. Thus, unlike constitutional "restriction[s] on judicial power, the political question doctrine limits the exercise, not the exis-

*Id.* at 25 (emphasis added). In sum, the Administrative Court of Appeals rejected the claims that Iwanowa seeks to assert—claims sounding in unjust enrichment against private corporations for the forced labor she performed during World War II.

The Administrative Court of Appeals also rejected plaintiffs' claims under BGB section 812. As stated in *supra,* Part IV.C.2, BGB section 812 provides that "[a] person who, through an act performed by another, or in any other manner, acquires something at the expense of the latter without any legal ground, is bound to return it to him". In dismissing plaintiffs' claims, the Administrative Court of Appeals held that:

the Plaintiffs cannot claim compensation for forced labor on the basis of a public law restitution claim by analogy to § 812 of the Civil Code. Even if their legal predecessor was used to perform severe physical labor . . . the custody state—as explained—must assume sole responsibility for this under the rules of international law. No direct claim

on the part of the injured party against the custody state exists.

OVG Münster (1998), at 25.

Similarly, in its opinion reversing *Krakauer I,* the Court of Appeals of Cologne stated that it cannot be concluded from Article 5(2) of the London Debt Agreement that compensation exists under German law for forced labor claims. *See Krakauer II,* OLG Cologne (1998), at 35. Specifically, the Court of Appeals of Cologne noted that the language of the London Debt Agreement that "a review of the claims arising from the Second World War is postponed" does not assume that such a claim for forced labor exists under German law. *Id.* The Court further stated that it was certainly not the London Debt Agreement's intent to establish such a claim. *Id.* As such, the Court reasoned, it was "not possible to infer from the Two–Plus–Four Treaty that the compensation claims of victims of Nationalist Socialist persecution were revived upon the conclusion of the [Two–Plus–Four] Treaty." *Id.*

tence, of federal judicial power." *Atlee,* 347 F.Supp. at 701.

The political question doctrine has its genesis not only in the concept of the separation of powers, "but also of the limitation of the judiciary as a judicial body." *Occidental of Umm al Qaywayn, Inc. v. A Certain Cargo of Petroleum,* 577 F.2d 1196, 1203 (5th Cir.1978) (citing *Coleman v. Miller,* 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385 (1939)). The Supreme Court has held that in determining whether an issue constitutes a political question, courts must consider "the appropriateness under our system of government of attributing finality to the action of the political departments and also the lack of satisfactory criteria for a judicial determination." *Coleman,* 307 U.S. at 454, 59 S.Ct. 972. As one court has stated, the Supreme Court does not consist of "tribal wisemen dispensing divinely or theoretically inspired judgments, but [of] a court limited to the application of predetermined law." *Occidental of Umm,* 577 F.2d at 1203.

▮ The political question doctrine distinguishes between cases encompassing foreign relations and those addressing purely domestic issues. *See United States v. Curtiss–Wright Export Corp.,* 299 U.S. 304, 320, 57 S.Ct. 216, 81 L.Ed. 255 (1936); *Oetjen v. Central Leather Co.,* 246 U.S. 297, 302, 38 S.Ct. 309, 62 L.Ed. 726 (1918); *Atlee,* 347 F.Supp. at 696. The Supreme Court has declared that

> [t]he conduct of the foreign relations of our Government is committed by the Constitution to the executive and the legislative—'the political' departments of the government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision.

*Oetjen,* 246 U.S. at 302, 38 S.Ct. 309. The President is "the sole organ of the federal government in the field of international relations." *Curtiss–Wright,* 299 U.S. at 320, 57 S.Ct. 216. Thus, the most appropriate case for applicability of the political question doctrine concerns the conduct of

foreign affairs. *See Baker,* 369 U.S. at 211, 82 S.Ct. 691. Indeed, the Supreme Court has warned courts against intruding in matters involving foreign relations. *See Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.,* 333 U.S. 103, 111, 68 S.Ct. 431, 92 L.Ed. 568 (1948). The Supreme Court reasoned that

> [t]he very nature of executive decisions as to foreign policy is political, not judicial. Such decisions are wholly confided by our Constitution to the political departments of the government, Executive and Legislative. They are delicate, complex, and involve large elements of prophecy. They are and should only be undertaken by those directly responsible to the people whose welfare they advance or peril. They are decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility and which has long been held to belong in the domain of political power not subject to judicial intrusion or inquiry.

*Id.* In sum, courts should restrain from adjudicating questions of foreign policy for the following reasons: (1) the relevant materials in a case involving foreign policy will likely come from a multitude of sources, including U.S. and foreign sources, which might be voluminous and thus, potentially unmanageable for individual courts to handle; (2) there is a distinct possibility that the parties might not be able to compile all of the relevant information, thus making any attempt to justify a ruling on the merits of an issue that will affect the nation, difficult and imprudent; (3) courts cannot predict the international consequences flowing from a decision on the merits; (4) there might not be any standards for courts to apply in issuing a decision on the merits; and (5) courts addressing questions of foreign policy are faced with the task of reviewing initial determinations made by the political branches of government, determinations which are constitutionally committed to those branches. *See Atlee,* 347 F.Supp. at 702 (citing *Chicago & S. Air Lines,* 333

U.S. at 111–13, 68 S.Ct. 431; *Oetjen*, 246 U.S. at 304, 38 S.Ct. 309).

■ However, not every case involving foreign affairs or foreign relations raises a political question. *See Baker*, 369 U.S. at 211, 82 S.Ct. 691. In determining whether a matter raises political questions which the court must decline to address, courts must examine the following factors: (1) a demonstrable constitutional commitment of the issue to a coordinate political department; or (2) the lack of judicially discoverable and manageable standards for resolving it; or (3) the impossibility of making a decision without first making a policy determination of the type clearly outside judicial discretion; or (4) the court's inability to resolve the issue without expressing lack of respect to the coordinate branches of government; or (5) an unusual need for unquestioning adherence to a political decision already made; or (6) the potential for embarrassment from multifarious pronouncements by various departments on one question. *See Baker*, 369 U.S. at 217, 82 S.Ct. 691. If any one of these factors "is inextricable from the case", the Court should dismiss the case as nonjusticiable because it involves a political question. *See id.* For the reasons stated below, this Court finds that at least four of the *Baker* factors are inextricable from Iwanowa's claims and, therefore, Iwanowa's forced labor claims raise nonjusticiable political questions.

**1. Constitutional Commitment of Issue to Another Branch**

■ As stated above, the Constitution relegates issues involving foreign policy to the political departments of the government—the executive branch and the legislative branch. *See Oetjen*, 246 U.S. at 302, 38 S.Ct. 309. As an issue affecting U.S. relations with the international community, war reparations fall within the domain of the political branches and are not subject to judicial review. *Id.*

The executive branch has always addressed claims for reparations as claims between governments.[84] Historically, at the end of a war, there has always been a declaration of victorious nations and defeated nations. As part of that process, the victorious nations invariably discuss the reparations that the defeated nations must pay to compensate the prevailing countries and their nationals for the loss that the aggressor country has caused. The nature of war is such that the governments of the victorious nations determine and negotiate the resolution of the claims of their nationals by way of agreements between the nations involved or affected by the war. This is evident from the reparations provisions in the Treaty of Versailles following World War I, and the discussion of reparations in the Yalta Conference, the Potsdam Conference and the Paris Reparations Treaty at the end of World War II. More recently, at the end of the Gulf War, the United Nations established an international claims resolution tribunal to resolve claims against Iraq. *See* Elyse J. Garmise, *The Iraqi Claims Process and the Ghost of Versailles*, 67 N.Y.U.L.Rev. 840, 841 (1992). Thus, it is evident that responsibility for resolving forced labor claims arising out of a war is constitutionally committed to the political branches of government, not the judiciary.

---

**84.** Iwanowa argues that she is not asserting claims for reparations but rather, for restitution of unjust enrichment. However, both the German Supreme Court and the German Federal Government have held that forced labor claims are reparations claims. *See Staucher*, BGH (1963), at 2; BGH (1964), at 3; U.S. Dep't of State, *German Compensation for National Socialist Crimes*, Appendix I, § IV (visited Sept. 1, 1999) <http://www.state.gov/www/regions/eur/germa-ny/compensation-for-victims.html> (stating that "Germany considers forced labor claims to be reparations claims"); (Letter from German Ministerial Director Horst Teltschik to Chancellor Helmut Kohl of 3/15/90, at 1) (stating that "the concept of reparations claims encompasses all international law claims for compensation related to war [including] individual claims by injured citizens of victorious powers.").

## 2. *Lack of Respect to the Coordinate Branches of Government*

The executive branch has always taken the position that claims arising out of World War II must be resolved through government-to-government negotiations. Thus, allowing private litigation of war-related claims would express a lack of respect for the executive branch.

In 1953, the executive branch declared that "reparation and other governmental claims relating to World Wars I and II should more appropriately be dealt with in the context of a peace treaty or similar arrangement." *See Letter from Secretary of State John Foster Dulles to President Eisenhower of April 4, 1953*, 83d Cong., 1st Sess. 205 (1953) (summarizing the purpose of Article 5(2) of the London Debt Agreement). However, as shown *supra*, Germany was divided into two nations until 1991. Hence, "a peace treaty or similar arrangement" was not feasible at the "time in view of existing world political conditions." *Id.* Although Germany never entered into a formal peace treaty with the Allies,[85] it has entered into multiple bilateral treaties providing compensation for victims of Nazi persecution.[86] In fact, in 1993, Germany entered into a multilateral agreement with three of the successor states to the U.S.S.R., Belarus, the Russian Federation and Ukraine, whereby Germany agreed to contribute DM 1 billion for the individual compensation of Nazi victims. *See* Exchange of Notes, Mar. 30, 1993, F.R.G.–Uk.–Bela.–Rus.; *see also Compensation for Holocaust Victims* (visited Sept. 1, 1999) available at <http://www. bundesregierung. de>.

Thus, it is evident that the executive branch, the department responsible for negotiating international agreements, considers claims arising out of World War II as falling within the ambit of government-to-government negotiations. The interpretations of the parties to a treaty, while not binding, are entitled to significant weight. *See Kolovrat v. Oregon*, 366 U.S. 187, 194, 81 S.Ct. 922, 6 L.Ed.2d 218 (1961) ("While courts interpret treaties for themselves, the meaning given them by the departments of the government particularly charged with their negotiation and enforcement is given great weight."); *Sullivan v. Kidd*, 254 U.S. 433, 442, 41 S.Ct. 158, 65 L.Ed. 344 (1921) ("the construction placed upon [a] treaty . . . and consistently adhered to by the Executive Department of the Government charged with the supervision of our foreign relations, should be given great weight."); *Charlton v. Kelly*, 229 U.S. 447, 468, 33 S.Ct. 945, 57 L.Ed. 1274 (1913) (stating that construction of treaty by political department of government, while not conclusive, is nevertheless of much weight); *Ahmad v. Wigen*, 726 F.Supp. 389, 402 (E.D.N.Y.1989) ("The State Department's view deserves deference, unless it represents a substantial departure from national or international norms."), *aff'd*, 910 F.2d 1063 (2d Cir. 1990); *Demjanjuk v. Petrovsky*, 776 F.2d 571, 579 (6th Cir.1985) (stating that an executive department's "logical reading" of a treaty "is entitled to considerable deference."), *vacated on other grounds*, 10 F.3d 338 (6th Cir.1993).

In its 1996 summary of compensation programs available to Nazi victims, the

**85.** There has never been a peace treaty with Germany to conclude World War II as there was with Japan because such a treaty would have had to include a unified Germany. *See Legal Issues Relating to Future Status of Germany: Hearing Before the Senate Comm. on Foreign Relations*, 101st Cong. 1 (1990) (statement of Sen. Jesse Helms).

**86.** Before the reunification of Germany, the F.R.G. entered into treaties with the following nations, *inter alia*, to compensate victims of

Nazi persecution: Luxembourg on July 11, 1959 for DM 18 million; Norway on August 7, 1959 for DM 60 million; Greece on March 18, 1960 for DM 115 million; the Netherlands on April 8, 1960 for DM 125 million; France on July 15, 1960 for DM 400 million; Belgium on September 28, 1960 for DM 80 million; Austria on November 27, 1961 for DM 101 million; and the U.K. on June 9, 1964 for DM 11 million. *See Krakauer II*, OLG Cologne (1998), at 33 (listing treaties).

U.S. Department of State announced that "Germany considers forced labor claims to be reparations claims arising from the actions of the German military forces during the Second World War." U.S. Dep't of State, *German Compensation for National Socialist Crimes,* Appendix I, § IV (visited Sept. 1, 1999) <http://www.state.gov/www/regions/eur/germany/compensation_for_victims. html>.[87] The executive department repeated that "[r]eparations claims are to be addressed at the state-to-state level". *Id.* In addition, the U.S. Department of State indicated that the U.S. can only pursue the individual claims of persons who were U.S. citizens during World War II. *See id.* Other nationals must resolve their claims under the domestic procedures of the country of which they were a national at the time their claim arose. *See id.*[88] Thus, Iwanowa, a Soviet citizen during World War II, must press her claims through the successor states of the former U.S.S.R.

The executive branch's commitment to resolving individual claims arising out of World War II through government-to-government negotiations is also evident in examining the negotiations leading up to the Two–Plus–Four Treaty in 1990. In his letter transmitting the Two–Plus–Four Treaty to the Senate, President George Bush noted that some United States citizens and Jewish victims of the Nazi regime had outstanding reparations claims against the G.D.R. *See Letters Transmitting Treaty on the Final Settlement With Respect to Germany to the U.S. Senate,* 30 I.L.M. 570, at 2 (1991). President Bush wrote that the government of the newly unified Germany had promised that "shortly after reunification, [it would] resolve through negotiations with the United States government, the claims of United States nationals that were previously under discussion with the German Democratic Republic." *Id.* Nothing in President Bush's message, or in the text of the Two–Plus–Four Treaty, suggested that courts would be handling forced labor claims in lieu of the government-to-government negotiations. Indeed, if civil litigation were the preferred, or even contemplated, avenue for resolution of such claims, the resulting government-to-government negotiations could have, and would have, plainly provided for such a potentiality.

Courts may not pass judgment upon the political negotiations of the executive branch and the international community. Such intrusion into the realm of foreign policy would undermine the executive branch's sole discretion in the field of international relations. *See Curtiss–Wright,* 299 U.S. at 320, 57 S.Ct. 216.

### 3. Potential for Embarrassment from Multifarious Pronouncements by Various Departments

For the reasons stated in the preceding section, this Court's resolution of individual forced labor claims would inevitably embarrass and undermine our executive branch's authority in foreign affairs. In addition, although this Court is not bound by the decisions of other circuits, it is noteworthy that the only other U.S. courts that have addressed forced labor claims have dismissed them as nonjusticiable.

In 1966, the Court of Appeals for the District of Columbia held that forced labor claims arising out of World War II did not fall "within the established scope of judi-

---

**87.** As noted in *supra* note 83, this view is supported by the decisions of the German Supreme Court. *See Staucher,* BGH (1963), at 2 (holding that forced labor claims are reparations claims).

**88.** The Court of Appeals in *Krakauer II* also noted that Nazi era forced laborers were able to turn to their own country as their protector state with respect to their injuries. Their respective countries were able, in turn, to seek recourse against the German state by way of international reparation. As presented above, foreign states did in fact avail themselves of this opportunity.
OLG Cologne (1998), at 32.

cial authority." *Kelberine v. Societé International*, 363 F.2d 989, 995 (D.C.Cir. 1966). Although the *Kelberine* Court did not formally engage in an analysis of the *Baker* factors, the Court specifically noted that although the legislative or executive branches could enact a program to compensate former slave laborers, courts lacked the ability to provide such relief. *See id.*

More recently, in 1992, a former forced laborer, Hugo Princz, brought suit against the F.R.G. to recover money damages for the forced labor he performed during World War II. *See Princz v. Federal Republic of Germany*, 26 F.3d 1166 (D.C.Cir. 1994). The Court of Appeals for the District of Columbia dismissed on the ground that the F.R.G. was immune from suit pursuant to the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602–1611. *See id.* Subsequently, *Princz* brought suit against the private corporations that had compelled him to perform forced labor. On September, 18, 1995, the District Court for the District of Columbia approved a stipulation of dismissal which set forth as a basis for dismissal, that forced labor claims were to be resolved through government-to-government negotiations, rather than through litigation, based on the London Debt Agreement's reservation of such claims for government consideration. *See Princz v. BASF Group, et al.*, Civ. No. 92–0644, at 3 (D.D.C. Sept. 18, 1995).[89] The stipulation of dismissal further noted that eleven countries had resolved claims arising out of World War II via treaties with the F.R.G. *See id.* Shortly after the execution of the stipulation of dismissal, the U.S. government and the German Federal Government entered into an agreement providing that Germany would create a fund to compensate U.S. citizens who were subjected to forced labor during World War II. This agreement is known as the Princz Agreement. *See* Agreement Concerning Final Benefits to Certain United States Nationals Who Were Victims of National Socialist Measures of Persecution, Sept. 19, 1995, U.S–F.R.G., 35 I.L.M. 193; *see also German Compensation for National Socialist Crimes* (visited Sept. 1, 1999) <http://www.state.gov/www/regions/eur/ germany/compensation_for_victims.html>.

More importantly, this Court cannot sit as the ultimate judge of foreign policy issues falling outside the ambit of proper judicial review. As stated by the Federal Circuit in upholding President Ronald Reagan's extinguishment of any claims the Iran hostages may have had against Iran in exchange for their release:

> [t]he determination whether and upon what terms to settle the dispute with Iran over its holding of the hostages and obtain their release, necessarily was for the President to make in his foreign relations role. That determination was "of a kind clearly for nonjudicial discretion," and there are no "judicially discoverable and manageable standards" for reviewing such a Presidential decision. A judicial inquiry into whether the President could have extracted a more favorable settlement would seriously interfere with the President's ability to conduct foreign relations.

*Belk v. United States*, 858 F.2d 706, 710 (Fed.Cir.1988). Thus, adjudication of Nazi era forced labor claims when the executive branch has rejected the notion that such claims are justiciable, would embarrass the executive branch in the eyes of the international community.

### 4. *Lack of Judicially Discoverable and Manageable Standards*

More than thirty (30) years ago, the *Kelberine* Court dismissed forced labor claims on the ground that they "pos[ed] an insoluble problem if undertaken by courts

---

**89.** Of course, this Court is cognizant that an unpublished stipulation of dismissal lacks precedential value. However, since Princz's claims were similar to Iwanowa's claims, the reasoning behind the parties' agreement to dismiss Princz's forced labor claims is persuasive.

without legislative or executive guidance, authorization or support." 363 F.2d at 995. The *Kelberine* Court noted that

> the span between the doing of the damage and the application of the claimed assuagement is too vague. The time is too long. The identity of the alleged tortfeasors is too indefinite. The procedure sought—adjudication of some two hundred thousand claims for multifarious damages inflicted twenty to thirty years ago in an European area by a government then in power—is too complicated, too costly, to justify undertaking by a court without legislative provision of the means wherewith to proceed.

363 F.2d at 995.

Thirty-three years have passed since the *Kelberine* Court found that too much time had passed since defendants' infliction of injuries on slave laborers. Iwanowa now asks this Court to adjudicate the claims of thousands of persons who performed forced labor for Ford Werke between 1941 and 1945. The specter of adjudicating thousands of claims arising out of a war that took place more than fifty years ago amounts to a more daunting task for this Court to tackle than the *Kelberine* Court could have ever contemplated. First, the parties would have the task of identifying and notifying thousands of potential plaintiffs around the world. Second, this Court would have to analyze every treaty between the F.R.G. and/or the G.D.R., and the respective governments of each of the potential plaintiffs to determine whether those treaties subsumed individual claims or whether individual remedies had already been provided for in an intervening treaty. For example, if this Court were to certify a class which included, *inter alia*, Russian, Belarusian, Ukranian, French, Greek, Dutch and Austrian plaintiffs, this Court would have to examine each and every treaty between those nations and the F.R.G., between those nations and the G.D.R., and between those nations and a unified Germany, post–1991. Third, the relevant materials come from a multitude

of sources, which as evidenced by the instant motions, are voluminous and potentially unmanageable for individual courts to handle. *See Atlee*, 347 F.Supp. at 702. Fourth, when sources are scattered all over the world, it is unlikely that the parties will be able to gather all of the pertinent data. *See id.* A court cannot adjudicate claims that may potentially affect U.S. relations' with other nations without first obtaining all of the relevant materials. *See id.* Fifth, although not a strictly judicial consideration, the age of the class of the potential plaintiffs may raise unique challenges, particularly given their locations around the world. Thus, this Court finds the Kelberine Court's reasoning persuasive. Without guidance from the political branches of government, the courts are unable to manage and resolve forced labors claims arising out of actions that took place over fifty years ago, in a foreign nation, during wartime.

The preceding analysis of the *Baker* factors reveals that Iwanowa's forced labor claims raise nonjusticiable political questions. As such, Defendants' motion to dismiss the Complaint on the ground that Nazi era forced labor claims are nonjusticiable is granted.

## VI. *INTERNATIONAL COMITY*

 International comity also counsels that this Court abstain from hearing the instant claims. The principle of international comity mandates the "proper level of respect for the acts of our fellow sovereign nations." *Turner Entertainment Co. v. Degeto Film GmbH*, 25 F.3d 1512, 1518 (11th Cir.1994).

> 'Comity,' in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its Territory to the legislative, executive, or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its

own citizens or of other persons who are under the protection of its laws.

*Hilton v. Guyot*, 159 U.S. 113, 164–65, 16 S.Ct. 139, 40 L.Ed. 95 (1895); *see U.S. ex rel Saroop v. Garcia*, 109 F.3d 165, 169 (3d Cir.1997); *Philadelphia Gear Corp. v. Philadelphia Gear de Mexico, S.A.*, 44 F.3d 187, 191 (3d Cir.1994). International comity "is a nation's expression of understanding which demonstrates due regard both to international duty and convenience and to the rights of persons protected by its own laws." *Somportex Ltd. v. Philadelphia Chewing Gum Corp.*, 453 F.2d 435, 440 (3d Cir.1971). Such deference to the executive, legislative, and judicial acts of a foreign nation "fosters international cooperation and encourages reciprocity, thereby promoting predictability and stability through satisfaction of mutual expectations." *Spatola v. United States*, 925 F.2d 615, 618 (2d Cir.1991) (quoting *Laker Airways, Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 937 (D.C.Cir.1984)). The Third Circuit has stated that "[c]omity should be withheld only when its acceptance would be contrary or prejudicial to the interest of the nation called upon to give it effect." *Philadelphia Gear Corp.*, 44 F.3d at 191 (quoting *Somportex*, 453 F.2d at 440).

The German Federal Government has taken the position that foreign citizens may not assert direct claims for war-time forced labor against private companies. First, in a letter to Chancellor Helmut Kohl, the German Ministerial Director, Horst Teltschik, wrote that "[u]nder international law, the concept of reparations claims encompasses all international law claims for compensation related to war [including] individual claims by injured citizens of victorious powers." (Letter from Teltschik to Kohl of 3/15/90, at 1.) Second, in its report to the German Federal Diet (the German legislative body), the German Federal Government stated:

> To the extent that foreign forced laborers were obligated and employed during the Second World War, they cannot make direct claims applicable against the state waging war or its enterprises. Such claims cannot, according to generally acknowledged international law fundamentals, be made applicable by individual persons and also cannot be made applicable against individual persons or civil law legal persons but rather be made applicable from state to state as reparations claims. Civil law agreements between the affected states are required for regulating such claims. German private enterprises are therefore not able to be laid claim to by foreign forced laborers. German laws as well do not provide for such claims.

German Federal Government, *Comprehensive Report on Previous Restitution Payments by German Companies*, at 1 (June 3, 1996). Thus, according to the German Federal Government, Iwanowa may not assert forced labor claims against Ford Werke; such claims must be pursued by way of agreements between nations. *See id.* (stating that in the post-war years, Germany paid reparations to many nations and "[i]t was incumbent upon the recipient states to especially compensate those of their citizens who were especially damaged as a result of the events of the war.").

Although courts are not bound by a foreign government's pronouncement of which claims are cognizable, the principles of international comity dictate that a court not interfere with a foreign sovereign's pronouncement of its law. Furthermore, courts generally give great weight to a signatory nation's interpretation of a treaty. *See Kolovrat*, 366 U.S. at 194, 81 S.Ct. 922 (considering the position of the U.S. Department of State and the official view of the Ministry of Foreign Affairs of the Republic of Korea); *Matter of Extradition of Rabelbauer*, 638 F.Supp. 1085, 1087–88 (S.D.N.Y.1986) (finding that opinion of the Austrian Federal Ministry of Justice that a treaty provision was intended to encompass the defendant's conduct was entitled to great weight).

International comity dictates that this Court follow the pronouncements of the

German Federal Government as to individual claims. As such, this Court must also dismiss the instant claims on the ground that consideration of these claims violates principles of international comity.

### CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(1), for lack of subject matter jurisdiction, is denied. Defendants' motion to dismiss the claims against Ford, for violations of international law, pursuant to Federal Rule of Civil Procedure 12(b)(6), is granted on the ground that the claims are time-barred. Defendants' motion to dismiss the claims against Ford Werke, for violations of international law, is granted based on the London Debt Agreement's contemplation that individual claims against German companies would be pursued by way of government-to-government negotiations, not private litigation. Defendants' motion to dismiss the claims under German law and U.S. common law is granted on the ground that the claims are time-barred by the applicable statute of limitations. Finally, Defendants' motion to dismiss on the grounds of nonjusticiability and international comity is also granted.